0UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 20-cv-01153-PAB-KLM

(Consolidated with Civil Actions Nos. 20-cv-01340-RM-RNR; 20-cv-01518-NRN; 20-cv-01689-STV; 20-cv-01751-MEH; and 20-cv-01837-SKC)

In re: FRONTIER AIRLINES LITIGATION

---

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Nelcy Alexa Rivera-De Leon,  Stephanie Muters, Shirley Johnson, Jeffrey Bone, ChaCha Powell, Danielle Porreca, David Dickstein, and Kelli Capra (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Frontier Airlines, Inc. ("Defendant" or "Frontier"), through their attorneys, and allege as follows based on information and belief, except as to allegations specifically pertaining to Plaintiffs, which are made upon personal knowledge:

## INTRODUCTION

1.      The COVID-19 pandemic severely reduced the opportunity and ability to travel for many Americans, both financially and physically. Due to reduced flight demand, airlines, including Frontier, slashed flight schedules and cancelled thousands of flights, to avoid incurring losses caused by operating flights well-below maximum capacity.

2.      Frontier's contract of carriage ("Contract of Carriage"), attached hereto as **Exhibit A**, expressly and clearly provides that if Frontier cancels a flight, it shall "provide a refund for the unused portion of the passenger's ticket."[1]

3.      Despite its contractual obligation in its Contract of Carriage, Frontier refuses to issue monetary refunds to passengers whose flights it cancelled.

4.      The U.S. Department of Transportation ("DOT")—through regulations that Frontier expressly incorporated into its Contract of Carriage—has long required airlines like Frontier to issue refunds whenever they cancel flights. According to an enforcement notice issued by the DOT on April 3, 2020, carriers like Frontier have a "longstanding obligation . . . to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier."

5.      The "longstanding obligation" regarding refunds is set forth in the Code of Federal Regulations. Specifically, consumers are entitled to refunds whenever their carrier cancels their flight. 76 Fed. Reg. 23110-01, at 23129 (Apr. 25, 2011) ("Since at least the time of an Industry Letter of July 15, 1996 . . . the Department's Aviation Enforcement Office has advised carriers that refusing to refund a non-refundable fare when a flight is cancelled and the passenger wishes to cancel is a violation of 49 U.S.C. 41712 (unfair or deceptive practices) and would subject a carrier to enforcement action.").

---

[1] Frontier has represented that this version (Version 72) of the Contract of Carriage was in effect from October 25, 2019 until April 16, 2020.

6.      According to the DOT, this refund obligation applies regardless of whether the cancellation arises from circumstances beyond the carrier's control: "[t]he focus is not on whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger."

7.      The federal government bailed out the airline industry through the Coronavirus Aid, Relief, and Economic Security Act ("CARES"), providing approximately $58 billion in aid, including approximately $211 million to Frontier alone. But despite receiving over $200 million from taxpayers, Frontier decided to impose the consequences of the pandemic on its customers.

8.      Instead of fulfilling its obligations under federal law and honoring its passengers' contractual rights, Frontier has engaged in various schemes and contrivances to avoid its obligation to provide refunds.

9.      Frontier's goal has been to ensure that passengers only receive travel credits that expire in 90 days or limited travel vouchers rather than refunding any money for tickets for cancelled flights and trips never taken. Given the pandemic, for the vast majority of passengers, a 90-day travel credit was unusable and worthless. Frontier also drastically cut back on routes and flight capacity, thus further limiting the use of any travel credits.

10.     Rather than provide passengers with refunds for flights that Frontier itself cancelled, Frontier instead rebooked customers on non-comparable flights, and sent misleading emails offering travel credits and vouchers that duped passengers into purportedly forgoing their right to a refund. These solicitations failed to meaningfully disclose that any travel credits would expire in 90 days.

11.     In a further scheme to evade its obligations, Frontier often waited as long as possible prior to departure to cancel a flight. Instead of cancelling the flight and issuing refunds, Frontier emailed passengers ticketed on flights that Frontier intended to cancel, and encouraged those passengers to preemptively cancel their flights in exchange for travel credit and an additional travel voucher. Frontier failed to disclose that if those passengers simply waited for Frontier to cancel their flights, Frontier was legally obligated to provide them with a full monetary refund. Frontier also repeatedly failed to disclose that travel credits would expire in 90 days until after the consumer had already cancelled the reservation. Through its misstatements and omissions, Frontier duped its customers into allowing Frontier to avoid its refund obligations while providing only useless travel credits that expired before Plaintiffs and the Class could use them.

12.     Throughout this time, Frontier's customer service has been completely inadequate, as consumers have reported their calls being disconnected, hold times frequently exceeding an hour, and customer service representatives providing confusing and conflicting information. Customers frequently have not been able to contact Frontier to discuss their options or obtain reliable information regarding their rights.

13.     Accordingly, Plaintiffs bring this Complaint on behalf of themselves and similarly situated Frontier passengers to obtain relief from Frontier.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005, because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of

interest and costs, and (iii) there is minimal diversity because at least one class member and defendant are citizens of different States.

