# EXHIBIT A

**MARKS & KLEIN, ESQS.**
63 Riverside Avenue
Red Bank, NJ 07701
732-747-7100
Justin M. Klein, Esq.
Attorney for Plaintiffs

| | |
|---|---|
| RAYMOND BONANNO, ANTHONY BONANNO, ROBERT PETER, RAJAN DESAI, NISHA DESAI AKA NISHA BHANSALI, ELISA WHITEHALL, DALJIT PARMAR , MANJIT PARMAR, IRVING BROTHMAN, BINITA PATEL and HEMLATTA PATEL, Individually and on behalf of others similarly situated, | STATE OF NEW JERSEY SUPERIOR COURT LAW DIVISION MIDDLESEX COUNTY |
| Plaintiffs, | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| vs. | |
| THE QUIZNOS MASTER LLC., THE QUIZNOS CORPORATION, THE QUIZNOS FRANCHISE COMPANY LLC, S&S COMPANY, QUIZNOS FRANCHISE REALTY COMPANY, QUIZNOS FRANCHISE LICENSING COMPANY, QFA ROYALTIES LLC, PETER ARGOW, JAMES COZINE, MICHAEL GORDON, KEVIN BEDNOWSKI, and ROBERT TOBIAS, | SUPERIOR COURT MIDDLESEX COUNTY RECEIVED & FILED FEB 1 6 2006 GREGORY EDWARDS DEPUTY CLERK OF SUPERIOR COURT |
| Defendants. | |

## INTRODUCTION AND NATURE OF THIS ACTION

This action is brought on behalf of Raymond Bonanno, Anthony Bonanno, Robert Peter,

Rajan Desai, Nisha Desai, aka Nisha Bhansali, Elisa Whitehall, Daljit Parmar, Manjit Parmar,

Irving Brothman, Binita Patel and Hemlatta Patel, individually and on behalf of others similarly

situated, for violation of the New Jersey Consumer Protection Act, Fraudulent Inducement,

violation of the Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Breach of Contract, Negligent Misrepresentation, Unjust Enrichment, Fraudulent Conversion, and violation of the New Jersey Franchise Practices Act. For the reasons set forth below, the Plaintiffs seek compensatory damages, treble damages, attorney's fees and injunctive relief to prevent the Quiznos Franchise Corporation from any future selling of Quiznos franchises in the state of New Jersey.

## PARTIES

1.      Plaintiffs, Raymond Bonanno, Anthony Bonanno and Robert Peter (collectively "Bonanno") were at all times relevant residents and consumers of the state of New Jersey. Plaintiffs Bonanno together purchased the Quiznos franchise trade area of Cedar Grove, New Jersey on or about August 16, 2004. As of the date this complaint was filed, Bonanno still has not been granted a location in the Cedar Grove trade area. (A copy of Bonanno's franchise agreement is attached hereto as Exhibit A).

2.      Plaintiffs, Rajan Desai and Nisha Desai aka Nisha Bensali (collectively "Desai"), were at all times relevant residents and consumers of the state of New Jersey, Middlesex County. Plaintiffs Desai purchased the Quiznos Franchise trade area of Franklin, New Jersey in June of 2003. As of the date this complaint was filed, Desai still has not been granted a location in their trade area. (A copy of Desai's franchise agreement is attached hereto as Exhibit B).

3.      Plaintiff, Elisa Whitehall ("Whitehall"), was at all times relevant a resident and consumer of the state of New Jersey. Plaintiff Whitehall signed her Franchise Agreement in New Jersey for the trade area of "Forest Hills and Congress" in Palm Beach County, Florida on March 22, 2004. Whitehall attended a Quiznos seminar in Cherry Hill, New Jersey, and the entire transaction took place in the state of New Jersey. As of the date this complaint was filed,

2

Whitehall still has not been granted a location.  (A copy of Whitehall's franchise agreement is attached hereto as Exhibit C).

4.      Plaintiffs, Daljit Parmar and Manjit Parmar (collectively "Parmar"), were at all times relevant residents and consumers of the state of New Jersey.  Plaintiffs Parmar purchased the Quiznos Franchise trade areas of Matawan, New Jersey and Elizabeth, New Jersey in August 2004.  As of the date this complaint was filed, Parmar still has not been granted a location in their trade area.  (A copy of Parmar's franchise agreement is attached hereto as Exhibit D).

5.      Plaintiff, Irving Brothman ("Brothman"), was at all times relevant a resident and consumer of the state of New Jersey. Plaintiff Brothman signed his Franchise Agreement for two Quiznos franchises, in the trade area of New York, New York in April 2002. As of the date this complaint was filed, Brothman still has not been granted a location.  (A copy of Brothman's franchise agreements are attached hereto as Exhibit E).

6.      Plaintiffs, Binita Patel and Hemlatta Patel (collectively "Patel"), were at all times relevant residents and consumers in the state of New Jersey, Middlesex County. Plaintiffs Patel purchased the Quiznos Franchise trade area of Middlesex County in October 2003.  As of the date this complaint was filed, Parmar still has not been granted a location in their trade area.  (A copy of a 2003 form franchise agreement is attached hereto as Exhibit F).[1]

7.      Defendant, The Quiznos Master LLC ("TQM"), has a business address at 1415 Larimer Street, Denver, Colorado 80202.  TQM does substantial business within the state of New Jersey, including but not limited to the sale of its franchises. The Quiznos restaurant franchise is, for the time being, most notably known to the general public for its highly promoted, marketed and advertised specialty-toasted subs.

---

[1] Parties listed in Paragraphs 1-6 are collectively hereinafter referred to "Plaintiffs".

8.     Defendant, The Quiznos Corporation ("TQC"), a Colorado Corporation incorporated in January 1991, upon information and belief was renamed The Quiznos Master LLC and fulfilled the same duties and obligations as TQM.

9.     Defendant, The Quiznos Franchise Company, LLC ("TQFC"), incorporated in Colorado on October 30, 2000 and is in the business of selling sandwich franchises. TQFC does substantial business within the state of New Jersey.

10.     Defendant, The S&S Company ("S&S") (formerly Quiznos Development Co.), incorporated in Colorado in 1995 to develop restaurants for sale or lease to Franchisees and does substantial business within the state of New Jersey.

11.     Defendant, The Quiznos Realty Company ("TQRC"), incorporated in Colorado in 1997 to execute leases for Quiznos restaurants and does substantial business within the state of New Jersey.

12.     Defendant, The Quiznos Licensing Company ("TQLC"), incorporated in Colorado in 1998, and subleases Quiznos trademarks and service marks to third-party premium companies who then sell premium products to franchisees. TQLC does substantial business within the state of New Jersey.

13.     Defendant, QFA Royalties, LLC ("QFA"), is a Colorado limited liability company, and is a successor company to Quiznos Franchising, LLC and The Quiznos Franchise Company, LLC.  QFA does substantial business within the state of New Jersey.[2]

14.     Defendant, James Cozine ("Cozine") is, or was, upon information and belief, a New Jersey resident and a Quiznos employee who had direct communications with Plaintiffs in the state of New Jersey and assisted Quiznos in effectuating the deceptive scheme more thoroughly described and incorporated by reference herein.

---

[2] Parties listed in Paragraphs 7-13 are collectively hereinafter referred to "Quiznos".

15.     Defendant, Peter Argow ("Argow") is, or was, upon information and belief, a New Jersey resident and a Quiznos employee who had direct communications with Plaintiffs in the state of New Jersey and assisted Quiznos in effectuating the deceptive scheme more thoroughly described and incorporated by reference herein.  Quiznos in effectuating the deceptive scheme more thoroughly described and incorporated by reference herein.

16.     Defendant, Michael Gordon ("Gordon") is, or was, upon information and belief, a Quiznos employee who had direct communications with Plaintiffs in the state of New Jersey and assisted Quiznos in effectuating the deceptive scheme more thoroughly described and incorporated by reference herein.

17.     Defendant, Kevin Bednowski ("Bednowski") is, or was, a Quiznos employee who had direct communications with Plaintiffs in the state of New Jersey and assisted Quiznos in effectuating the deceptive scheme more thoroughly described and incorporated by reference herein.

18.     Defendant, Robert Tobias ("Tobias") is, or was, a Quiznos employee who had direct communications with Plaintiffs who are residents of New Jersey, and assisted Quiznos in effectuating the deceptive scheme more thoroughly described and incorporated by reference herein.[3]

19.     Plaintiffs bring this case on behalf of themselves and other similarly situated persons as members of a statewide class of all Quiznos franchisees in the State of New Jersey.

20.     This action is brought as a class action pursuant to New Jersey Court Rule 4:32 on behalf of the plaintiffs named above and all others similarly situated.  The class is defined as:

> All persons in the state of New Jersey who signed a Quiznos franchise agreement, between 2001 and the present, including

---

[3]Unless otherwise indicated "Defendant Salespersons" refers to parties listed in paragraphs 14-18.

former residents who resided in New Jersey at the time of the signing of the agreement, but did not secure a location and/or commence operations within the time allotted under the agreement and still, as of the date of this filing, have not received a location.

Upon information and belief, the class has more than 200 members (including present and past franchisees). All members of the class assert claims for violation of the law as more particularly set forth herein.

21.      All Class members pray for money damages.

22.      All Class members pray for temporary and permanent injunctive relief, declaratory relief because the parties opposing the Class have acted on grounds generally applicable to the Class, thereby making appropriate injunctive relief to the class as a whole.

23.      The proposed Class meets the criteria set forth for the maintenance of a class action as described below.

24.      *Numerosity*. There are over 200 members of the Class, which number is sufficiently large so that individual joinder of all of them is impracticable.

25.      *Typicality*. The named plaintiffs are typical of the claims presented by the Class in that they are all franchisees who have been victims of the business scheme described herein as implemented by Quiznos. The business scheme is the result of policies and procedures adopted and centrally coordinated by The Quiznos Corporation and other similar Defendants.  The business scheme applies equally to all members of the Class.  As such, the proofs of the named plaintiffs will prove the claims of all class members.

26.      *Adequacy of Representation*.  Plaintiffs can and will fairly and adequately represent and protect the interests of all members of the Class.  They have no interests that conflict with or are antagonistic to the interests of the Class members.  Plaintiffs have retained attorneys competent and experienced in class action and complex commercial litigation.

27.   *Common Questions of Fact.*   The common nucleus of operative facts to be determined for the Class as a whole center upon the business scheme of Quiznos and its agents in New Jersey.  The questions of fact common to Class members include, but are not limited to, the business scheme described herein.

28.   *Common Questions of Law.*  All of the issues of law in this class action are common to the members of the Class.  The common issues include, but are not limited to, the following:

- Whether Quiznos' failure to live up to their representations made to Class members constitutes fraud;

- Whether Quiznos' uniform and standardized business practices breach its standard Franchise Agreement;

- Whether the provisions in Quiznos' standard Franchise Agreement are valid and enforceable;

- Whether Quiznos and other similar Defendants have a fiduciary duty to the franchisees and, if so, the extent of that duty;

- Whether Quiznos and other similar Defendants has breached the covenant of good faith and fair dealing;

- Whether Quiznos' business scheme described herein violates the New Jersey Consumer Protection Act.

- Whether the business scheme described herein is an unconscionable business practice;

- Whether the procedural obstacles in Quiznos' form adhesive agreements are contrary to New Jersey public policy;

- Whether temporary and permanent injunctive relief is appropriate for all class members; and

- The amount of damages owed to all class members.

29.   *Superiority.* A class action is superior to any other available method for the fair and efficient adjudication of this controversy, because:   (i) common questions of law and fact overwhelmingly predominate over any individual questions that may arise, such that there will be efficiencies to the courts and the parties in litigating the common issues on a class basis rather than on an individual basis; (ii) the damages to some class members are larger than to others, but all claims are sufficiently small that individual prosecution of the claim would not be an economically viable alternative; (iii) class treatment is desired for optimal deterrence and compensation; (iv) the economies of scale inherent in litigating similar claims on a common basis will enable this case to be litigated on a cost-efficient basis as a class action, especially when compared to repetitive individual actions; (v) no unusual difficulties are likely to be encountered in the management of this class action as the proofs as to liability are common to all class members; and (vi) this action would be effectively impossible to bring as individual actions leaving plaintiffs and others similarly situated with no viable remedy.