16.     This Court has personal jurisdiction over Frontier because it is headquartered in this judicial district.

16.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391 because Defendant is headquartered in this District, transacts business in this District, is subject to personal jurisdiction in this District, and therefore is a citizen of this District, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### Plaintiffs

17.     Plaintiff Nelcy Alexa Rivera-De Leon is a resident of Florida. On December 16, 2019, Plaintiff Rivera-De Leon purchased four tickets to fly round-trip on Frontier between Tampa, Florida and San Juan, Puerto Rico on March 13, 2020 and March 20, 2020. Plaintiff Rivera-De Leon booked her flights directly through Frontier and paid approximately $483.00 for her Frontier tickets for a family vacation, which was to include her husband, Roger Zehr, and two minor children. On or about March 12, 2020, Roger Zehr—who is in the U.S. Military—was advised that, effective March 13, 2020, he was prohibited from non-military travel for 60 days due to COVID-19 restrictions. When Plaintiff Rivera-De Leon learned that her husband would be unable to travel, she immediately cancelled her trip through a phone call with Frontier.

18.     Upon cancelling her Frontier trip, Plaintiff Rivera-De Leon was advised by Frontier that she would only receive a credit toward a future trip rather than a refund of the purchase price, and that she had until June 11, 2020 to use those credits. Plaintiff Rivera-De Leon informed

Frontier that, due to a decision by the U.S. Military to prohibit members of the U.S. Military from non-official travel, she and her husband would be unable to travel in the near future. Further, Plaintiff Rivera-De-Leon informed Frontier that she would be unable to travel in the near future because her son was high-risk for COVID-19 due to a previous cancer diagnosis. Plaintiff Rivera-De Leon, therefore, requested a full monetary refund instead of travel credits, but Frontier refused.

19.     Frontier ultimately cancelled Plaintiff Rivera-De Leon's return flight from San Juan, Puerto Rico to Tampa, Florida. Plaintiff Rivera-De Leon could not apply her flight credits by June 11, 2020 because of ongoing restrictions imposed by COVID-19. Plaintiff Rivera-De Leon contacted Frontier multiple times, but Frontier refused to provide a refund.

20.     Given the unforeseeable circumstances caused by the pandemic, Plaintiff Rivera-De Leon would have never booked her flights with Frontier had she known that Frontier would not give her a refund.

21.     Plaintiff Stephanie Muters is a resident of New York. On or about February 24, 2020, Plaintiff Muters purchased two airline tickets for herself and her daughter to fly round-trip on Frontier between Syracuse, New York and Tampa, Florida on April 5, 2020 and April 13, 2020, respectively, paying $849.60. Plaintiff Muters booked her flights directly through Frontier.

22.     Plaintiff Muters is employed as a civilian by the U.S. Department of Defense. Plaintiff Muters' daughter is health-compromised and susceptible to COVID-19. On or about March 12, 2020, Plaintiff Muters was advised that, effective March 13, 2020, she was prohibited from non-military travel for 60 days.

23. On or about March 17, 2020, Plaintiff Muters received an email from Frontier recommending that she cancel her flights in exchange for a "bonus" $50 voucher per passenger on a new booking.

24. On or about March 22, 2020, the Governor of New York issued a stay-at-home order to New York residents that was extended through May 28, 2020. On or about March 23, 2020, the Governor of Florida issued an Order requiring people flying to Florida from New York or New Jersey to undergo a 14-day quarantine. On or about March 19, 2020, Plaintiff Muters cancelled her trip on Frontier as a result of these circumstances.

25. Upon cancelling her trip, Plaintiff Muters was advised by Frontier that she would only receive a credit toward a future trip rather than a refund of the purchase price, and that she had until June 17, 2020 to apply the credits she received for cancelling her flight. Frontier ultimately cancelled the flights on which Plaintiff Muters was scheduled to travel. Plaintiff Muters could not apply her flight credits by June 17, 2020, because of both ongoing restrictions imposed by COVID-19 and the fact that she is uncertain when her health compromised daughter will be able to travel again.

26. Given the unforeseeable circumstances caused by the pandemic, Plaintiff Muters would have never booked her flights with Frontier or agreed to cancel her flights had she known that that Frontier would not give her a refund.

27. Plaintiff Shirley Johnson is a New Jersey citizen residing in Willingboro, New Jersey. On February 27, 2020, Ms. Johnson purchased an airline ticket directly from Frontier online for $797.83. She purchased airfare for a round-trip flight from Philadelphia, Pennsylvania to Orlando, Florida departing April 18, 2020 and returning April 25, 2020.

28.     On April 8, 2020, Frontier emailed requesting that Ms. Johnson cancel her reservation, which she did, and offered a travel credit. Frontier did not adequately disclose that the credit would expire within 90 days. A few days later, Frontier cancelled her flight. Ms. Johnson then requested that her credit be converted to a refund, but Frontier refused to do so.

29.     Given the unforeseeable circumstances caused by the pandemic, Plaintiff Johnson would have never booked her flight with Frontier had she known that that Frontier would not give her a refund.

30.     Plaintiff Jeffrey Bone is a resident of St. Louis, Missouri. In February 2020, Plaintiff Bone booked a flight to attend his brother's wedding for himself and his wife from St. Louis to Cancun, Mexico through Frontier's website, paying $1,352.72.