## QUIZNOS BUSINESS SCHEME

30.   Quiznos is in the business of offering sandwich shop franchises to the general public, and more specifically to consumers who are residents of New Jersey.

31.   The Quiznos Corporation was incorporated in 1991 initially as D&R Inc., and upon information and belief, has been franchising restaurants since that time.

32.   Quiznos deceptively increases its franchise numbers by selling trade areas to franchisees that have little, if any, potential to provide a location for a franchisee to open a restaurant; This is done through deceit and misrepresentation.

33.     Quiznos trade areas or "target areas", as they are referred to in the franchise agreement and by the Defendant Salespersons, are misrepresented to prospective franchisees, including Plaintiffs, as though they are exclusive areas. In fact Quiznos works hard to instill the reasonable belief in a prospective franchisee that they are purchasing the rights to a specific town, despite the agreements contradictory language. The operative language is buried within a subsection. This is deceptive.

34.     Plaintiffs signed a form franchise agreement with Quiznos. Plaintiffs and others similarly situated had no opportunity to negotiate the terms of the agreements. The franchise agreements were offered on a "take-it-or leave-it" basis. The agreement is adhesive.

35.     The operational and approval terms included in the form adhesive agreements are extremely one-sided, in favor of Quiznos.

36.     It is not uncommon for Quiznos to sell the same trade area to multiple franchisees. This is deceptive.

37.     Quiznos provides, in its form franchise agreement, provisions to ensure that the already fruitless trade areas sold can be resold over and over again to unwitting investors; this process is designed to create the illusion that Quiznos is opening units consistently, when in fact, this is not true. This is deceptive. (See Exhibits A-F, sub-section 6.9).

38.     The form franchise agreements state:

> A franchisee must open a restaurant within twelve months of signing the franchise agreement or he/she will be in default. One requirement of opening is that Quiznos must approve a site. (See Exhibits A-F sub-sections 6.1 & 6.2)

39.     After Quiznos deceives prospective franchisees, including Plaintiffs, into signing a franchise agreement, it unreasonably denies site approval and relies on unclear, conveniently ever changing criteria. This creates an unreasonable standard of performance.

40.     After several months, or even years of not receiving a location, Quiznos and its Defendant Salespersons perpetuate the deceptive relationship by making misrepresentations to franchisees, including the Plaintiffs and others similarly situated, that "Quiznos might have a location coming free soon" and "to be patient". These are mere falsehoods used to temporarily appease otherwise dissatisfied franchisees without any real solution. All the while Quiznos is reselling the trade area to other franchisees.

41.     Upon information and belief, Quiznos did no market research that would justify the number of franchises they sold in the state of New Jersey, or their ability to open restaurants within the time allowed by the agreement.

42.     Upon requesting the return of its initial fee, which was induced through misrepresentations and fraud, franchisees, including Plaintiffs and others similarly situated, are told that there is no refund. This is deceptive.

43.     It was represented to franchisees that Quiznos would secure locations for them. This was false. Now, Quiznos is keeping their money - this is deceptive.

44.     Quiznos has established a thriving "Ponzi Scheme", which it hucksters to the general public and more specifically, New Jersey residents and consumers.

45.     Quiznos has perfected its scheme so as to generate income through deception without holding up on their end of the deal.

46.     According to its own figures, Quiznos has sold, in the last two years (2003 & 2004), a staggering 234 trade areas in the state of New Jersey alone, none of which have produced a single location. This is in stark comparison to the mere 91 units actually opened in the same time frame. Considering the average initial fee is approximately $25,000, Quiznos has received an astonishing **$5,850,000** while insidiously offering no legitimate expectations that these

10

franchisees will bear any fruit from these agreements. (See page 61 of Quiznos 2005 UFOC attached hereto as Exhibit G).

47.     Quiznos projected that it would sell 60 more trade areas to New Jersey residents and consumers in 2005, bringing the total number of trade areas sold in New Jersey to an astounding 294 units. By way of this scheme, in total, Quiznos has wrongfully taken or will take, from New Jersey residents and consumers, including Plaintiffs and others similarly situated, more than $7 million (See page 64 of Quiznos 2005 UFOC attached hereto as Exhibit H).

48.     Quiznos uses the figures of trade areas sold to create the illusion of growth and success as an aide in its deceptive scheme to induce the general public, including Plaintiffs and others similarly situated, to buy more and more franchises without any hope or chance of being approved for a location. This is deceptive.

49.     Quiznos promotes itself in numerous magazines and trade publications as one of the "fastest growing franchises" based upon these misleading figures. (See advertisement for Quiznos Seminar on their website attached hereto as Exhibit I). Quiznos misrepresents these figures to the general public by touting its awards on its website for the purpose of perpetuating this scheme with the intent of deceiving unsophisticated business persons into investing into their scheme:

    a.  *Entrepreneur Magazine's* top 10 fastest growing franchises;
    b.  #1 in *The Nation's Restaurant News* ranking of growth in the number of U.S. Units in the July 2002;
    c.  #1 in *The Nation's Restaurant News* rankings of sandwich chains by U.S. System wide sales growth in the July 2002 issue;
    d.  #4 in *Restaurants & Institutions* Top 400 rankings of the Sandwich/bakery Category for estimated unit sales worldwide;
    e.  #1 in *Technomic's* Ten Fastest-Growing Chains with sales over $200 million, May 2003;
    f.  #1 in *Nation's Restaurant News* rankings of sandwich chains system-wide sales growth in the July 2003 issue.

g. #1 in *Nation's Restaurant News* ranking the growth in number of U.S. units in July 2003 issue;

h. # 7 *Entrepreneur Magazine's* Top 10 Franchises in 2003;

i. #2 in *Technomic's* Ten Fastest-Growing Chains with sales over $200 million, May 2004;

j. # 1 in *Nation's Restaurant News* Sandwich chains ranked by U.S. System-wide sales growth in the July 2004 issue;

k. #1 in *The Nation's Restaurant News* rankings for growth in the number of U.S. units in the July 2004 issue. (See copy of Quizno's Timeline from Quiznos website attached hereto as Exhibit J).

50.  These accolades and awards create an illusion that these are actually opened and successful operating restaurants, in effect inducing potential franchisees into purchasing a trade area.

51.  Quiznos is focused and consumed with increasing sales of its franchise trade areas. Quiznos achieves these higher sales by aggressively advertising Quiznos so called "franchise opportunities" on television, radio, newspapers, internet and seminars throughout the state of New Jersey.  Quiznos website states its goal is to "to build up a **critical mass** of Quiznos restaurants owned by independent Franchise Owners".  (See copy of the Quiznos "company structure" from its web site attached hereto as Exhibit K).

52.  Defendant Salespersons, and those like them, deceived, misrepresented and lied to the general public, and more specifically to the Plaintiffs and others similarly situated, claiming opportunities exist within defined trade areas in order to persuade them into purchasing a Quiznos Franchise, with the knowledge that the trade areas being sold cannot maintain a location, nor will Quiznos approve a location within reasonable time.

## FACTS REGARDING PLAINTIFFS BONANNO

53.  Plaintiffs, Bonanno, paid $25,000 for their trade area in August 2004 (See Exhibit A).

54.  Bonanno's trade area was subsequently changed from Cedar Grove, New Jersey to Fairfield, New Jersey.

Case 1:06-cv-02058-DAB-RAB-K Document 25-1 Filed 11/24/2006 USDC Colorado Page 14 of
865
Case 2:06-cv-01415-DMC-MF Document 51-2 Filed 03/24/2006 Page 16 of 35

55. Prior to signing his agreement, Plaintiff Raymond Bonanno was told by Argow that a location would be found within three to five months. Bonanno relied on this representation, and others, in deciding to sign the franchise agreement.

56. The only locations Bonanno was offered or that were available were in undesirable, unviable areas. When Plaintiff expressed reservations, Defendant Bednowski indicated that these sites in Bonanno's trade area would be offered to other franchisees.

57. As of the date this complaint was filed, Bonanno has still not received a viable location in which to open their store.

**FACTS REGARDING PLAINTIFFS DESAI**

58. Plaintiffs, Desai, paid $25,000 for their trade area in June 2003 (See Exhibit B).

59. Prior to signing the franchise agreement, Desai was told by Defendants that Quiznos would help them in finding and securing a location, that Quiznos would be responsible for all communications with potential landlords, and that Quiznos would do all the market research to make sure it was a high volume sales area and guaranteed success (See letter from Quiznos dated 7/29/03 and attached as Exhibit L).

60. Despite its representations neither Quiznos nor defendant salespeople located or offered any viable restaurant locations to Desai.

61. Desai located a potential site in Carteret, however a McDonald's restaurant was in the same shopping center, and according to the terms of their lease, McDonald's had to grant permission for another food business to open.

62. Quiznos told Desai that they would handle contacting McDonald's. For about a year and a half they continued to tell Desai that they were negotiating with McDonald's, and would possibly soon get permission for the Quiznos restaurant to open.

13

63. Finally, Desai directly contacted the owner of the McDonald's restaurant. He told her that McDonald's would never agree to allow a Quiznos restaurant in that location, and they had informed Quiznos of this long ago.

64. Desai asked Quiznos for a refund of their franchise fee, but Quiznos refused (See emails attached as Exhibit M).

65. As of the date this complaint was filed, Desai has still not received a viable location in which to open their store.

## FACTS REGARDING PLAINTIFF WHITEHALL

66. Plaintiff, Whitehall, paid $25,000 for her trade area in March 2004 (See Exhibit C).

67. Whitehall moved to Florida from New Jersey after signing the Quiznos agreement, and therefore requested and was assigned a trade area at the intersection of "Forest Hills & Congress", in Palm Beach County, Florida.

68. Quiznos told Whitehall that this location was in the process of being constructed.

69. After arriving in Florida, Quiznos real estate salesperson there, tried to convince her to switch to a different area, however she was not satisfied with the alternate locations offered.

70. As of the date this complaint was filed, there is still no store location available in the trade area Whitehall purchased and she has not commenced operations.

## FACTS REGARDING PLAINTIFFS PARMAR

71. Plaintiffs, Parmar, purchased two trade areas for a total of $45,000 (See Exhibit D).

72. Argow told Parmar that they were purchasing the "entire Matawan, New Jersey territory".

73. Parmar was told not to contact anyone regarding business sites, because this was Quiznos' responsibility.

14

74.     Nevertheless, after signing the agreement, Parmar began scouting out sites in the Matawan area.

75.     Parmar located a prime location on Route 34 in Matawan, only to find out that this location had already been assigned to another Quiznos franchisee.

76.     After trying and failing to contact Argow, Manjit Parmar confronted Defendant Cozine about their rights to the Matawan territory, but was then told that Matawan was divided into several trade areas.  Had Parmar been aware of this prior to signing, he would not have signed the franchise agreement.

77.     As of the date this complaint was filed, Parmar has still not received a viable location in which to open their store and he has not been refunded his money.

## FACTS REGARDING PLAINTIFF BROTHMAN

78.     Plaintiff, Brothman, purchased two trade areas for a total of $45,000 (See Exhibit E), plus additional fees of approximately $5,000.

79.     Brothman was granted two trade areas in New York City, New York.

80.     Brothman was told by Defendant Tobias that it would take no more than 9 months to find a location and open a Quiznos restaurant.

81.     Brothman was never contacted by any Quiznos real estate representatives, and was never offered any sites for a Quiznos restaurant.

82.     As of the date this complaint was filed, Brothman has still not received viable locations in which to open his restaurants and has not commenced operations.

15

## FACTS REGARDING PLAINTIFFS PATEL

83.     Plaintiffs, Patel, purchased a Quiznos trade area in Middlesex County, New Jersey for $20,000 (See Exhibit F). Plaintiff Binita Patel also purchased another trade area in Jersey City, New Jersey, which has been operating for approximately 2 years.

84.     Patel met with Quiznos representatives in New Jersey, including Defendants Argow and Cozine, prior to signing their franchise agreement. Defendants told her that "they would find a good location for her" in the Middlesex County area, where she lived and that it would only take "a couple months" to find a location.

85.     Patel suggested locations to Quiznos where she wanted to open a restaurant, but Quiznos told her they were "not interested in opening restaurants in those areas".