31.     In or around June 2020, Frontier cancelled his flights. Plaintiff requested that Frontier provide him a refund for his flight and tried calling Frontier only to be put on hold for nearly an hour. Upon receiving Plaintiff's request, Frontier claimed that Plaintiff purportedly accepted a "schedule change through email" and only offered him a 90-day travel credit that has since expired and a $50 travel voucher per passenger.

32.     Given the unforeseeable circumstances caused by the pandemic, Plaintiff Bone would have never booked his flights with Frontier had he known that Frontier would not give him a refund.

33.     Plaintiff Danielle Porreca is a resident of Philadelphia, PA. On or around December 20, 2019, Plaintiff booked directly through Frontier a flight from Philadelphia to Las Vegas for her and another passenger. She paid $604.20 out-of-pocket for the trip and used a $25 voucher.

34.     In March 2020, Frontier emailed requesting that Plaintiff Porreca cancel her reservation, which Plaintiff did. Plaintiff was told after cancelling that she would receive only a 90-day travel credit. Plaintiff Porreca has since requested a refund and has been refused. Her travel credit has also expired.

35.     Given the unforeseeable circumstances caused by the pandemic, Plaintiff Porreca would have never booked her flights with Frontier had she known that Frontier would not give her a refund.

36.     Plaintiff ChaCha Powell is a resident of Jersey City, New Jersey. In February and March 2020, she booked a few trips through Frontier's website to Jacksonville, Florida, and Atlanta, Georgia paying around $575.40.

37.     Frontier sent Plaintiff various emails encouraging her to cancel her reservations and Frontier cancelled at least one of her flights. Plaintiff has requested a refund for her flights, but Frontier refused, claiming Plaintiff accepted a 90-day travel credit via email.

38.     Given the unforeseeable circumstances caused by the pandemic, Plaintiff Powell would have never booked her flights with Frontier had she known that Frontier would not give her a refund.

39.     Plaintiff David Dickstein is a resident of Lafayette, California. In January 2020, from his home in California, Plaintiff Dickstein booked a red-eye direct, non-stop flight from Las Vegas to Orlando, FL to depart on March 29, 2020 directly through Frontier using Frontier's website and paid $227.20.

40.     On March 28, 2020, Frontier cancelled Plaintiff Dickstein's flight and rebooked him on a flight that was not direct but connected through Chicago with an overnight stay. Due to

the rebooking, Plaintiff Dickstein's arrival in Orlando would have been most likely been more than 12 hours later than the original booking and thereby have deprived him of a full day of his trip.

41.     Plaintiff Dickstein attempted to call Frontier to discuss the issue but was unable to reach customer service at all as he could not get a call through. Plaintiff did not want to "no-show" his flight, so he cancelled his rebooked reservation and requested a refund. Frontier refused and provided Plaintiff with a 90-day travel credit which has expired.

42.     Given the unforeseeable circumstances caused by the pandemic, Plaintiff Dickstein would have never booked his flight with Frontier had he known that Frontier would not provide a refund.

43.     Plaintiff Kelli Capra is a resident of Colorado. On or about January 28, 2020, Plaintiff Capra booked flights for her and her family members through Frontier's website from Denver to Puerto Vallarta, totaling $5,132.75.

44.     In March 2020, due to the travel shutdowns caused by the pandemic, Plaintiff Capra contacted Frontier to cancel her reservations. After multiple phone calls, Plaintiff Capra was told in writing by a representative of Frontier that she would receive travel credits that were valid through March 2021. However, when Plaintiff Capra later went to book a flight for her daughter to return to college, she was told that the travel credits had expired in June 2020.

45.     Given the unforeseeable circumstances caused by the pandemic, Plaintiff Capra would have never booked her flights with Frontier had she known that Frontier would not provide a refund.

**Defendant**

46.     Defendant Frontier Airlines, Inc. is a corporation organized under the laws of the State of Colorado with a principal place of business at 4545 Airport Way, Denver, Colorado 80239.

## FACTUAL ALLEGATIONS

### A.  Frontier Airlines

47.     Frontier is the eighth-largest commercial airline in the United States.

48.     Over the past decade, Frontier more than doubled its operating revenue, from $1.1 billion in 2009 to $2.5 billion in 2019.[2]

49.     Between 2015 and 2019, Frontier almost doubled in size by carrying 12.7 million additional passengers.[3]

50.     In 2019, Frontier operated flights to more than 100 destinations throughout the United States and 31 international destinations.[4]

51.     Frontier typically operates approximately 300 flights per day.

### B.  The COVID-19 Pandemic

52.     On March 11, 2020, the World Health Organization reclassified COVID-19 as a worldwide pandemic. That same night, then President Trump made a televised address from the Oval Office during which he announced a moratorium on all flights from Europe (excluding Great Britain) for 30 days. The President extended that ban to Great Britain the very next day.

---

[2]     Available at: https://www.statista.com/statistics/765504/operating-revenues-frontier-airlines/#:~:text=Over%20the%20past%20decade%2C%20the,billion%20U.S%20dollars%20in%202019. (last accessed January 22, 2021).

[3]     Available at: https://www.anna.aero/2019/09/20/to-new-lands-the-development-of-frontier-airlines/ (last accessed January 22, 2021).

[4]     Available at: https://www.flyfrontier.com/about-us/ (last accessed January 22, 2021).