86.     After not approving several of the areas that Patel suggested, Patel found out that other franchisees had opened or were in the process of opening Quiznos restaurants in those same areas that Quiznos had refused to her even though she had brought them to Quiznos' attention first.

87.     As of the date this complaint was filed, Patel has still not received a viable location in which to open her second franchise.

## FACTS COMMON TO CLASS

88.     Quiznos has knowingly and/or negligently, with reckless disregard for the Plaintiffs and others similarly situated, sold trade areas which it knew or should have known, provided no feasible locations for franchisees to open a Quiznos Franchise or could not open in the time afforded under the agreement.

16

89.     Trade areas were represented and sold to the Plaintiffs and others similarly situated by Quiznos and Defendant Salespersons as areas that would provide feasible commercial real estate able to house and sustain a Quiznos restaurant within 8 - 12 months. This was false.

90.     In fact, Quiznos, having realized that its representation was false, misleading and/or unattainable amended its UFOC and qualified that it was possible to open within 12 months "[i]f you secure a location within 6 to 8 months". (See 2005 Quiznos UFOC p. 46 attached as Exhibit N.) Either way, the representation is false, misleading and/or unattainable for the majority of Quiznos franchisees.

91.     Quiznos aggressively advertises and promotes the sale of said trade areas throughout New Jersey by way of radio advertising, franchise meetings, and seminars, which are open to the public, with knowledge that these trade areas possess no viable location for a potential franchisee to open a restaurant.

92.     Quiznos advertises nationally, internationally and throughout the state of New Jersey.

93.     Plaintiffs and others similarly situated were induced into franchise agreements through deceptive, coercive and deliberate means, specifically:

    a.  the use of seemingly professional public speakers during Quiznos franchise seminars who give rehearsed and prepared speeches about their phenomenal success as Quiznos franchisees;

    b.  the aforementioned website, which creates the illusion that these achievements are based on the number of franchises opened, when in actuality they are merely sold trade areas;

    c.  the Quiznos Franchise Offering Circular (UFOC), which states, "the typical length of time between the date you sign the Franchise Agreement and open your

17

Franchise is eight to twelve months". (See copy of 2003 Quiznos UFOC p.40 attached as Exhibit O); and

d. statements directly from Quiznos and Defendant Salespersons, to potential franchisees, including Plaintiffs, at the pre-signing stage that the trade areas in question have locations to place a restaurant, are in high demand, and will be sold quickly to another interested buyer if they do not sign the agreement.

94.     Further, Quiznos takes full responsibility for locating approvable locations and in fact discourages Plaintiffs and others similarly situated from finding their own locations.

95.     Said representations were made directly to Plaintiffs by Quiznos and Defendant Salespersons and other current and former Quiznos employees.

96.     This systemic and pervasive scheme increases the number of franchises Quiznos can claim it has sold.  Hence, Quiznos creates favorable statistics, which create a false sense of growth by the franchise, which advertises itself as "one of the fastest growing" with the goal of inducing consumers such as Plaintiffs and other persons similarly situated, into investing money into the franchise.

97.     Upon information and belief, Defendants sold trade areas to Plaintiffs, and others similarly situated, with the knowledge that many of the franchisees who bought trade areas in New Jersey were not able to secure a location within the 12 month period specified in the agreement and re-sold those same locations to other unsuspecting franchisees.

98.     Defendants pursued this scheme to increase the number of franchises sold, in order to create the appearance that Quiznos is a rapidly growing company, for the purpose of marketing it to potential buyers.

99.   In fact, on or about December 15, 2005, Quiznos announced that it was for sale, and valued itself astoundingly at over $2 billion (See article from CBSNews.com attached hereto as Exhibit P).

## THE UNCONSCIONABLE FRANCHISE AGREEMENT

100.   Franchisees who attempt litigate claims against Quiznos are purportedly limited by onerous and in the standard Franchise Agreement. The franchise agreements signed by Plaintiffs, and others similarly situated, are identical or substantially similar.

101.   Quiznos franchisees are typically unsophisticated in business ownership and unquestionably have inferior economic and bargaining power.

102.   Plaintiffs and others similarly situated had no ability to negotiate any of the terms of the franchise agreement. (See Exhibit Q Attached)

103.   The franchise agreement purports to abrogate many substantive and procedural rights of the franchisees and is exploitive of the dealers.  It truncates the statute of limitations, it further renders the court powerless to award punitive or exemplary damages regardless of the statutory right to receive said damages, it prohibits class actions and prohibits consolidation of proceedings.  The franchise agreement also seeks to eliminate the covenant of good faith and fair dealing, which is in and of itself violative of New Jersey law.

104.   The franchise agreement and the procedural obstacles therein are an integral aspect of the Quiznos business scheme because it is designed to prevent Quiznos franchisees from discovering and proving the uniform and systematic nature of the oppression and abuse they have suffered pursuant to the business scheme as described in detail herein.  The divide and conquer method has allowed Quiznos to dupe hundreds of New Jersey consumers out of between at least $20,000 and $45,000, for years, without recourse.

105.    The franchise agreement and more specifically certain provisions therein are unconscionable and unenforceable.

**COUNT ONE**
**VIOLATION OF THE NEW JERSEY CONSUMER PROTECTION ACT**
(As To All Defendants)

106.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length.

107.    Plaintiffs and others similarly situated are consumers as defined under the New Jersey Consumer Protection Act ("NJCPA"), N.J.S.A. 56:8-1 et seq.

108.    The Quiznos franchise is merchandise as defined in N.J.S.A 56:8-1(c).

109.    Quiznos actions, including but are not limited to the Quiznos business scheme as alleged and incorporated herein, failure to provide support as promised, failure to advertise as promised, as well as making promises and representations Quiznos knew or should have known it would not follow through on with the intent of inducing Plaintiffs and others similarly situated to purchase a Quiznos franchise, are an "unconscionable commercial practice . . . in connection with the sale or advertisement of any merchandise" in violation N.J.S.A. 56:8-2.

110.    Quiznos and the other Defendants deceptive actions as more thoroughly described herein constitute an "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby".

111.    Upon information and belief, Quiznos offers its franchises to the general public and no special skills or extraordinary training is needed as a prerequisite to purchasing a Quiznos franchise.

112.    Defendants' commission of unfair or deceptive acts and/or prohibited practices under the New Jersey Consumer Protection Act has caused each Plaintiff, and others similarly situated, to suffer an ascertainable loss including but not limited to economic harm.

113.    Plaintiffs and others similarly situated have been damaged, and are entitled to recovery from Quiznos, in an amount to be determined at trial plus treble damages and attorneys' fees and costs.

WHEREFORE, Plaintiffs demand that a Class be certified as set forth above, and that judgment be entered against all Defendants, jointly and severally, ordering:

    a.   An award to the Class of monetary damages, as appropriate;

    b.   An award to the Class of its reasonable attorney's fees, interest, and costs;

    c.   An award to the Class of punitive damages;

    d.   Treble Damages pursuant to N.J.S.A. 56: 8-19;

    e.   Injunctive and/or declaratory relief as herein described; and

    f.   Such other relief as this Court finds reasonable and proper.

## COUNT TWO
## FRAUDULENT INDUCEMENT
(As To All Defendants)

114.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length.

115.    Pursuant to a fraudulent scheme, Quiznos exploited the trust and confidence of Plaintiffs and others similarly situated in the advertised integrity, fidelity, superior knowledge

and business image of Quiznos and made a series of false representations to them, or omitted or failed to disclose certain material information to them, all in order to wrongfully induce them to invest their money and sign a Quiznos franchise agreement.

116.    The fraudulent conduct and scheme engaged in by Quiznos consisted of fraud by commission and omission, which commenced prior to Plaintiffs investing their money and continued throughout the term of the agreement.

117.    Plaintiffs and others similarly situated were fraudulently induced into each and every provision of said franchise agreements.

118.    Quiznos, and more specifically Defendant Salespersons, made numerous oral and written false representations to franchisees regarding the Quiznos franchise, which Plaintiffs and others similarly situated relied on, including, but not limited to, the following:

   a.    Franchisees must sign the franchise agreement quickly or the specified trade areas would be sold to other interested people, thus closing out that possibility of owning said trade areas;

   b.    That the specified trade areas would provide a viable location that would house a restaurant within the time allotted under the agreement;

   c.    That Quiznos was a highly respected franchise, which are desired by high end commercial real estate developers;

   d.    That Quiznos was very selective in who they allow to purchase a franchise;

   e.    That Quiznos sales representatives and real estate developers had arrangements with commercial real estate developers, who were building the areas specified prior to signing the agreement;

    f.   That franchisees should not seek a location on their own but rather leave it to Quiznos representatives;

    g.   That franchisees were prohibited from speaking to landlords and other individuals in connection with securing a location;

    h.   That franchisees' trade areas would not be sold to subsequent franchisees prior to those franchisees opening a restaurant;

    i.   That Quiznos would provide franchisees with the right of first refusal of new locations within their trade areas before offering them to "new" franchisees;

    j.   That Quiznos would act in good faith to ensure that the franchisees' best interests were protected;

    k.   That franchisees would get a good return on their investment; and

    l.   That the franchise would generate sufficient cash flow for franchisees to meet their financial needs and obligations.

119.    These and other representations made by Quiznos were false, fraudulent, misleading and Quiznos knew or should have known them to be false, fraudulent and misleading.

120.    Quiznos and Defendant Salespersons, repeatedly made the aforementioned false, fraudulent and misleading representations to franchisees, in person, by telephone and in emails on various dates, especially during the time preceding the entering into a Quiznos franchise agreement and continued throughout the period of time during which they remained Quiznos franchisees.

121.    At the same time that Quiznos was making the above described false, fraudulent and misleading affirmative representations, Quiznos, and Defendant Salespersons, also knowingly

and intentionally concealed and/or suppressed facts material to Plaintiffs' decision to invest their money and enter into and/or continue with a Quiznos franchise.

122.    These material facts known to Quiznos, but concealed or suppressed from franchisees by Quiznos, included, without limitation, the following:

      a.    That trade areas specified in the franchise agreements provided no sites to place a Quiznos franchise;

      b.    That trade areas specified in the franchise agreements would not allow franchises due to township ordinances; and

      c.    That the specific locations discussed and promised to the Plaintiffs, prior to the signing of the agreements, would not be able to accommodate a Quiznos franchise.

123.    Based exclusively upon these promises, representations, and lack of knowledge of the omissions, Plaintiffs and others similarly situated were fraudulently induced to give their consent to both invest their money and sign a Quiznos franchise agreement.

124.    In reliance upon Quiznos misrepresentations, without any knowledge of the omissions fraudulently concealed, Plaintiffs and others similarly situated took various actions, all of which caused their financial and emotional hardship.

**WHEREFORE**, Plaintiffs demand that a Class be certified as set forth above, and that judgment be entered against all Defendants, jointly and severally, Ordering:

      a.    An award to the Class of monetary damages, as appropriate;

      b.    An award to the Class of its reasonable attorney's fees, interest, and costs;

      c.    An award to the Class of punitive damages;

      d.    Injunctive and/or declaratory relief as herein described;

e.   The rescission of the contractual agreements between the parties; and

f.   Such other relief as this Court finds reasonable and proper.

**COUNT THREE**
**VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
(As To Defendants The Quiznos Master LLC., The Quiznos Corporation,
The Quiznos Franchise Company LLC and QFA Royalties LLC)

125.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length.

126.   Every agreement between the Plaintiffs and Quiznos includes not only express written provisions, but also those terms and conditions, which although not formally expressed, are implied by law.  Such implied terms are as binding as the terms that are actually written into the agreement.

127.   Inherent to all contracts is an implied covenant that the parties will act in good faith and deal fairly with each other in the performance of their respective covenants and obligations under the contract and will not take any action that will injure the other party or compromise his benefit of the contract.

128.   The obligations of Quiznos to abide by the covenant of good faith and fair dealing is heightened by the substantial imbalance of power between Quiznos and the Plaintiffs, which imbalance allows Quiznos to implement the business scheme described in detail herein and incorporated by reference.  This is especially true under New Jersey Law.

129.   Quiznos breached the implied covenant of good faith and fair dealing by virtue of the deceptive practices described herein and by acts independent of the deceptive practices.