53.     The President declared a "National Emergency" on March 13, 2020 and, on March 15, 2020, the Centers for Disease Control and Prevention recommended that U.S. residents avoid gatherings of 50 people or more. The next day, the federal government tightened those guidelines and recommended avoiding groups of 10 people or more.

54.     Despite these efforts, by March 23, 2020, the United States had reported more confirmed cases of COVID-19 than any other county in the world, and by the end of March, most governors had declared states of emergency due to COVID-19. State and local officials across the country also issued stay-at-home orders that cancelled public events, banned group gatherings, and closed schools, restaurants, and retail stores, and prohibited unnecessary travel for weeks, if not indefinitely.

55.     Circumstances did not improve materially in the ensuing months. COVID-19 transmission spiked across the United States with record infection, hospitalization, and death rates.

56.     As COVID-19 began spreading across the United States and most of the country was ordered to take refuge in their homes, demand for air travel plummeted. Passenger volume dropped by some 97%, reaching levels not seen since the 1950s.

57.     In March and April 2020, for instance, demand for travel at one point dipped as low as five percent capacity compared to 2019.[5]

58.     As a direct and proximate result of the decreased demand for their services, in March 2020, many airlines, including Frontier, cancelled or rescheduled flights.

---

[5]     Available at: https://www.travelpulse.com/news/airlines/colorado-official-asks-dot-to-investigate-frontier-airlines.html (last accessed January 21, 2021).

59.     These cancellations continued into April 2020, when Frontier announced it would be "cutting more than 90% of flight capacity nationwide in April" and expected to only "be in a position to gradually build flight capacity back up to as much as 35% in May."[6]

60.     In May, Frontier was flying only 92 daily flights — a decrease of 76 percent from May 2019. More than 40 percent of the airline's planes were idled.[7]

61.     Any hope to build back up its flight capacity by the summer of 2020 was dashed, as spikes in COVID-19 cases "resulted in the airline tempering its expectations and pulling some capacity from the marketplace."[8]

62.     In October 2020, news reports outlined that Frontier expected to carry at least 20 million fewer passengers this year than it did in 2019, when it flew more than 31 million people.[9]

63.     Even during the normally busy December holiday season, passenger volume was down over 50% from 2019.[10]

---

[6] Available at: https://www.cleveland.com/business/2020/04/frontier-airlines-cuts-90-of-capacity-flying-only-to-orlando-from-cleveland-hopkins-in-april.html (last accessed January 21, 2021). w

[7] Available at: https://www.washingtonpost.com/road-to-recovery/frontier-airlines-pushes-ahead-with-some-success-despite-pandemic/2020/10/27/57470f90-1583-11eb-bc10-40b25382f1be_story.html (last accessed January 22, 2021).

[8] Available at: https://centreforaviation.com/analysis/reports/frontier-airlines-adjusts-to-uncertain-realities-spurred-by-covid-19-534381 (last accessed January 22, 2021).

[9] Available at: https://www.washingtonpost.com/road-to-recovery/frontier-airlines-pushes-ahead-with-some-success-despite-pandemic/2020/10/27/57470f90-1583-11eb-bc10-40b25382f1be_story.html (last accessed January 22, 2021).

[10] Available at: https://www.nbcnews.com/business/business-news/2020-was-brutal-airlines-next-year-could-be-even-trickier-n1252436 (last accessed January 22, 2021).

64.    Future cancellations appear likely in light of COVID-19's resurgence globally and in the United States. Indeed, some airlines are predicting that their capacity for January and February 2021 will be only 45% of what it was in 2019.[11]

65.    Recognizing the severe reduction in demand, the federal government provided a $58 billion bailout to the airlines in the CARES Act, including approximately $211 million to Frontier alone. Frontier received an additional $574 million loan from the federal government at the end of September 2020.[12]

66.    Unfortunately for Frontier's customers, despite the significant taxpayer-funded relief paid to Frontier, Frontier continues to disregard its own Contract of Carriage and subject customers to unlawful cancellation policies.

67.    Indeed, while many airlines throughout the world have provided refunds for flights canceled due to COVID-19, Frontier has refused to issue refunds to its customers.

**C. Frontier's Contract of Carriage**

68.    During the COVID-19 crisis and as a direct response to plummeting demand, Frontier cancelled a huge number of flights. While exact numbers are in the exclusive possession of Frontier, in late March, airlines were canceling over one-third of all scheduled flights each day in the United States.

---

[11] Available at: https://www.cnbc.com/2021/01/01/us-airline-2-losses-expected-to-top-35-billion-in-dismal-2020-from-pandemic.html (last accessed January 22, 2021).
[12] Available at: https://www.washingtonpost.com/road-to-recovery/frontier-airlines-pushes-ahead-with-some-success-despite-pandemic/2020/10/27/57470f90-1583-11eb-bc10-40b25382f1be_story.html (last accessed January 22, 2021).

69.     Under the Contract of Carriage (Ex. A), Frontier was obligated to provide passengers on those flights the option of either alternative transportation to their destination or a refund.

70.     Section 18 of Frontier's Contract of Carriage concerns specific remedies for flight cancellation. It explicitly provides for a refund when Frontier cancels a flight:

> Delay, Misconnection, or Cancellation – In the event (i) a passenger's flight is canceled, . . . to the extent possible, Frontier will provide transportation on its own flights at no additional charge to the passenger's original destination or equivalent destination as provided herein. Frontier will have no obligation to provide transportation on another carrier. If Frontier cannot provide the foregoing transportation, Frontier **shall, if requested, provide a refund** for the unused portion of the passenger's ticket in lieu of the transportation under the foregoing.