130.   Moreover, Quiznos has denied the Plaintiffs and others similarly situated the ability to achieve its reasonable expectations in entering into the franchise relationship including but not limited to:

a. An award to the Class of monetary damages, as appropriate;

b. An award to the Class of its reasonable attorney's fees, interest, and costs;

c. An award to the Class of punitive damages;

d. Injunctive and/or declaratory relief as herein described;

e. The rescission of the contractual agreements between the parties; and

f. Such other relief as this Court finds reasonable and proper.

## COUNT FOUR
## BREACH OF FIDUCIARY DUTY
### (As to all Defendants)

132.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length.

133.    At all times relevant hereto, all Defendants had a fiduciary relationship with the Plaintiffs and others similarly situated and owed a fiduciary duty to the Plaintiffs and others similarly situated to act in utmost good faith with care and undivided loyalty. This fiduciary duty derives from the special relationship and special circumstances between all Defendants and the Plaintiffs as more particularly described herein.

134.    All Defendants breached their fiduciary duty owed to the Plaintiffs and others similarly situated.

**WHEREFORE**, Plaintiffs demand that a Class be certified as set forth above, and that judgment be entered against all Defendants, jointly and severally, Ordering:

a. An award to the Class of monetary damages, as appropriate;

b. An award to the Class of its reasonable attorney's fees, interest, and costs;

c. An award to the Class of punitive damages;

d. Injunctive and/or declaratory relief as herein described;

27

WHEREFORE, Plaintiffs demand that a Class be certified as set forth above, and that judgment be entered against Defendants The Quiznos Master LLC., The Quiznos Corporation, The Quiznos Franchise Corporation and QFA Royalties LLC, jointly and severally, Ordering:

    a. An award to the Class of monetary damages, as appropriate;

    b. An award to the Class of its reasonable attorney's fees, interest, and costs;

    c. An award to the Class of punitive damages;

    d. Injunctive and/or declaratory relief as herein described; and

    e. Such other relief as this Court finds reasonable and proper.

## COUNT SIX
### NEGLIGENT MISREPRESENTATION
(As To All Defendants)

139. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length.

140. Defendants negligently have made false statements, misrepresentations and omissions of material fact to the Plaintiffs and others similarly situated without regard for how those statements would affect the Plaintiffs and others similarly situated and prospective agents.

141. Those negligent misrepresentations have been more particularly described herein and include, but are not limited to, the following acts:

    a. Quiznos coerced the franchisees to sign an agreement on the basis of false and misleading data and representations including misrepresentations;

    b. Quiznos failed to provide legitimate trade areas to the franchisees in an effort to sell as many franchises as possible with no realistic expectations of franchises

actually opening, despite representing that all trade areas were "Good Investments"; and

c.  Quiznos negligently misrepresented the availability of real estate within trade areas so as to induce the franchisees to sign an agreement on the basis that locations existed in their areas, which would house a Quiznos franchises.

142.  Plaintiffs and others similarly situated relied upon these false statements, misrepresentations and omissions of material fact in deciding to become a Quiznos franchisee.

143.  As a direct and proximate result of the reasonable reliance of the Plaintiffs and others similarly situated on the false statements, misrepresentations, and omissions of material fact made by the defendants, the Plaintiffs and others similarly situated have suffered damages.

**WHEREFORE**, Plaintiffs demand that a Class be certified as set forth above, and that judgment be entered against all Defendants, jointly and severally, Ordering:

a.  An award to the Class of monetary damages, as appropriate;

b.  An award to the Class of its reasonable attorney's fees, interest, and costs;

c.  An award to the Class of punitive damages;

d.  Injunctive and/or declaratory relief as herein described; and

e.  Such other relief as this Court finds reasonable and proper.

**COUNT SEVEN**
**UNJUST ENRICHMENT**
(Against All Defendants)

144.  Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length.

Case 1:06-cv-02053-DMC-MF Document 25-1 Filed 04/24/06 USDC Colorado Page 30 of
865
Case 2:06-cv-01415-DMC-MF     Document 1-2     Filed 03/24/2006     Page 32 of 35

145.   Defendants have, by virtue of its agreements with Plaintiffs and others like them in
the state of New Jersey, received millions of dollars in payments from franchisees who never had
the opportunity to open a Quiznos restaurant or receive any benefit from their investment.

146.   Defendants have, therefore, received millions of dollars in money to which they are
not entitled and the receipt of which has constituted or will constitute unjust enrichment to
Defendants.

147.   The franchisees are entitled to an award of damages consisting of the amounts that
they paid to Quiznos.

WHEREFORE, Plaintiffs demand that a Class be certified as set forth above, and
that judgment be entered against all Defendants, jointly and severally, Ordering:

   a.   An accounting and disgorgement of all monies Defendants have received from
        persons who are members of the Class as described above;

   b.   An award to the Class of monetary damages, as appropriate;

   c.   An award to the Class of its reasonable attorney's fees, interest, and costs;

   d.   An award to the Class of punitive damages;

   e.   Injunctive and/or declaratory relief as herein described; and

   f.   Such other relief as this Court finds reasonable and proper.


### COUNT EIGHT
### VIOLATION OF THE NEW JERSEY FRANCHISE PRACTICES ACT
(As To All Defendants)

148.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing
paragraphs of this Complaint with the same force and effect as though fully set forth at length.

149.   Plaintiffs and others similarly situated reasonably relied upon the written and oral
promises and representations of Quiznos and were induced to expend substantial time, effort and

155. In addition to the extremely one-sided operational and approval terms included in the form adhesive agreements, Quiznos has included procedural obstacles, which intend to discourage claims against it and/or attempt to shield it from <u>any</u> liability.

156. These provisions are unenforceable. The provisions include, inter alia:

    a.  Limitations on suing potentially liable parties;

    b.  Truncated Statute of Limitations;

    c.  Preclusion of punitive or exemplary damages;

    d.  No class action; and

    e.  Preclusion of consolidating proceedings. (See for Example Exhibit A, pp. 33-34)

157. The onerous provisions in the form adhesive franchise agreement are violative of New Jersey public policy and shall be declared void and unenforceable.

158. Plaintiffs are therefore entitled to a Declaration from the Court that the Quiznos franchise agreements signed by Plaintiffs, and others similarly situated is void and unenforceable or in the alternative the Court shall strike those provisions that are unenforceable.

**WHEREFORE,** Plaintiffs demand that a Class be certified as set forth above, and that judgment be entered against all Defendants, jointly and severally, Ordering:

    a.  A declaratory judgment in favor of Class Members, stating that the franchise agreement signed by Plaintiffs and others similarly situated is void and unenforceable;

    b.  A declaratory judgment that each offending provision of the franchise agreement listed above (¶153) is unconscionable and unenforceable; and

    c.  A declaratory judgment that the provisions of the franchise agreements are collectively unconscionable and unenforceable.

Case 1:06-cv-02055-JSR-RLE Document 25-1 Filed 04/07/2006 USDC Colorado Page 32 of
865
Case 2:06-cv-01415-DMC-MF    Document 1-2    Filed 03/24/2006    Page 34 of 35

## PRAYER FOR INJUNCTIVE RELIEF

159.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing
paragraphs of this Complaint with the same force and effect as though fully set forth at length.

160.   As a result of the foregoing, and because money damages are inadequate to
compensate the Plaintiffs and others similarly situated or to prevent further instances of the
future violations, temporary and permanent injunctive relief is warranted as follows:

     a.   Quiznos shall cease the sale of any future franchises in New Jersey, unless and
        until all current franchisees are provided and approved locations to open and/or
        Quiznos reimburses the fees collected to those who wish the return of the fee;

     b.   Quiznos shall be permanently enjoined from implementing the business scheme
        described herein or incorporated by reference; and

     c.   An independent examiner shall be appointed by the Court to monitor and report to
        the Court on Quiznos compliance with the injunction as entered by the Court.

**MARKS & KLEIN, ESQS.**

Justin M. Klein
63 Riverside Avenue
Red Bank NJ 07701
(732) 747-7100
Attorneys for Plaintiffs

Dated: February 15, 2006

## CERTIFICATION

Pursuant to R. 4:5-1, I hereby certify that the matter in controversy is not the subject of
any other action pending in any court or a pending arbitration.  I further certify that I am not
aware of any parties that should be joined in this action.

I further certify that this pleading has been filed within the time required by the Rules of Court and/or an order of the Court and/or the stipulation of the parties.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

February 15, 2006

Justin M. Klein

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Justin M. Klein, Esq. is hereby designated as trial counsel for Plaintiffs in the within matter.

**MARKS & KLEIN, ESQS.**
Attorneys for Plaintiffs

By: _____
Justin M. Klein

February 15, 2006

# EXHIBIT B

Case No. 1:20-cv-01689-RAB-KLM Document 99-1 Filed 03/30/21 USDC Colorado pg 35 of 65

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:20-cv-01689-STV

FELIKS OBERTMAN, on behalf of himself and all others similarly situated,

> Plaintiff,

v.

FRONTIER AIRLINES, INC.,

> Defendant.

---

## FRONTIER AIRLINES, INC.'S MOTION TO STRIKE
### PURSUANT TO FED. R. CIV. P. 23(c)(1)(A) and (d)(1)(D)

---

Defendant Frontier Airlines, Inc. ("Frontier") by and through undersigned counsel, moves to strike the class allegations contained in Plaintiff's Complaint pursuant to Fed. R. Civ. P. 23(c)(1)(A) and (d)(1)(D).

## I. INTRODUCTION & FACTUAL BACKGROUND

Frontier moves to strike the Complaint's class allegations because: (i) Plaintiff's class action claims are barred by Frontier's Contract of Carriage ("Contract"); (ii) Plaintiff's factual allegations make clear that individual issues will predominate, precluding Plaintiff from meeting his burden of demonstrating that common questions predominate; and (iii) the class definition includes class members who do not have standing. These deficiencies warrant striking all of the class allegations in the Complaint.

This lawsuit arises from Plaintiff's purchase of tickets for air travel on Frontier. Like many United States air carriers, in response to COVID-19, Frontier was forced to reduce its flying

1

Case No. 1:20-cv-01663-STV Document 22 Filed 06/17/20 USDC Colorado pg 2 of 14
Case 1:20-cv-01663-STV Document 22 Filed 06/17/20 USDC Colorado Page 2 of 14
of 65

significantly as a result of drastically lower consumer demand. Dkt. No. 1, Compl. ¶ 11. This reduction in operations necessitated the cancellation of many of its flights. *Id.* ¶ 12. When passengers book travel aboard Frontier, they become bound by its Contract, which outlines the airline's obligations to its passengers in a variety of situations. *Id.* ¶ 30, Ex. A § 18.[1] That Contract specifies that when Frontier cancels a flight, it must either attempt to reaccommodate the passenger on another Frontier flight, and if unable to do so and the passenger so requests—refund the unused portion of the passenger's fare to the passenger's original method of payment. *Id.* ¶¶ 32, 33, Ex. A. If a passenger does not specifically request a refund, or if a passenger cancels a trip *before* Frontier cancels the passenger's flight, the passenger is *not* entitled to a refund. Ex. A § 18.

Plaintiff, a California resident, alleges that on March 17, 2020, he purchased two roundtrip tickets for a May 8, 2020 flight from Sacramento, California to Denver, Colorado. *Id.* ¶¶ 20, 24. He alleges he purchased his tickets **after** the World Health Organization's March 11, 2020 declaration of COVID-19 as a pandemic, and the March 16, 2020 announcement of "shelter-in-place orders" by "seven counties in the San Francisco, California area." *Id.* ¶¶ 3-7. Plaintiff alleges he bought a third roundtrip third ticket for the same flight on March 21, 2020, *id.* ¶ 25, **after** California's governor's March 19, 2020 issuance of a mandatory stay-at-home order barring non-essential travel for all Californians. *See* https://www.gov.ca.gov/2020/03/19/governor-gavin-newsom-issues-stay-at-home-order/. Plaintiff does not allege whether his ticket purchases were

---

[1] The Complaint attaches a version of the Contract that post-dated Plaintiff's alleged March 2020 ticket purchases. *See* attached Declaration of David Ross ("Ross Dec."), **Exhibit 1**. Few changes exist between these versions. To the extent the versions are the same as to a provision discussed herein, Frontier solely references the version attached to the Complaint, and to the extent they differ, Frontier explains the difference herein.