(Ex. A).

71.     Section 18, Subsection E also provides that Frontier may issue refunds for schedule changes prior to the day of travel.  That provision permits Frontier to divert a passenger "over its own route system to the destination" due to a "modification in Frontier's schedule . . . ." However, "[i]n the event Frontier determines that the schedule modification is significant, at Frontier's discretion, it may refund the cost of the unused portion of the ticket." (Ex. A).

72.     As described below, this contract provision, which purportedly left it up to Frontier to decide whether to provide a refund when a significant schedule change occurred, is contrary to longstanding federal law.  Frontier has since changed its Contract of Carriage to require that "[i]n the event Frontier determines that the schedule modification is significant, **Frontier shall, if requested**, provide passengers a refund of the cost of the unused portion of the ticket." (*See* Version 74 of the Contract of Carriage attached hereto as Exhibit B (emphasis added).)

73.     Section 18 Subsection B provides "Force Majeure - In the occurrence of a force majeure event, Frontier may cancel, divert, or delay any flight without liability except to provide a refund for the unused portion of the ticket."  (Ex. A.)

74.     The Contract of Carriage also sets forth the charges and fees Frontier must refund in the event it cancels a customer's flight.  Section 20, Subsection A(4) states that "if no portion of the ticket has been used, the refund amount will be equal to the fare, plus any ancillary purchases (checked or carry-on bag, seat assignments, etc.) and all charges, taxes and fees paid for the ticket issued to the passenger." (Ex. A.)

75.     Section 20, Subsection A(1) also confirms that all refunds "will be subject to government laws, rules, regulations, or orders of the country in which the ticket was originally purchased and of the country in which the refund is being made." (Ex. A.).

76.     Finally, under Section 9, Subsection A(1), the Contract of Carriage provides that "[i]f a passenger cancels a ticket before the scheduled flight departure time, the value of the ticket less a service fee will be retained for 90 days from the date of cancellation of the ticket in the form of an electronic credit." (Ex. A.)

77.     In no event, however, does the Contract of Carriage permit Frontier to offer its customers only a credit or voucher when it cancels a flight.

**D.  The Federal Regulations and DOT Notice**

78.     Frontier's failure to provide refunds to customers whose flights it canceled likewise violates applicable federal regulations, which Frontier's Contract of Carriage expressly incorporates by reference. Specifically, 49 U.S.C. § 41712 prohibits unfair or deceptive practices in the air carrier industry, and "since at least the time of an Industry Letter of July 15, 1996 . . . the

[DOT's] Aviation Enforcement Office has advised carriers that refusing to refund a non-refundable fare when a flight is cancelled and the passenger wishes to cancel is a violation" of section 41712. Enhancing Airline Passenger Protections, 76 Fed. Reg. 23110-01, 23129.

79.    On April 3, 2020, in response to airlines' refusals to issue refunds to passengers for cancelled flights, the DOT issued an "Enforcement Notice Regarding Refunds By Carriers Given the Unprecedented Impact of the COVID-19 Public Health Emergency On Air Travel" (the "Enforcement Notice").[13] The Enforcement Notice states that:

> Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier.  The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions).

80.    Moreover, the requirement to provide a "prompt refund" applies to passengers who purchased "non-refundable tickets" and applies to any optional fee charged for services a passenger is unable to use, such as baggage fees, meals, and seat upgrades.

81.    The Enforcement Notice also states that this obligation "does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions)." Instead, airlines are required to offer refunds whenever passengers are not at fault for the cancellation, regardless of whether the cancellation is within the carrier's control.

82.    The "longstanding obligation" regarding refunds is set forth in the Code of Federal Regulations. Specifically, consumers are entitled to refunds whenever their carrier cancels their

---

[13]    Available    at:    https://www.transportation.gov/sites/dot.gov/files/2020-04/Enforcement%20Notice%20Final%20April%203%202020_0.pdf (last visited January 29, 2021).

flight for any reason. 76 Fed. Reg. 23110-01, at 23129 (Apr. 25, 2011) ("Since at least the time of an Industry Letter of July 15, 1996 . . . the Department's Aviation Enforcement Office has advised carriers that refusing to refund a non-refundable fare when a flight is cancelled and the passenger wishes to cancel is a violation of 49 U.S.C. 41712 (unfair or deceptive practices) and would subject a carrier to enforcement action.")

### E. Frontier's Unlawful Conduct

83.     Frontier is obligated to provide refunds for cancelled flights under both its Contract of Carriage and federal law. Because of the number of flights cancelled, Frontier, however, had substantial financial incentives to prevent passengers from obtaining the refunds to which they were contractually and legally entitled. Acting improperly based on these incentives, Frontier engaged in a number of schemes designed to avoid its contractual and legal obligation to provide refunds. The decision to cancel flights and deny passengers full monetary refunds was a strategic business decision designed to save Frontier money at the expense of its consumers.