2

pretext purchases merely designed to manufacture a lawsuit against Frontier.[2]

On March 23, 2020, Frontier emailed Plaintiff to advise that the May 8, 2020, flight was now canceled and he would be rebooked. On March 31, 2020, Frontier emailed him to advise that he was rebooked on a May 10, 2020, flight from Sacramento to Denver. *Id.* ¶¶ 26, 27. He alleges he contacted Frontier, requested a refund, and Frontier informed him his options were to accept the rebooked flight or credit for future travel, and he accepted the credit. *Id.* ¶ 28.

Plaintiff includes one cause of action, breach of contract, on behalf of himself and a putative nationwide class of Frontier passengers. *Id.* ¶¶ 50-54. Plaintiff defines his putative class as "[a]ll persons in the United States who purchased tickets for travel on a Frontier Airlines flight scheduled to operate from March 1, 2020 through the date of a class certification order, whose flight(s) were canceled by Frontier, and who were not provided a refund." *Id.* ¶ 37. Plaintiff excludes from the proposed class, *inter alia*, "any person who was reaccommodated and transported to their ticketed destination by Defendant or its agents." *Id.* ¶ 38. For the reasons listed above and as described in detail below, Plaintiff's class allegations must be stricken from his Complaint.[3]

## II.     APPLICABLE LEGAL STANDARDS

Rule 23(c)(1)(A) directs that "[a]t an early practicable time after a person sues or is sued

---

[2] Plaintiff is also the named plaintiff in a product liability putative class action filed in December 2019 against Electrolux Home Care Products, Inc. in the United States District Court for the Eastern District of California, No. 19-cv-01164. Plaintiff is represented in that case by the law firm of Bursor & Fisher, P.A., which is also representing the plaintiff in a putative class action case filed in May 2020 against Frontier that also involves the alleged failure to provide refunds for Defendant's flights that were canceled as a result of the COVID-19 pandemic, *Young v. Frontier Airlines*, No. 20-cv-1153 (D. Colo).

[3] Frontier has today filed a Motion to Dismiss showing that Plaintiff's Complaint must be dismissed pursuant to Rule 12(b)(1) and (6). The instant Motion to Strike is filed in the event that any portion of the Complaint survives Frontier's Motion to Dismiss.

936903v.2

as a class representative, the court must determine by order whether to certify the action as a class action." "Sometimes the issues are plain enough from the pleadings" to determine whether class claims are appropriate. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982); *Stearns v. Select Comfort Retail Corp.*, No. 08-2746, 2009 U.S. Dist. LEXIS 112971, *45 (N.D. Cal. Dec. 4, 2009) ("it is procedurally proper to strike futile class claims at the outset of litigation to preserve time and resources"). Further, under Rule 23(d)(1)(D), the court may "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." *Edwards v. Zenimax Media, Inc.*, No. 12-cv-00411, 2012 U.S. Dist. LEXIS 137520, *7 (D. Colo. Sept. 25, 2012) (quoting Fed. R. Civ. P. 23(d)(1)(D)). Courts have held that a motion to strike class allegations made pursuant to Rule 23(c)(1)(A) and (d)(1)(D) can be an appropriate device to determine whether a case will proceed as a class action. *See, e.g., Muehlbauer v. Gen. Motors Corp.*, 431 F. Supp. 2d 847, 870 (N.D. Ill. 2006).

## III.   ARGUMENT

### A.   Plaintiff's Class Action Allegations are Barred by the Contract of Carriage

The Contract, which Plaintiff attaches to the Complaint and alleges governs the parties' relationship in this case, expressly bars class action lawsuits, providing in § 22 H:

> No Class Action – Any case brought pursuant to this Contract of Carriage, Frontier's Tarmac Delay Plan, or Frontier's Customer Service Plan may be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

Compl., Ex. A § 22 H; Ross Dec., Ex. 1 § 22 H.[4] Plaintiff brings this lawsuit pursuant to the

---

[4] The class action bar language in § 22 H is the same in the version of the Contract that Plaintiff attaches to the Complaint and the version in existence when Plaintiff purchased his tickets in March 2020. Compl., Ex. A § 22 H; Ross Dec., Ex. 1 § 22 H.

4

Contract and does not allege that any portion of it is unenforceable, supporting that the "No Class Action" provision requires the striking of all class allegations. Moreover, under Colorado law the Class Action Bar is enforceable.[5]

When applying Colorado law, courts begin with the presumption that a contract provision is enforceable. *See Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003) ("We will enforce the agreement as written unless there is an ambiguity in the language; courts should neither rewrite the agreement nor limit its effect by a strained construction."). Plaintiff does not allege in the Complaint that the Contract contains any ambiguity.

A contract that favors one party more than another does not eliminate the presumption of enforceability. *See, e.g., Thurmon v. Skipton*, 403 P.2d 211, 214 (Colo. 1965) ("Courts will enforce a contract as made, regardless of whether it is an improvident one from the standpoint of one of the parties."); *Sedalia Land Co. v. Robinson Brick & Tile Co.*, 475 P.2d 351, 354 (Colo. Ct. App. 1970) ("The general rule is that, if a party enters into a contract or any other legal transaction with sufficient mental capacity to understand it, and not under the influence of fraud, coercion or imposition, the courts will not relieve him of the consequences of his act on the sole ground that the bargain is improvident as to him."). "[T]he party seeking to avoid application of a contractual provision bears the burden of showing that it is unconscionable." *Bonanno v. Quizno's Franchise Co., LLC*, No. 06-cv-02358, 2009 U.S. Dist. LEXIS 37702, *56 (D. Colo. April 20, 2009) (enforcing contractual class action bar). Plaintiff does not allege in the Complaint that any

---

[5] The Contract contains a choice of law provision that requires application of Colorado law: "This Contract of Carriage will be governed by and construed in accordance with the laws of the United States of America and the State of Colorado without regard to conflict of law principles or law." Compl., Ex. A § 22 H; Ross Dec., Ex. 1 § 22 H.

provision in the Contract is unconscionable.

1.      **Federal Aviation Law Does Not Preclude the Class Action Bar in the Contract**

The Contract's class action bar is not prohibited by Federal Aviation Regulations. Specifically, 14 C.F.R. § 253.2 provides that an airline's contract of carriage "applies to all scheduled direct air carrier operations" in interstate air transportation, and "applies to all contracts with passengers, for those operations." A contract of carriage commences when a passenger has purchased the air transportation. 14 C.F.R. § 399.88(a). Airlines are permitted to incorporate contracts of carriage into passengers' tickets or other written instruments, 14 C.F.R. § 253.4(a), and the incorporated terms may include "[c]laims restrictions." 14 C.F.R. § 253.5(b)(2). The Federal Aviation Regulations do not contain any prohibition against class action bar provisions in airlines' contracts of carriage. *See* 14 C.F.R. § 1.1, *et seq.*

B.      **Even if Plaintiff Was Not Contractually Precluded from Pursuing a Class Action, He Does not Satisfy Rule 23(b)**

Even if the Contract did not preclude Plaintiff's pursuit of a putative class action, his class action allegations would still be unsustainable. As a threshold issue, even assuming, *arguendo*, that Plaintiff sufficiently pled the four Rule 23(a) requirements for class certification, he fails to satisfy at least one of the categories in Rule 23(b). Fed. R. Civ. P. 23(b).

1.      **Plaintiff Does Not Plead a Rule 23(b)(1) or (2) Class Action**

Although Plaintiff seeks certification under Rule 23(b)(1), (2), or (3), Compl. ¶¶ 37, 41, 46, 47, the factual allegations in the Complaint make clear that this case is about individualized, money damages that fall under Rule 23(b)(3). *See, e.g.,* Compl. ¶ 37 (defining putative class as persons "who were not provided a refund") and ¶ 49 (explaining that sole cause of action is a "claim for breach of contract damages or, in the alternative, specific performance of the contract's

6

refund terms"). Hence, certification under Rule 23(b)(1) or (2) is inappropriate. *Corley v. Entergy Corp.*, 222 F.R.D. 316, 320-23 (E.D. Tex. 2004). *See also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011); *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995) ("The trial judge understood that injunctive relief was requested and that certification of a class under such circumstances was legally permissible under Rule 23(b)(2), but nevertheless decided that it was not appropriate to certify a class under that rule where the relief sought was primarily money damages."); *Clark v. State Farm Mut. Auto. Ins. Co.*, 245 F.R.D. 478, 485-86 (D. Colo. 2007) ("The predominant-relief inquiry . . . allows courts to ensure that insignificant or sham requests for injunctive relief do not provide cover for Rule 23(b)(2) certification of claims that are brought essentially for monetary recovery."); *Friedman v. Dollar Thrifty Auto. Group*, 304 F.R.D. 601, 614 (D. Colo. 2015); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986-87 (9th Cir. 2011).

1.      **Plaintiff's Factual Allegations Demonstrate that Individual Issues will Predominate, and He Cannot Meet His Burden to Demonstrate that Common Questions will Predominate Under Rule 23(b)(3)**

This Court should strike Plaintiff's class action allegations because he cannot meet his burden of satisfying the requirements of Rule 23(b)(3). Rule 23(b)(3) permits a class action to be maintained if two requirements are met: (1) common questions of law or fact must predominate over any questions affecting only individual members; and (2) a class resolution must be superior to other available methods for fairly and efficiently adjudicating the controversy.[6] "The Rule

---

[6] This Court need not address threshold requirements under Rule 23(a) or Rule 23(b)(3)'s requirement of superiority because Plaintiff has not met burden of showing common questions predominate. *Moua v. Jani-King of Minn., Inc.*, No. 08-4942, 2010 U.S. Dist. LEXIS 23462, *6-7 (D. Minn. Mar. 12, 2010).

23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Moua*, 2010 U.S. Dist. LEXIS 23462, *7. "In examining this requirement, the Court is to conduct a limited preliminary inquiry, looking behind the pleadings to determine whether, given the factual setting of the case, if the plaintiff's general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Id.* (internal quotations and ellipsis omitted). "This necessarily requires an examination of the underlying elements necessary to establish liability for plaintiffs' claims, and the predominance standard is satisfied only if those elements can be proven on a systematic, class-wide basis." *Id.* (internal quotations and omitted).

In this case, Plaintiff alleges a breach of contract claim, the elements of which are: (1) existence of a contract; (2) performance by plaintiff; (3) non-performance by defendant; and (4) damages. *Tatten v. Bank of Am. Corp.*, 912 F. Supp. 2d 1032, 1041 (D. Colo. 2012). One contract is at issue here, Frontier's Contract. However, as noted above, different versions exist at different times, and the version that Plaintiff attaches to his Complaint post-dates the version in existence when Plaintiff purchased his tickets in March 2020. *Compare* Compl., Ex. A; Ross Dec., Ex. 1. Thus, for every purchaser, an individualized assessment is required to determine the version of the Contract that is at issue. While few changes exist between the version Plaintiff attaches to his Complaint and that in existence during his March 2020 ticket purchase, an individualized assessment is necessary to determine if the particular circumstances of each transaction implicate one of the provisions that is different. For example, § 18 of the Contract, "Failure to Operate on Schedule or Failure to Carry," contains different language in the two versions for § 18 E, "Schedule Change Prior to Day of Travel." *Compare* Compl., Ex. A § 18 E; Ross Dec., Ex. 1 § 18 E. Indeed,

8

936903v.2

someone who purchased multiple tickets at different times, *e.g.,* March 2020 and April 2020, could have different versions of the Contract relevant to different transactions.

Additional reasons show that the resolution of putative class members' breach of contract claims will require individualized inquiries that will predominate over common questions. For example, § 18 C, which addresses cancellations, makes refunds contingent on whether Frontier was able to rebook the passenger and, if not, whether the passenger has requested a refund. Compl., Ex. A § 18 C; Ross Dec., Ex. 1 § 18 C. Further, §18 E of the Contract, which addresses schedule changes, makes a refund contingent on whether Frontier has been able to rebook the passenger and whether an itinerary change was deemed "significant." Compl., Ex. A § 18 E; Ross Dec., Ex. 1 § 18 E. Thus, individual issues exist that are not capable of resolution on a class-wide basis. Some passengers may have been rebooked, had itinerary changes that were not significant, canceled their own flights, accepted credit, or not requested a refund, and each putative class member's individualized circumstances and relevant Contract version or versions at issue will dictate the member's and Frontier's contractual obligations, requiring separate, individualized inquiries.