84.     When Frontier cancelled a flight, it frequently rebooked passengers on inconvenient or significantly different flights. When those passengers tried to complain about the rebooking or request a refund, they were met with long hold times and unhelpful customer service. Rather than completely forfeit the rebooked ticket, Frontier forced the passengers' hand and many passengers cancelled the rebooked flights and received a 90-day travel credit.

85.     This 90-day limit to use the credits renders the credits virtually worthless during the COVID-19 pandemic. Frontier drastically reduced its flight capacity and available routes in response to the pandemic, severely limiting the flights available for rebooking, and stay at home orders were in effect during a substantial portion of the continuing class period.

86.     As reported on the travel website *One Mile at a Time*, "Frontier Airlines has by far the worst rebooking policy . . . Frontier Airlines is requiring customers to rebook future travel within 90 days of cancellation, and travel has to be completed by November 9, 2020. Giving customers just 90 days to rebook is rather ridiculous when you consider the amount of uncertainty at the moment."[14]

87.     Further, Frontier often would not cancel flights until very close to the day of departure. Before Frontier cancelled any flights, it also attempted to induce its consumers to preemptively cancel their flights in exchange for the travel credit and $50 travel voucher. Frontier thus sought to trick customers into preemptively cancelling their flights to relieve Frontier of its obligation to issue full monetary refunds for flights it would ultimately cancel.

88.     Frontier has used the pandemic and its accompanying uncertainty as a part of its ploy when sending out emails with time-limited offers to customers to cancel their reservations in exchange for Frontier travel credit, such as in the email depicted below:

---

[14]Available        at:        https://onemileatatime.com/frontier-airlines-convert-vouchers-into-miles/#:~:text=Frontier%20Airlines'%20awful%2090%20day%20rebooking%20policy,-Frontier%20Airlines%20has&text=Frontier%20Airlines%20is%20requiring%20customers,of%20uncertainty%20at%20the%20moment (last accessed January 21, 2021).

## ACT NOW, OFFER ENDS TONIGHT



# 00 | 00 | 00 | 00
DAYS | HOURS | MINUTES | SECONDS

### ACT NOW TO QUALIFY!

**IMPORTANT INFORMATION ABOUT YOUR UPCOMING FLIGHT**

## FINAL DAY – CANCEL AND RECEIVE A $50 VOUCHER PER PASSENGER ON YOUR BOOKING

Valued Customer,

We want to thank you for choosing Frontier. We know things are difficult during this unprecedented time and we want to provide you another option for your upcoming travel with us.

Cancel your booking today and you will receive a **$50 per person voucher for future travel**. This is in addition to a travel credit applicable to a future Frontier flight for the full amount of your unused ticket.

## STEP 1

Simply go to **flyfrontier.com** now and cancel your flight via the "**My Trips/Checkin**" tab.

## STEP 2

You will automatically receive your credit for future use and **also** receive your additional voucher within seven days of your cancellation to the email address used in the original booking. Your **$50 per person voucher** will be available for booking through Dec. 31, 2020. The best part is your travel does not need to be completed by Dec. 31 just booked!

To qualify for the $50 per person voucher and flight credit, you must cancel your flight **TONIGHT** (Friday, March 27). This offer is valid for flights scheduled from **March 28 – June 17**. If you did not book your travel with Frontier directly, you will need to update your contact information when you cancel your flight. For more about this offer, **click here**.

We appreciate your continued patience and understanding as we navigate this challenging time, and we hope to serve you on many future Frontier flights.

Team Frontier

89.     The travel credit offered by Frontier for the cancellation expired after 90 days. Frontier did not adequately disclose that the travel credit will be limited to 90 days until after the consumer has accepted Frontier's offer to cancel the consumer's reservation.

90.     After deceiving customers to opt for future credit or Frontier points, instead of the refund to which they are entitled to under its Contract of Carriage and federal law, Frontier denied refunds for flights it later cancelled.

91.     Moreover, whenever a customer chose to preemptively cancel their flight, Frontier did not refund them—in Frontier credit or otherwise—any of the additional fees they incurred when purchasing their original airline tickets, such as fees paid for seat selection.

92.     By providing credits instead of refunds, Frontier has additional opportunities to charge service, processing baggage, seat selection, and other fees that will ensure Frontier reaps additional future profits.

93.     Frontier's tactics saved it money but also provoked outrage. On March 31, 2020, a group of Senators, including Edward J. Markey, Richard Blumenthal, Elizabeth Warren, and Sheldon Whitehouse, sent a letter to Frontier CEO Barry L. Biffle urging the airline to "issue full cash refunds to all customers" whose flights are cancelled during the crisis.[15]

94.     The Senators noted the toll the crisis has taken on personal finances: "The ongoing pandemic is placing enormous financial strain on millions of Americans, and families need cash to pay for essentials such as food housing, and medical care." The Senators further criticized Frontier's conduct as particularly inequitable given that the government bailed out the airline industry: "In light of this pressing need and the unprecedented bailout—to the tune of $25 billion—that the airline industry has just received from Congress,[16] we believe your company has a moral responsibility to provide real refunds, not travel vouchers, to consumers . . . ."

95.     Despite the backlash to Frontier's cancelation and refund policy, Frontier continues to refuse to provide refunds to passengers for flights cancelled due to COVID-19.