Claims under the Contract, in particular § 18 C and E, also require individual inquiries beyond which passengers made refund requests and some of the other individualized inquiries noted above. This Court will have to determine on an individualized basis several other aspects, including but not limited to: (1) eligibility, *i.e.* who purchased the ticket, and is the claimant someone other than the ticketed passenger, who could potentially obtain relief, whether a gift card, rewards miles, or previous credit was used to purchase the ticket; (2) was a rebooking offered (and if so, whether to an original or equivalent destination); (3) did the passenger accept a reaccommodation (excluded in the Complaint from the class definition, Compl. ¶ 38) or travel

credits; and (4) inquiries within inquiries such as (a) what was the originally ticketed schedule; (b) what was the alternative schedule offered in a rebooking; (c) what other alternatives existed to get to the same destination or equivalent destination; (d) whether the trip was non-stop or had one or more layovers; (e) whether the trip was scheduled to be one-way or roundtrip; (f) if the trip was scheduled to be roundtrip, how long the trip was supposed to be, whether one or both flights were cancelled and subject to rebooking, and the impact on the total planned time to be spent in the destination city; and (g) whether Frontier logged or otherwise memorialized any determinations it made about whether a schedule modification was "significant."

Given the foregoing, common questions of law or fact do not predominate over any questions affecting only individual members. The determinations necessary for the proposed class are not sufficiently cohesive to warrant adjudication by representation in a class action, and it is appropriate for this Court to "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." *Edwards*, 2012 U.S. Dist. LEXIS 137520, *7. This Court should accordingly strike the class action allegations.

### 1. The Class Allegations Must be Stricken because the Class Definition Includes Class Members who Lack Article III Standing to Sue

Plaintiff's class allegations must be stricken because the class definition inherently and improperly encompasses passengers who were not entitled to cash refunds and therefore lack standing. Article III of the United States Constitution requires that a party have standing to bring a lawsuit. USCS Const. Art. III, § 2, Cl 1. One of the three requirements for standing is the existence of an injury-in-fact. *See Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-181 (2000). Actual economic damages can satisfy the injury-in-fact requirement, *Sierra Club v. Morton*, 405 U.S. 727, 733-34 (1972), and can be satisfied when a

10

plaintiff properly alleges a "particularized breach of contract," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1551 (2016) (Thomas, J., concurring).

Plaintiff brings a putative class on behalf of himself and others, complaining of money damages due to Frontier's alleged failure to provide a refund. He defines his putative class as "[a]ll persons in the United States who purchased tickets for travel on a Frontier Airlines flight scheduled to operate from March 1, 2020 through the date of a class certification order, whose flight(s) were canceled by Frontier, and who were not provided a refund." Compl. ¶ 37. *See also* Compl. ¶ 49 (explaining that sole cause of action is a "claim for breach of contract damages or, in the alternative, specific performance of the contract's refund terms").

Plaintiff's proposed class definition is so broad that it inherently includes passengers who cancelled their flights voluntarily before Frontier did, who did not request a refund from Frontier as required, who willingly accepted vouchers from Frontier in lieu of a cash refund, and who purchased their air transportation using non-cash means and who are therefore not entitled to a cash refund, to name just a few. Passengers in any of these categories are *not* entitled to cash refunds under the Contract and therefore lack any justiciable damages. Therefore, Frontier could not have breached its Contract in refusing to provide cash refunds to such passengers and Plaintiff cannot allege an actionable breach of contract for such putative class members, because they have no standing.

Despite the number of possible circumstances that exist in which passengers are not entitled to refunds and where Frontier accordingly could not have breached its Contract, the only exclusion Plaintiff includes in his class definition are passengers who were reaccommodated on other flights to their destinations. Compl. ¶ 38. The deficient inclusion of putative class members with no

11

Article III standing further supports the striking of Plaintiff's class allegations.

## IV.  CONCLUSION

For the foregoing reasons, Frontier respectfully requests that the Court strike the class allegations contained within Plaintiff's Complaint pursuant to Rule 23(c)(1)(A) and (d)(1)(D).

<u>Statement Regarding Oral Argument</u>

Oral argument is requested, to the extent a hearing will assist this Court in evaluating the arguments submitted.

DATED this 17th day of June, 2020.

Respectfully submitted,

Wilson Elser Moskowitz Edelman & Dicker, LLP

By:  /s/ Jason D. Melichar
        Jason D. Melichar, Esq.
        R. Joseph Isert, Esq.
        1225 17th Street, Suite 2750
        Denver, CO 80202
        (303) 572-5300
        (303) 573-5301 (fax)
        jason.melichar@wilsonelser.com
        joe.isert@wilsonelser.com

        William J. Katt, Esq.
        740 N. Plankinton Avenue, Suite 600
        Milwaukee, WI 53203
        (414) 276-8816
        (414) 276-8819 (fax)
        william.katt@wilsonelser.com

        Patrick J. Kearns, Esq.
        401 West A Street Suite 1900
        San Diego, CA 92101
        (619) 321-6200
        (619) 321-6201 (fax)
        patrick.kearns@wilsonelser.com

Case 1:20-cv-01689-STV   Document 22   Filed 06/17/20   USDC Colorado   Page 13 of 14

David M. Ross, Esq.
1500 K Street, NW, Suite 330
Washington, D.C. 20005
(202) 626-7660
(202) 628-3606 (fax)
david.ross@wilsonelser.com

*Attorneys for Defendant Frontier Airlines, Inc.*

## CERTIFICATION OF COUNSEL

Frontier's counsel certifies that on June 16, 2020, counsel for Frontier conferred with Plaintiff's counsel regarding the relief sought in this Motion, and did not obtain consent to the relief requested herein.

By: /s/ Jason D. Melichar
Jason D. Melichar, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of June 2020, a true and correct copy of the foregoing was filed with the Court and served via CM/ECF on the following:

| | |
|---|---|
| Hassan A. Zavareei, Esq.<br>Annick Marie Persinger, Esq.<br>TYCKO & ZAVAREEI LLP<br>1828 L Street NW, Suite 1000<br>Washington, DC 20036<br>Telephone: (202) 973-0900<br>Facsimile: (202) 973-0950<br>Email: hzavareei@tzlegal.com<br><br>Jeff Ostrow, Esq.<br>Jonathan M. Streisfeld, Esq.<br>Joshua R. Levine, Esq.<br>Daniel Tropin, Esq.<br>KOPELOWITZ OSTROW<br>FERGUSON WEISELBERG GILBERT<br>1 West Las Olas Blvd. Suite 500<br>Fort Lauderdale, FL 33301<br>Telephone: (954) 525-4100<br>Facsimile: (954) 525-4300<br>Email: streisfeld@kolawyers.com<br>ostrow@kolawyers.com<br>*Counsel for Plaintiff* | Melissa S. Weiner, Esq.<br>PEARSON, SIMON & WARSHAW, LLP<br>800 LaSalle Avenue, Suite 2150<br>Minneapolis, Minnesota 55402<br>Telephone: (612) 389-0600<br>Facsimile: (612) 389-0610<br>Email: mweiner@pswlaw.com<br><br>Daniel L. Warshaw, Esq.<br>PEARSON, SIMON & WARSHAW, LLP<br>15165 Ventura Boulevard, Suite 400<br>Sherman Oaks, CA 91403<br>Telephone: (818) 788-8300<br>Facsimile: (818) 788-8104 |

By: /s/ Jason D. Melichar
Jason D. Melichar, Esq.

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:20-cv-01153-PAB-KLM

MELISSA YOUNG, on behalf of herself and all others similarly situated;

      Plaintiff,

v.

FRONTIER AIRLINES, INC.;

      Defendant.

---

## FRONTIER AIRLINES, INC.'S MOTION TO DISMISS PLAINTIFF'S
## FIRST AMENDED COMPLAINT

---

Defendant Frontier Airlines, Inc. ("Frontier") moves to dismiss Plaintiff's First Amended Complaint ("FAC") for failing to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and for lack of standing pursuant to Rule 12(b)(1) because Plaintiff: (i) brings a lawsuit preempted by federal law; (ii) fails to state a breach of contract claim; (iii) lacks standing to pursue injunctive relief; and (iv) is precluded by Frontier's Contract of Carriage ("Contract") from pursuing class action allegations or recovering attorney's fees in this action.

## I.      INTRODUCTION & FACTUAL BACKGROUND

As a result of the devastating impact of the COVID-19 pandemic, like many air carriers, Frontier was forced to significantly reduce its flights due to drastically lower consumer demand. These measures also necessitated the cancellation of many flights. FAC ¶ 2. When passengers book travel aboard Frontier, they become bound by its Contract,[1] which outlines the airline's

---

[1] The FAC attaches a version of the Contract that post-dated Plaintiff's alleged March 2020 ticket

obligations to its passengers in a variety of situations. *Id.* ¶ 12, Ex. A § 18. The Contract specifies that when Frontier cancels a flight, it must attempt to reaccommodate the passenger on another Frontier flight, and if it is unable to do so and the passenger makes a specific request, refund the unused portion of the fare to the passenger's original method of payment. *Id.* If a passenger does not specifically request a refund or cancels their travel *before* Frontier cancels that flight, the passenger is *not* entitled to a refund. *Id.*

Plaintiff, a South Carolina resident, alleges that in March 2020—in the midst of Coronavirus emerging as a national concern—she purchased two roundtrip tickets for a May 19, 2020, Frontier flight from Myrtle Beach, South Carolina to Long Island, New York. *Id.* ¶ 18. On March 19, 2020, Frontier emailed Plaintiff to advise that the May 19, 2020, flight was now canceled, and offered her a rebooking or a travel voucher. *Id.* On March 19, 2020, Plaintiff called Frontier to request a cash refund and was advised that she would receive one. *Id.* Plaintiff alleges that refund never came, and that during a call with Frontier two weeks later, Frontier advised her that she was never offered a cash refund and that she was only entitled to a travel voucher. *Id.*

The FAC includes one cause of action—breach of contract—on behalf of herself and a putative nationwide class of Frontier passengers. *Id.* ¶¶ 32-36. Plaintiff seeks injunctive relief and to recover her attorney's fees. *Id.* ¶ 31, Prayer for Relief. Plaintiff's recovery is barred on the four corners of the FAC alone and the FAC should be dismissed in its entirety.

## II.    APPLICABLE LEGAL STANDARDS

A Rule 12(b)(6) motion to dismiss permits courts to terminate lawsuits that are fatally

---

purchases. *See* attached Declaration of David Ross ("Ross Dec."), **Exhibit 1**. Few changes exist between these versions; to the extent they differ as relevant herein, Frontier solely references the version attached to the FAC, and to the extent they differ, Frontier explains the difference herein.

1104054v.1

flawed in their legal premises and destined to fail, sparing litigants the burdens of unnecessary pretrial and trial activity. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989). "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of elements of a Cause of Action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). A plaintiff must allege facts sufficient to "nudge his claims…across the line from conceivable to plausible." *Id.* at 683. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 570. Mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations omitted). A motion to dismiss under Rule 12(b)(1) tests standing to ensure the constitutional limitation of federal court jurisdiction to actual cases or controversies. *Simon v. Eastern KY Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976). Where a plaintiff seeks injunctive relief, he must demonstrate a real and immediate threat of future injury to satisfy the injury in fact requirement. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-04 (1983).

## III.    ARGUMENT

### A.  Plaintiff's Claim Is Preempted by the Airline Deregulation Act of 1978

To the extent Plaintiff's breach of contract claim attempts to rely upon, or must be adjudicated with reference to any external law or policy, her claim is barred by the doctrine of federal preemption and cannot proceed. Because Plaintiff sues Frontier, an airline, this case is subject to the Airline Deregulation Act of 1978 ("ADA"). The ADA precludes claims relating to "a price, route, or service of an air carrier" based on state "law, regulation, or other provision having the force and effect of law." 49 U.S.C. § 41713(b)(1). Airline refund cases relate to the

airline's prices and are therefore encompassed by the ADA. *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 31 (1st Cir. 2007); *Statland v. Am. Airlines, Inc.*, 998 F.2d 539, 541-42 (7th Cir. 1992).