---

[15]Available at:  https://www.markey.senate.gov/imo/media/doc/Airline%20Cash%20Refunds%20for%20Coronavirus%20Cancellations.pdf (last accessed January 21, 2021).

[16] Coronavirus Aid, Relief, and Economic Security (CARES) Act, § 4003(b)(1), Pub. L. No. 116-136, https://www.congress.gov/bill/116th-congress/house-bill/748/text.

## CLASS ALLEGATIONS

96.     Plaintiffs bring this action individually and, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), on behalf of the following "Class" defined as follows:

All persons in the United States who meet the following criteria:

i. Purchased tickets to fly on Frontier Airlines, to, from or within the United States; and

ii. Frontier cancelled the flight(s) or the consumer cancelled the flight(s), on or after February 29, 2020; and

iii. To whom Frontier has failed to provide a refund; and

iv. Who has not used any travel credits provided by Frontier to fly on a Frontier flight when the reservation was cancelled.

97.     Excluded from the Class are: (a) Frontier and its affiliates, agents, employees, officers, and directors; and (b) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to amend this class definition as the case and discovery progress.

98.     **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identity of the Class members are unknown to Plaintiffs, such information is in the sole possession of Frontier and obtainable through the discovery process. The Class consists of thousands of people.

99.     **Commonality**: Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.      Whether Frontier's customers had a contractual right to refunds for flights cancelled by Frontier;

b.   Whether Frontier breached its contract with customers when it did not provide refunds for flights that Frontier cancelled;

c.   Whether Frontier breached its contract with customers by failing to provide an adequate means for customers entitled to receive refunds for flights that Frontier cancelled to request or otherwise obtain such refunds;

d.   Whether Frontier breached its contract by providing Class members with travel credits instead of refunds;

e.   Whether rescission of the Contract of Carriage is appropriate and restitution provided;

f.   The appropriate injunctive relief; and

g.   The quantum of damages or restitution to which the Class is entitled.

100.   **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and Class members' claims all arise out Frontier's uniform conduct, policies, and practices.

101.   **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

102.   **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Frontier's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court

system could not. Individualized litigation increases the delay and expense to all Parties, and to the court system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by one court.

103.    Frontier has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

**CLAIM FOR RELIEF**
**BREACH OF CONTRACT**
**(on behalf of Plaintiffs and the Class)**

104.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

105.    Plaintiffs bring this claim on behalf of themselves and members of the Class.

106.    Frontier made offers to Plaintiffs and the Class members to enter into a contract for Frontier to provide transportation services to Plaintiffs and the Class members through passenger tickets for air travel between specific locations, on specific flight numbers, on specific dates and times, at specific prices.

107.    Frontier's offer to provide transportation services to Plaintiffs and the Class members also included Frontier's term that it would refund Plaintiffs and the Class members for all cancellations. At all times relevant, such offers and terms were specifically identified in Frontier's Contract of Carriage (*see* Exhibit A), entered into between Plaintiffs and the Class members on one hand, and Frontier on the other, at the time of ticket purchases.

108.    The Contract of Carriage reflects obligations voluntarily undertaken by Frontier.

109.    Moreover, Plaintiffs and the Class members did not draft the terms of the Contract of Carriage. Rather, all its terms were drafted by Frontier and at Frontier's direction.

110.    Numerous sections of the Contract of Carriage applicable at the time Plaintiffs and Class members purchased their tickets confirm their contractual rights to refunds for tickets and fees where a flight has been cancelled and/or significantly changed, regardless of the reason for such cancellation or delay.

111.    First, in the event that Frontier cancels a flight, Section 18(C) of the Contract of Carriage requires it to either provide reasonable alternative transportation or a monetary refund.

112.    The foregoing applies with equal force to *all* Frontier tickets, regardless of whether they were deemed "refundable" or "non-refundable," or purchased through Frontier or a third party.

113.    Second, in Section 20(A)(1), the Contract of Carriage expressly incorporates by reference DOT regulations requiring Frontier to issue refunds when it cancels a flight for *any* reason:

> All refunds will be subjected to government laws, rules, regulations, or orders of the country in which the ticket was originally purchased and of the country in which the refund is being made.

114.    Additionally, Section 22(A) affirms that, "[i]n all cases, this Contract of Carriage will be subordinate to any applicable law."

115.    The terms of Frontier's offer to provide transportation services contained a definite promise by Frontier and gave Plaintiffs and the Class the power to agree to the terms of Frontier's

offer to provide transportation services through, including but not limited to, the act of purchasing a ticket or accepting transportation on Frontier's aircraft.

116.   Plaintiffs and the Class accepted Frontier's offer to provide transportation services, agreeing to the material terms contained in Frontier's offer.

117.   Plaintiffs and the Class communicated their acceptance of Frontier's offer to Frontier by purchasing one or more tickets and booking transportation services with Frontier.

118.   The agreement between Plaintiffs, the Class members, and Frontier included an exchange of promises or value, *i.e.*, consideration. Here, Plaintiffs and the Class members provided Frontier with consideration in the form of amounts equal to the monetary value of the fare and all charges and taxes paid.

119.   Plaintiffs and all Class members performed under the Contract of Carriage. Specifically, Plaintiffs and Class members tendered payment for airline tickets to Frontier and complied with all conditions precedent under the Contract of Carriage.