A narrow exception to ADA preemption exists for breach of contract claims seeking to recover "solely for the airline's alleged breach of its own, self-imposed undertakings." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 227-28 (1995). The *Wolens* exception is inapplicable when a plaintiff seeks to invalidate instead of enforce a contract. *Id.* at 233 (courts are confined, "in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement"). *See Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 289 (2014) (holding ADA preemption applies where plaintiff uses an external law to enlarge his rights under a contract); *Alaska Airlines, Inc. v. Carey*, 395 F. App'x 476, 479 (9th Cir. 2010) (finding preemption barred plaintiff's effort to invalidate airline contract). If Plaintiff's breach of contract claim cannot be adjudicated without resort to external law or policies, the ADA preempts her claim. *Smith v. Comair, Inc.*, 134 F.3d 254, 257 (4th Cir. 1998) (dismissing breach of contract claim on ADA preemption grounds because claim could not be adjudicated without reference to federal laws external to parties' agreement); *Boon Ins. Agency, Inc. v. Am. Airlines, Inc.*, 17 S.W.3d 52, 58-59 (Tex. App. 2000) (dismissing breach of contract claim that could not be adjudicated without reference to state laws external to parties' agreement on ADA preemption grounds); *Howell v. Alaska Airlines, Inc.*, 994 P.2d 901, 905 (Wash. App. 2000) (same).

The FAC repeatedly references April 3, 2020 and May 12, 2020 U.S. Department of Transportation ("DOT") Enforcement Notices. FAC ¶¶ 3-4, 11, 15, 28. In citing those Notices, Plaintiff seeks to enlarge the obligations voluntarily undertaken by the parties through the Contract by introducing an external document, and her claim is therefore preempted. Further, to the extent

4

her breach of contract claim cannot be adjudicated without reference to that external policy, or to the law upon which the DOT Notices is based, Enhancing Airline Passenger Protections, 76 Fed. Reg. 23110-01, at 23129 (Apr. 25, 2011), her claim is preempted. Thus, to the extent that the breach of contract claim is not limited to the terms of the parties' Contract, the claim is preempted.

While Plaintiff's references to the DOT Notices support the preemption of her breach of contract claim, even if preemption did not apply, the Notices do not assist Plaintiff in meeting her burden to show a viable breach of contract claim. DOT guidance is not enforceable in a private action. *Wolens*, 513 U.S. at 222. *See Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 36-37 (1st Cir. 2007) ("The plaintiffs have not directed us to a single case holding that a federal regulation incapable of spawning an implied private right of action may be enforced between private parties as an implicit contractual term."); *Statland v. Am. Airlines, Inc.*, 998 F.2d 539, 541 (7th Cir. 1993) ("DOT, not private parties, will enforce consumer protection rules against the airlines."); *Kalick v. Northwest Airlines Corp.*, 372 F. App'x 317, 320 (3d Cir. 2010) (no private right of action to enforce airline's violation of DOT regulations about compensating passengers impacted by oversold flights). Plaintiff also has not alleged that the Contract is ambiguous to permit the consideration of extrinsic evidence. *Fort Lyon Canal Co. v. High Plains A&M, LLC*, 167 P.3d 726, 729 (Colo. 2007).

**B. The FAC Fails to State a Claim for Breach of Contract**

In addition to the unavailability of the DOT Notices for Plaintiff to prove a breach of contract claim, she fails to sufficiently plead her claim for two independently dispositive reasons: (1) Frontier performed under the contract; and (2) Plaintiff sustained no damages. The elements of breach of contract are: (1) existence of a contract; (2) performance by the plaintiff; (3) non-performance by the defendant; and (4) damages. *Tatten v. Bank of Am. Corp.*, 912 F. Supp. 2d

1032, 1041 (D. Colo. 2012). Setting aside the first two elements for the purposes of this Motion, Plaintiff's own factual allegations show that Frontier met its obligations under the Contract by offering to rebook Plaintiff on a different flight; and because Plaintiff was also offered a voucher for future air travel from Frontier, she is unable to show that she sustained any damages as a result of any alleged non-performance by Frontier. For these reasons, she fails to state a claim.

### 1. Frontier Performed Under the Contract

Notwithstanding Plaintiff's allegations that Frontier breached the Contract, her factual allegations and the terms of the Contract demonstrate that Frontier satisfied its contractual obligations. Frontier cancelled her flight as permitted under the Contract and offered to rebook her on a later flight in compliance with its obligations. FAC ¶ 18, Ex. A § 18 C, E. She instead demanded a refund. FAC ¶ 18. Frontier had no obligation to provide a refund under these circumstances. Upon the cancellation, the Contract required Frontier to provide a flight to the passenger's original destination, and only required a refund if Frontier could not do so and the passenger requested a refund, and limits Frontier's liability to this process. FAC Ex. A § 18 C, E. The breach of contract claim fails because Frontier performed under the Contract when it offered Plaintiff the option to rebook her flight and ultimately offered her a voucher, as alleged in the FAC.

Under the Contract, Colorado law governs this dispute. The Contract provides that it "will be governed by and construed in accordance with the laws of the United States of America and the State of Colorado without regard to conflict of law principles or law." FAC Ex. A § 22 J. Under Colorado law, contract interpretation is a question of law for a court to decide. *Spring Creek Exploration & Prod. Co., LLC v. Hess Bakken Invs. II*, LLC, 887 F.3d 1003, 1017 (10th Cir. 2018). "The primary goal of contract interpretation is to determine and effectuate the intent and reasonable

expectations of the parties." *Id.* at 1018. "To determine the intent of the parties, the court should give effect to the plain and generally accepted meaning of the contractual language." *Id.* A court "should be wary of viewing clauses or phrases in isolation," "instead reading them in the context of the entire contract, seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Id.* (internal quotations and citations omitted). "On a motion to dismiss, allegations in a complaint do not overcome contradictory statements in the text of a contract attached to the complaint." *Id.* (internal quotations and brackets omitted).

Plaintiff alleges that the Contract is the operative document for this lawsuit, but bases her entire case on the incorrect allegation that the Contract's terms required Frontier to refund her the cost of her cancelled flight. Section 18 governs situations where there is a failure to operate on schedule or a failure to carry. FAC Ex. A § 18. Section 18 has four relevant subsections: A – Liability Limited, B – Force Majeure, C – Delay, Misconnection, or Cancellation, and E – Schedule Change Prior to Day of Travel. *Id.* These subsections address Frontier's obligations in the event of a cancellation or schedule change.[2]

### i. Section 18 A – Liability Limited Demonstrates that Plaintiff Had No Guarantee for Transportation on her Ticketed Flight

Pursuant to § 18 A of the Contract, "Frontier will use reasonable efforts to transport passengers . . . to the purchased destination, but published schedules, flight times . . . and similar details set forth in the ticket or Frontier's published schedules are not guaranteed and form no part of this Contract of Carriage." FAC Ex. A § 18 A. "Frontier may . . . change schedules, delay or

---

[2] Frontier does not take the position that one of these subsections takes precedent over the other under the facts pled in the FAC. Frontier reserves the right to argue that one or more of the § 18 subsections apply or do not apply based on the evidence. But, for the purposes of this Motion, Frontier addresses all the potentially relevant subsections to show that it complied with all of the terms of § 18 of the Contract based on the facts pled by Plaintiff.

1104054v.1

cancel flights . . . as required by its operations in Frontier's sole discretion." *Id.* "Frontier's obligations for failure to operate any flight, failure to operate a flight according to its schedule, or for changing the schedule . . . with our without notice to the passenger are set forth [in § 18 B-F]." *Id.* The gravamen of the FAC is that Plaintiff was entitled to either transportation on her booked flight or a refund – anything else was a breach of the Contract. Frontier was permitted pursuant to § 18A, at its sole discretion, to cancel her flight and rebook her flight pursuant to § 18 B-F. Plaintiff had no absolute contractual right to a refund in the event her flight was cancelled.

### ii. Section 18 C - Delay, Misconnection, or Cancellation Allows for Rebooking of Plaintiff on a Later Flight and a Refund is not Required Here

Section 18 C controls in the event of a cancellation. FAC Ex. A § 18 C. It provides in pertinent part: "In the event (i) a passenger's flight is canceled," "Frontier will provide transportation on its own flights at no additional charge . . . . ***If Frontier cannot provide the foregoing transportation***, Frontier shall, if requested, provide a refund for the unused portion of the passenger's ticket in lieu of the transportation under the foregoing. The foregoing shall be the limit of Frontier's liability for the matters covered by this provision." *Id.* (emphasis added). Plaintiff alleges that Frontier offered to rebook her on another flight, but she refused and demanded a refund. FAC ¶ 18. Because Frontier was able to provide transportation on its own flights (and offered to do so), it was not obligated to provide a refund under § 18 C, despite Plaintiff demanding a refund. Offering to rebook Plaintiff on a later flight and ultimately offering her a voucher for future travel was the limit of Frontier's obligations under the Contract in the event of a cancellation. As such, Frontier performed under the Contract and the breach of contract claim fails.

### iii. Section 18 E - Schedule Change Prior to Day of Travel

For schedule changes, § 18 E in effect when Plaintiff purchased her tickets provides:

8

When a passenger's itinerary is changed because of a modification in Frontier's schedule, arrangements will be made to:
1) Transport the passenger over its own route system to the destination; or
2) In the event the schedule modification is significant, at Frontier's discretion, it may refund the cost of the unused portion of the ticket.

Ross Dec. Ex.1 § 18 E. Frontier complied with the Contract. Plaintiff admits Frontier offered to rebook her on a later flight. FAC ¶ 18. Frontier was not required to refund the cost of Plaintiff's ticket when she refused the rebooking. Additionally, Plaintiff does not allege that the potential later flight constituted a "significant" "schedule modification." Even if Plaintiff had alleged a significant change occurred, Frontier had the discretion, not the mandatory requirement, to offer a refund and it chose to rebook Plaintiff as permitted by the Contract. Ross Dec. Ex.1 § 18 C, E. Thus, the allegations in the FAC show the absence of a breach.

### iv. Frontier Has No Obligation to Provide a Refund Under the § 18 B Force Majeure Provision Because that Provision is Harmonized with All of § 18

With respect to *force majeure* circumstances, § 18 B provides that Frontier may cancel any flight without liability "except to provide a refund for the unused portion of the ticket." FAC Ex. A § 18 B. This provision must be read in harmony with the rest of the Contract in general and the other subsections of § 18 specifically. "When interpreting a contract, [the court's] task is to give effect to the intent of the parties." *Bledsoe Land Co. LLLP v. Forest Oil Corp.*, 277 P.3d 838, 842 (Colo. Ct. App 2011) (internal quotations omitted); *Nat'l Union Fire Ins. Co. v. Fed. Ins. Co.*, 734 Fed. Appx. 586, 589 (10th Cir. 2018) ("[W]e must interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless."). "The intent of the parties to a contract is to be determined primarily from the language of the instrument itself." *Bledsoe Land Co*, 277 P.3d at 842. "That language must be examined and construed in harmony with the plain and generally accepted meaning of the words

9

used, and reference must be made to all the agreement's provisions." *Id.*

When § 18 B is read in harmony with the rest of § 18, it is clear that there is no requirement for an automatic refund in the event of a *force majeure*—assuming *arguendo* that *force majeure* even applies in the context of Frontier's flight cancellations related to the COVID-19 pandemic— while Plaintiff references this provision, FAC ¶ 12, the FAC contains no allegation that her cancelled flight resulted from a *force majeure* event. Even if Plaintiff had made that allegation, this Court would have to look to § 18 C and E, which govern cancellations and schedule changes. As addressed above, Frontier must provide a refund only when it cannot provide transportation on a different flight. Ross Dec. Ex. 1 § 18 C, E. Read in harmony, the language "without liability except to provide a refund" in § 18 B refers to instances where Frontier cannot provide the rebooking referenced in § 18 C and E. Stated otherwise, the requirement to provide a refund in § 18 B sets the outer limits of Frontier's liability in the event of a *force majeure*. It does not set the minimum obligation of Frontier as made clear when read in conjunction with § 18 C and E. Under Colorado law, a contract is interpreted in its entirety and so that no provision will be rendered meaningless. *Nat'l Union Fire Ins. Co.*, 734 Fed. Appx. at 589. This Court should read any refund requirement under § 18 B in the context of the accompanying contractual obligation of providing rebooking and then only a refund if a rebooking is not possible.