120.   By failing to provide refunds upon request when Frontier cancelled flights, Frontier breached its Contract of Carriage.

121.   By rebooking passengers automatically for non-comparable flights, and not providing refunds upon request, Frontier breached its Contract of Carriage.

122.   Although Frontier determined to cancel flights well in advance of doing so, it refused to timely advise passengers their flights would not depart in order to coerce them to accept a travel credit or an additional $50 travel voucher, instead of the cash refund to which the customer would be entitled once Frontier cancelled the flight.

123.    Had Frontier disclosed to Plaintiffs and the Class that it intended to cancel their flights and issue a refund under the Contract of Carriage, Plaintiffs and the Class would not have voluntarily accepted a travel credit or voucher, and would have received the refunds to which they were contractually entitled.

124.    The 90-day time limit, viewed in the context of the COVID-19 pandemic and Frontier's unilateral decision to reduce its flights in response to the significant drop in demand, made it impractical and, in many cases, impossible, for Plaintiffs and the Class to use the offered travel credits and voucher.

125.    Plaintiffs argue in the alternative that by inducing customers to cancel their reservations with the offer of a travel credit and a voucher, Frontier entered into a new agreement with its customers and the unilateral imposition of a 90-day expiration date on the travel credits offered was not a term of Frontier's offer and formed no part of any agreement made.

126.    Frontier's failure to perform under the Contract of Carriage damaged Plaintiffs and the Class, to whom Frontier did not provide the refunds, benefits, payment, and/or performance to which they were entitled.

127.    As a result of Frontier's conduct, Plaintiffs and Class members have incurred substantial damages, including but not limited to a refund of the purchase price Plaintiffs and the Class paid for the tickets on the flights cancelled by Frontier.

128.    As a result, Plaintiffs and the Class are entitled to fair compensation in the form of complete refunds for all fares, charges, and taxes paid, in an amount to be proven at trial.

129.    In the alternative, Plaintiffs and the Class seek all available equitable remedies including rescission with restitution and/or reformation. Plaintiffs and the Class booked flights

with Frontier to be transported to their intended destination in exchange for money. At the time Plaintiffs and the Class members booked their flights, the full extent of the COVID-19 pandemic was unforeseen and could not have been predicted. Plaintiffs and Class members would not have booked flights with Frontier had they been aware of the travel restrictions and other consequences of the pandemic prior to booking. In light of the pandemic, the 90-day travel credit provided by Frontier was worthless to Plaintiffs and Class members. Frontier also repeatedly failed to meaningfully disclose that travel credits were limited to 90 days through its various offers designed and intended to deceive Plaintiffs and Class members into purportedly forfeiting their rights to receive a refund. Under these circumstances, rescission with restitution, and/or reformation of contractual terms are appropriate to provide Plaintiffs and Class members with their money back or travel credits that are actually usable.

130.    Plaintiffs also seek injunctive relief. Refunds have not been provided, travel credits have expired, and the harms caused by Frontier are ongoing. The airline industry leaves consumers with very few carriers to choose from. Due to this lack of airline options, Plaintiffs and the Class may need to fly Frontier again. Injunctive relief is necessary to prevent Frontier from violating its own Contract of Carriage in the future and harming both Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    Appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C.      Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.      Award all other appropriate relief including rescission, restitution, and reformation;

E.      Award pre-judgment and post-judgment interest as allowed by law;

F.      Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Frontier to issue refunds to any member of the class so entitled to a refund;

G.      Award reasonable attorney's fees and costs; and

H.      Grant such further relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, on behalf of themselves and the putative Class, demands a trial by jury on all issues so triable.

Dated: January 29, 2021                    Respectfully submitted,


*/s/___Jamie Hubbard_____*
Jamie Hubbard
Kathryn J. Stimson
STIMSON STANCIL LABRANCHE HUBBARD
1652 Downing Street
Denver, CO 80218
Telephone: 720-689-8909
Email: hubbard@sslhlaw.com;
stimson@sslhlaw.com


***Interim Liaison Counsel***

Daniel O. Herrera
Christopher P.T. Tourek
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
150 S. Wacker, Suite 3000

Chicago, IL 60606
Telephone: (312) 782-4880
Email: dherrera@caffertyclobes.com
        ctourek@caffertyclobes.com

Bryan L. Clobes
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
205 N. Monroe St.
Media, PA 19063
Telephone: (215) 864-2800
Email: bclobes@caffertyclobes.com

Shanon J. Carson
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: scarson@bm.net

John G. Albanese
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel: (612) 594-5997
Email: jalbanese@bm.net

*Interim Co-Lead Counsel*

Joseph G Sauder
SAUDER SCHELKOPF LLC
1109 Lancaster Avenue
Berwyn, PA 19312
Phone: 888.711.9975
Facsimile: 610.421.1326
Email: jgs@sstriallawyers.com

Adam E. Polk
Jordan Elias
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800

Fax: (415) 981-4846
Email: apolk@girardsharp.com
Email: jelias@girardsharp.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of January 2021, a true and correct copy of the foregoing **Consolidated Class Complaint** was filed with the Clerk of Court via the CM/ECF filing system, which will send notification of such filing to all CM/ECF registrant(s) who have entered an appearance in this case.

*s/ Jamie Hubbard*
Jamie Hubbard