To read the refund language of the *force majeure* provisions in isolation would render § 18 C and E meaningless whenever a *force majeure* event required a cancellation or schedule change. Those subsections allow rebooking and do not require a refund unless (1) rebooking is not available; (2) any change is determined to be significant; and (3) the passenger requests a refund. Ross Dec. Ex.1 § 18 C, E. Here, (1) and (2) are missing, precluding any breach by Frontier.

### C. Plaintiff Did Not Sustain Any Damages

Plaintiff's breach of contract claim is also deficient because she does not adequately allege that she sustained damages. As alleged in the FAC, Frontier offered to rebook Plaintiff on a later flight once her original flight was cancelled. FAC ¶ 18. Plaintiff alleges she declined Frontier's offer of rebooking and instead demanded a refund to which she was not entitled under the plain language of the Contract. FAC Ex. A § 18 C, E. Ultimately, Frontier's offer of a voucher for future flight travel precludes her from sustaining actionable damages. FAC ¶ 18.

"In general, contract law espouses three distinct, yet equally important, theories of damages to remedy a breach of contract: expectation damages, reliance damages, and restitution damages." *Spring Creek Exploration & Prod. Co., LLC*, No. 17-1010, 2018 U.S. App. LEXIS 9803, *44 (10th Cir. Apr. 10, 2018). "The root purpose of a contract remedy is to place the plaintiff-promisee in as good a position as it would have occupied had the defendant-promisor not breached the contract." *Id.* (internal quotations and brackets omitted). "In an action for breach of contract, expectation damages are the norm." *Id.* (citing *Smith v. Farmers Ins. Exch.*, 9 P.3d 335, 337 (Colo. 2000) (In a breach of contract action, "a plaintiff may recover the amount of damages necessary to place him in the same position he would have occupied had the breach not occurred.")).

Here, the alleged bargained for exchange was "to provide services in the form of flights in exchange for a set amount of money." FAC ¶ 34. When Plaintiff's flight was cancelled, Frontier offered her another flight, which she declined. *Id.* ¶ 18. As a result, Frontier offered her the voucher for future flight travel, which meets the requirements of the bargained for exchange, *i.e.* air travel in exchange for payment. The fact that Plaintiff did not travel on her originally scheduled flight is of no consequence because, pursuant the Contract's terms, "the published schedules, flight times

. . . and similar details set forth in the ticket or Frontier's published schedules are not guaranteed and form no part of this Contract of Carriage." FAC Ex. A § 18 A. With the offer of the credit, Plaintiff sustained no damages and cannot prove an essential element of a breach of contract. *Tatten*, 912 F. Supp. 2d at 1041 (noting that damages are an element of a breach of contract claim).

### D. Absent Future Injury, Plaintiff Lacks Standing Here to Pursue Injunctive Relief

If the FAC could somehow survive dismissal, Plaintiff cannot pursue injunctive relief as a remedy because her deficient allegations render her without standing. The "requirement that a plaintiff allege a risk of future injury in order to obtain injunctive relief is a constitutional requirement that all plaintiffs must satisfy." *Atik v. Welch Foods, Inc.*, 2016 U.S. Dist. LEXIS 136056, *6 (E.D.N.Y. Sept. 30, 2016). That is, to "satisfy the threshold requirement imposed by Article III" a plaintiff seeking injunctive relief must demonstrate a likelihood of future injury. *Lyons*, 461 U.S. at 108. The "fact of past injury does not confer standing to seek prospective injunctive relief without some credible threat of future injury." *Id.*; *Winsness v. Yocum*, 433 F.3d 727, 735 (10th Cir. 2006). To establish standing to pursue injunctive relief, a plaintiff must demonstrate "a sufficient likelihood" of encountering some future harm. *Lyons*, 461 U.S. at 109, 111 (plaintiff had standing to pursue damages, but not standing to pursue injunctive relief).

Here, Plaintiff's reference to injunctive relief is limited to paragraph 31 of the FAC. The FAC lacks any allegation that Plaintiff will be injured or harmed again in the future. Plaintiff must plead this threshold requirement to pursue injunctive relief, and it is missing from the FAC entirely. Nowhere in the FAC does Plaintiff plead that she will, for instance, travel on Frontier again in the future. Even assuming, *arguendo*, Plaintiff actually was harmed in the manner she alleges he was, the FAC does not allege that such harm will occur again in the future. As a result, Plaintiff lacks

12

standing to seek injunctive relief. Based upon Plaintiff's allegations in the FAC, assuming they can proceed and are proven, Plaintiff's recovery is limited to economic damages only. Consequently, Plaintiff's request for injunctive relief must be dismissed

### E. The Contract Requires Dismissal of Plaintiff's Class Action Claims

The Contract, which Plaintiff references in the FAC and alleges governs the parties' relationship in this case, expressly bars class action lawsuits, providing in § 22 H:

> No Class Action – Any case brought pursuant to this Contract of Carriage, Frontier's Tarmac Delay Plan, or Frontier's Customer Service Plan may be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

FAC Ex. A § 22 H. Plaintiff brings this lawsuit under the Contract and does not allege that any part is unenforceable, supporting that this provision requires the dismissal of all class allegations.

Under Colorado law the class action bar is enforceable. When applying Colorado law, courts begin with the presumption that a contract provision is enforceable. *See Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003) ("We will enforce the agreement as written unless there is an ambiguity in the language; courts should neither rewrite the agreement nor limit its effect by a strained construction."). Plaintiff does not allege that the Contract contains any ambiguity.

A contract that favors one party more than another does not eliminate the presumption of enforceability. *Thurmon v. Skipton*, 403 P.2d 211, 214 (Colo. 1965) ("Courts will enforce a contract as made, regardless of whether it is an improvident one from the standpoint of one of the parties."); *Sedalia Land Co. v. Robinson Brick & Tile Co.*, 475 P.2d 351, 354 (Colo. Ct. App. 1970) ("The general rule is that, if a party enters into a contract … with sufficient mental capacity to understand it, and not under the influence of fraud, coercion or imposition, the courts will not relieve him of the consequences of his act on the sole ground that the bargain is improvident as to

him."). "[T]he party seeking to avoid application of a contractual provision bears the burden of showing that it is unconscionable." *Bonanno v. Quizno's Franchise Co., LLC*, No. 06-cv-02358, 2009 U.S. Dist. LEXIS 37702, *56 (D. Colo. April 20, 2009) (enforcing contractual class action bar). Plaintiff does not allege that any provision in the Contract is unconscionable.

### 1. Federal Aviation Law Does Not Preclude the Class Action Bar in the Contract

The Contract's class action bar is not prohibited by Federal Aviation Regulations. Specifically, 14 C.F.R. § 253.2 provides that an airline's contract of carriage "applies to all scheduled direct air carrier operations" in interstate air transportation, and "applies to all contracts with passengers, for those operations." A contract of carriage commences when a passenger has purchased the air transportation. 14 C.F.R. § 399.88(a). Airlines are permitted to incorporate contracts of carriage into passengers' tickets or other written instruments, 14 C.F.R. § 253.4(a), and the incorporated terms may include "[c]laims restrictions." 14 C.F.R. § 253.5(b)(2). The Federal Aviation Regulations do not contain any prohibition against class action bar provisions in airlines' contracts of carriage. *See* 14 C.F.R. § 1.1, *et seq*.

### F. The Contract Precludes any Attorney's Fees

Plaintiff is not entitled to recover attorney's fees. She seeks attorney's fees in her Prayer for Relief. The Contract provides that "Frontier is not liable for any indirect, special, or consequential damages arising out of or resulting from transportation provided, delay in transportation, or any failure to provide transportation." FAC Ex. A § 16 A. Further, § 18 provides that the limit of liability (under certain circumstances not present here) is the refund of a ticket when rebooking is not possible. *Id.* § 18 C, E.

"As a general rule, in the absence of any contractual or statutory liability therefor, attorney

14

fees and expenses of litigation of a plaintiff's claim are not recoverable as an item of damages either in a contract or a tort action." *Lawry v. Palm*, 192 P.3d 550, 568 (Colo. Ct. App. 2008) (internal brackets omitted). "If attorney fees are part of the substance of a lawsuit and are sought as a legitimate consequence of the tort or breach of contract sued upon, they are damages." But, "when a party claims it has incurred attorney fees as foreseeable damages arising from a breach of contract, such fees are considered special damages, which must be pleaded in the complaint pursuant to C.R.C.P. 9(g)." *Id.* at 569. *See also* Fed. R. Civ. P. 9(g) (same). "In the absence of allegations that the pleader is entitled to attorney's fees, therefore, such fees cannot be awarded." *Id.* A complaint's request for attorney fees in a general prayer for relief does not plead special damages. *Id.* Here, the Contract does not provide for attorney's fees and they are not a substantive part of Plaintiff's breach of contract claim. Plaintiff only includes an attorney's fees request in her Prayer for Relief. She fails to plead attorney's fees as special damages under Rule 9(g), and any recovery is precluded by the Contract, rendering the request for attorney's fees unsustainable.

## IV.    CONCLUSION

For the foregoing reasons, Frontier respectfully requests that the Court dismiss the FAC with prejudice pursuant to Rule 12(b)(6) and Rule 12(b)(1).

Respectfully submitted,

WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP

By: /s/ Jason D. Melichar

Jason D. Melichar, Esq.
R. Joseph Isert, Esq.

| | | | |
|---|---|---|---|
| William J. Katt, Esq. | Patrick J. Kearns, Esq. | David M. Ross, Esq. | 1225 17th Street |
| 740 N. Plankinton Avenue | 401 West A Street | 1500 K Street, NW | Suite 2750 |
| Suite 600 | Suite 1900 | Suite 330 | Denver, CO 80202 |
| Milwaukee, WI 53203 | San Diego, CA 92101 | Washington, DC 20005 | (303) 572-5300 |
| (414) 276-8816 | (619) 321-6200 | (202) 626-7660 | (303) 573-5301 (fax) |
| (414) 276-8819 (fax) | (619) 321-6201 (fax) | (202) 626-3606 (fax) | MelicharJ@wilsonelser.com |
| KattW@wilsonelser.com | KearnsP@wilsonelser.com | RossD@wilsonelser.com | IsertJ@wilsonelser.com |

*Attorneys for Defendant Frontier Airlines, Inc.*

15

## CERTIFICATION OF COUNSEL

Frontier's counsel certifies that on June 23, 2020, counsel for Frontier conferred with Plaintiff's counsel regarding the relief sought in this Motion, and did not obtain consent to the relief requested herein.

By: /s/ Jason D. Melichar
Jason D. Melichar, Esq.

**Statement Regarding Oral Argument**: Oral argument is requested, to the extent a hearing will assist this Court in evaluating the arguments submitted.

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of July 2020, a true and correct copy of the foregoing was filed with the Court and served via CM/ECF on the following:

| | |
|---|---|
| Scott A. Kamber, Esq.<br>Michael J. Aschenbrener, Esq.<br>Kamber Law, LLC<br>201 Milwaukee Street, Suite 200<br>Denver, CO 80206<br>Telephone: (646) 964-9600<br>Facsimile: (212) 202-6364<br>skamber@kamberlaw.com<br>masch@kamberlaw.com<br><br>Max S. Roberts, Esq.<br>Bursor & Fisher, P.A. – New York<br>888 17th Avenue, 3rd Floor<br>New York, NY 10019<br>mroberts@bursor.com<br><br>*Counsel for Plaintiff* | Yeremey O. Krivoshey<br>Bursor & Fisher, P.A.<br>1990 North California Boulevard, Suite 940<br>Walnut Creek, CA 94596<br>Telephone: (925) 300-4455<br>ykrivoshey@bursor.com |

By: /s/ Jason D. Melichar
Jason D. Melichar, Esq.

1104054v.1