# EXHIBIT A

No *Shepard's* Signal™
As of: March 31, 2021 11:27 PM Z

# *Ide v. British Airways PLC*

United States District Court for the Southern District of New York

March 26, 2021, Decided; March 26, 2021, Filed

20-CV-3542 (JMF)

**Reporter**
2021 U.S. Dist. LEXIS 58192 *; __ F. Supp. 3d __

STEPHEN IDE, KAREN STEELE-CLARKE, DONALD DOMINIQUE, JR., and PHILIP TENN, Plaintiffs, -v- BRITISH AIRWAYS PLC, Defendant.

## Core Terms

Airways, refund, customer, voucher, flight, ticket, travel, cancelled, preempted, damages, airline, website, Plaintiffs', quotation, marks, email, condition precedent, Reply, compel arbitration, motion to dismiss, allegations, scheduled, requests, argues, exemplary damages, injunctive relief, intent of a party, alleged breach, breach-of-contract, arbitration

**Counsel:** [*1] For Stephen Ide, on behalf of himself and all others similarly situated, Plaintiff: Adam E Polk, Girard Gibbs LLP, San Francisco, CA; John G. Albanese, Eleanor Michelle Drake, Berger & Montague, PC, Minneapolis, MN; Scott M Grzenczyk, Thomas Watts, Girard Sharp LLP, San Francisco, CA; Shanon Jude Carson, Berger Montague PC, Philadelphia, PA.

For Karen Steele-Clarke, Donald Dominique, Jr., Philip Tenn, Plaintiffs: Adam E Polk, Girard Gibbs LLP, San Francisco, CA.

For British Airways PLC, (UK), Defendant: Colleen M Gulliver, Keara M. Gordon, DLA Piper US LLP (NY), New York, NY; William Jeffrey Diggs, DLA Piper LLP (US), Short Hills, NJ.

**Judges:** JESSE M. FURMAN, United States District Judge.

**Opinion by:** JESSE M. FURMAN

## Opinion

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

In the spring of 2020, the COVID-19 pandemic brought travel around the world to a near halt, with devastating consequences for the airline industry. Most, if not all, airlines responded by cancelling flights en masse. Not surprisingly perhaps, litigation has followed, with cases filed against virtually every airline by customers alleging breach of contract and other claims. This case, against British Airways PLC, is among them. Four [*2] Plaintiffs whose British Airways flights were canceled bring claims on behalf of a putative class, alleging that British Airways breached the contract governing their tickets by failing to provide them with their preferred remedy: a refund. British Airways now moves to compel arbitration of one Plaintiff's claims and to dismiss the claims of the other three Plaintiffs. ECF No. 31. For reasons that follow, its motion to compel arbitration is GRANTED as unopposed, and its motion to dismiss is GRANTED in part and DENIED in part. In particular, the Court concludes that Plaintiffs state a plausible breach-of-contract claim under New York law and that their claim is not preempted by federal law, but their requests for relief other than compensatory damages must be stricken.

BACKGROUND

The following facts, taken from the First Amended Complaint ("Complaint") and documents referenced therein, are assumed to be true for the purposes of this motion. *See, e.g., Hogan v. Fischer, 738 F.3d 509, 513 (2d Cir. 2013)*.

### A. The General Conditions of Carriage

The General Conditions of Carriage ("COC") applies to all customers who buy tickets on British Airways flights and to all flights that British Airways operates. ECF No. 30 ("Compl."), ¶¶ 44-45; *see also* **[*3]** ECF No. 33-7 ("COC"), at 2, § 2(a). To the extent relevant here, the COC states that if British Airways "cancel[s] a flight," the customer "can choose one of . . . three remedies." COC § 9(b)(3). *First*, British Airways "will," at no additional charge, "carry [the customer] as soon as [it] can to the destination shown on [the customer's] ticket on another of [British Airways's] scheduled services on which a seat is available in the class of service for which [the customer] ha[s] paid the fare." *Id*. *Second*, British Airways "will," also at no additional charge, "carry [the customer] to the destination shown on [the customer's] ticket in the class of service for which [the customer] ha[s] paid the fare at a later date at [the customer's] convenience and within the validity period of [the customer's] ticket on another of [British Airways's] scheduled services on which a seat is available." *Id*. Or *third*, British Airways "will give or obtain for [the customer] an involuntary fare refund," *id.*, defined as a refund "equal to the fare and any carrier imposed charges and surcharges, and taxes, fees and charges" the customer has paid. *Id*. §§ 1, 10(b)(2).

### B. The COVID-19 Pandemic

In March 2020, <u>*air travel came to a near standstill*</u> **[*4]** <u>*as part of the effort*</u> to slow the spread of COVID-19. Compl. ¶¶ 50-53. In response, British Airways made significant reductions to its flight schedules and began cancelling flights "*en masse*." *Id*. ¶¶ 53-54; *see also id*. ¶ 56. "To limit the number of refunds [British Airways] would be required to issue" pursuant to the COC, "no later than mid-March 2020, [British Airways] modified its website to mislead its customers into accepting vouchers instead of the refunds it was contractually required to make available." *Id*. ¶ 58. In particular, customers were shown a page with a button labeled "[c]ancel and refund flight(s)," but customers who clicked on that button were taken to an application for a future travel voucher instead. *Id*. ¶¶ 59-61. Media outlets reported that, due to the COVID-19 pandemic, British Airways removed the option for submitting refund claims on its website altogether, *id*. ¶¶ 67-68, and that the "only way to receive a refund" was to call the airline by telephone, *id*. ¶ 65. Making matters worse, however, calling was "unavailable" for many customers because the airline "disconnect[ed] a large percentage of calls due to heavy call volume or other reasons." *Id*. When calls **[*5]** did connect, customers "often" had to "wait for hours on hold before speaking to a live customer service representative," which was "the only way to receive a refund" since British Airways did not implement an automated refund procedure. *Id.*

### C. The Named Plaintiffs

The four named Plaintiffs in this case each purchased roundtrip passage on British Airways flights scheduled for the spring and summer of 2020. Each received notice that one or both of the tickets had been cancelled. Each now seeks a refund.

*First*, Stephen Ide, a Massachusetts citizen, purchased a roundtrip ticket through the British Airways website to travel from Boston to London on March 25, 2020, and back on April 5, 2020. *Id.* ¶¶ 9-10. On March 18, 2020, British Airways notified Ide by email that his flight had been cancelled. *Id.* ¶ 11. Two days later, Ide called the British Airways customer service line "to request a refund," but he was "unable to connect with a customer service representative." *Id.* ¶ 12. On March 22, 2020, Ide searched online in an effort to find out how to get a refund, but he was able to find information only about obtaining a travel voucher. *Id.* ¶ 13. He ultimately requested a voucher because it was **[*6]** "the only relief available." *Id.*

On March 24 and 25, 2020, Ide called British Airways four times to request that the voucher be converted into a refund, but he was disconnected each time. *Id.* ¶ 14. The next day, he received his voucher by email; it stated that the voucher could be used as "part payment" towards a future booking and that it was redeemable only for flights taken within twelve months of his original booking's first flight. *Id.* ¶ 15. On April 21, 2020, Ide called British Airways again and spoke with a customer service agent who "denied his request for a refund" because he had already been issued a voucher. *Id.* ¶ 17. The agent informed Ide that he could "escalate his complaint by contacting Customer Relations and filing a complaint," but Ide was unable to do so because the "website would not permit him to file his complaint." *Id.*

*Second*, Karen Steele-Clarke, a Georgia citizen, purchased a roundtrip ticket through the British Airways website to travel between New York and London. *Id.* ¶¶ 18-19. On May 4, 2020, approximately two months before Steele-Clarke's scheduled departure, British Airways informed her by email that her outbound flight had been cancelled. *Id.* ¶ 20. She **[*7]** "promptly" filled out a form on the British Airways website that "she believed would allow her to request a refund," but on May 7, 2020, British Airways emailed her a voucher instead. *Id.* ¶¶ 21-22. She "promptly" responded, explaining that she wanted a refund and had not intended to request a voucher; she made similar requests through other

"channels," including direct messages on Twitter. *Id.* ¶¶ 23-24. British Airways "refused her request[s]," but it did end up refunding her "the extra $114 that she [had] paid for seat selection." *Id.* ¶ 24.

*Third*, Philip Tenn, a Florida citizen, purchased a roundtrip ticket through the British Airways website to travel from Tampa to London on March 15, 2020, and back on March 24, 2020. *Id.* ¶¶ 32-33. British Airways notified Tenn by email that his "return flight from London was canceled." *Id.* ¶ 34. Tenn filled out "the voucher form" on the British Airways website, but before he received a voucher, he contacted the airline by telephone and email to request a refund. *Id.* ¶ 35. British Airways "refused to provide him a refund." *Id.* Tenn contacted British Airways "numerous times" thereafter, but British Airways has never given him a refund. *Id.* ¶ 36. Nor **[*8]** has he received a voucher. *Id.* ¶ 37.

*Finally*, Donald Dominique, Jr., also a Florida citizen, purchased a roundtrip ticket to travel on British Airways from Miami to Paris on March 16, 2020, returning on March 20, 2020. *Id.* ¶¶ 25-26. Unlike the other named Plaintiffs, Dominique purchased his tickets through Expedia, a third-party travel website. *Id.* ¶ 26. His return flight was cancelled, and — wanting a refund — he called both British Airways and Expedia "several times." *Id.* ¶¶ 28, 31. He was never able to reach a British Airways representative. *Id.* ¶ 29. Finally, in early April 2020, Dominique spoke with an Expedia customer service representative who said that he could not obtain a refund for his canceled flight. *Id.* ¶ 30. The representative explained that British Airways had only authorized Expedia to give vouchers. *Id.* Dominique never received either a voucher or a refund. *Id.* ¶ 31.

## MOTION TO COMPEL ARBITRATION

British Airways's first motion — to compel arbitration of Dominique's claims — requires only brief discussion because it is uncontested. *See* ECF No. 35 ("Pls.' Opp'n"), at 22. That is for good reason. Alone among the named Plaintiffs, Dominique purchased his ticket through Expedia **[*9]** and, in doing so, agreed to arbitrate on an individual basis "[a]ny and all Claims," including "any Claims . . . against . . . travel suppliers or any companies offering products or services" through Expedia, such as British Airways. ECF No. 33-10, at 3; *see* Compl. ¶ 26.[1] The only question is whether, pending the arbitration, Dominique's claims should be dismissed with prejudice, as British Airways argues in its initial memorandum of law, *see* ECF No. 32 ("Def.'s Br."), at 2, or stayed, as Dominique argues, *see* Pls.' Opp'n 22. Dominique has the better of that argument — and, indeed, British Airways abandons the point in its reply memorandum of law. *See, e.g., Katz v. Cellco P'ship, 794 F.3d 341, 345 (2d Cir. 2015)* (holding that "a stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested"); *Torre v. Charter Communs., Inc., No. 19-CV-5708 (JMF), 2020 U.S. Dist. LEXIS 37897, 2020 WL 1048933, at *2 (S.D.N.Y. Mar. 4, 2020)* (granting a motion to compel arbitration with respect to one of several plaintiffs and staying only as to that one plaintiff). Accordingly, the motion to compel arbitration of Dominique's claims is GRANTED and the case is stayed as to him.

## MOTION TO DISMISS

That leaves the motion to dismiss the claims of Ide, Steele-Clarke, and Tenn (together, the "Non-Arbitration Plaintiffs") pursuant to *Rule 12(b)(6)*. In reviewing **[*10]** a *Rule 12(b)(6)* motion, a court is limited to "a narrow universe of materials." *Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016)*. In particular, a court may consider only: (1) "the factual allegations in the . . . complaint, which are accepted as true"; (2) "documents attached to the complaint as an exhibit or incorporated in it by reference"; (3) "matters of which judicial notice may be taken"; and (4) "documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit." *Roth v. CitiMortgage Inc., 756 F.3d 178, 180 (2d Cir. 2014)* (per curiam) (cleaned up). To survive a *Rule 12(b)(6)* motion, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citing *Twombly, 550 U.S. at 556*). More specifically, the plaintiff must allege enough facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

British Airways argues that the Non-Arbitration Plaintiffs fail to state a breach-of-contract claim under New York law and

---

[1] In evaluating British Airway's motion to compel arbitration, the Court "must apply the summary judgment standard, and thus may grant the motion only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law." *Zimmerman v. UBS AG, No. 17-CV-4503 (JMF), 2018 U.S. Dist. LEXIS 144133, 2018 WL 4054860, at *2 (S.D.N.Y. Aug. 24, 2018)* (internal quotation marks omitted). Thus, the Court may look beyond the four corners of the Complaint.

that, to the extent that any of them does, the claim is preempted by the Airline Deregulation Act of 1978 ("ADA"), as amended, *49 U.S.C. § 41713* **[*11]** . *See* Def.'s Br. 2-3, 14-23; ECF No. 38 ("Defs.' Reply"), at 2-8, 10 n.7.[2] In the alternative, it moves to strike Plaintiffs' requests for statutory, punitive, and exemplary damages and for injunctive relief. Def.'s Br. 3, 24-25; Def.'s Reply 9-10. The Court will address each argument in turn.

**A. Breach of Contract**

The primary question presented is whether the Non-Arbitration Plaintiffs state a plausible contract claim and, if they do, whether it is preempted by the ADA. Before addressing that question, however, the Court briefly addresses one argument unique to Tenn.

**1. Tenn's Claim**

British Airways argues that Tenn's claim should be dismissed because his ticket was cancelled due to a failure to appear for his outgoing flight. Def.'s Br. 14. By failing to appear, the argument goes, Tenn rendered both his departing and returning tickets without value, thus permitting British Airways to cancel his return flight, with no obligation to refund the price of the ticket, pursuant to the terms of the COC. COC § 3(c)(5)-(6), (10); Def.'s Br. 14-15; Def.'s Reply 2. The problem with this argument, however, is that it depends on a document that the Court may not consider at this stage of the litigation: Tenn's Passenger Name Record ("PNR"), which British Airways submits as an exhibit **[*12]** to its motion. *See* ECF No. 33-11. The Complaint makes no reference to Tenn's PNR (or its contents), and the document is not within the narrow universe of documents beyond the Complaint that the Court may consider on a motion to dismiss. *Goel, 820 F.3d at 559*; *see, e.g., Herrera v. Cathay Pac. Airways Ltd., No. 20-CV-3019 (JCS), 2021 U.S. Dist. LEXIS 35061, 2021 WL 673448, at *5 (N.D. Cal. Feb. 21, 2021)* (declining to take judicial notice of PNRs and ticket information); *Ward v. Am. Airlines, Inc., ___ F. Supp. 3d ___,*

*No. 4:20-CV-371 (O), 2020 U.S. Dist. LEXIS 249511, 2020 WL 8415080, at *12 (N.D. Tex. Nov. 2, 2020)* (declining to consider "ticket records" submitted with a motion to dismiss). The authority British Airways cites in arguing otherwise, *see* Defs.' Reply 2 n.1, is inapposite. *See Diveroli v. Am. Airlines, Inc., No. 19-CV-23251 (BB), 2019 U.S. Dist. LEXIS 190519, 2019 WL 5697198, at *6-7 (S.D. Fla. Nov. 4, 2019)* (considering a PNR for purposes of subjectmatter jurisdiction — namely, in evaluating whether the plaintiff had standing to bring the claim); *Cattaneo v. Am. Airlines, Inc., No. 15-CV-1748 (BLF), 2015 U.S. Dist. LEXIS 128701, 2015 WL 5610017, at *1 n.2 (N.D. Cal. Sept. 24, 2015)* (considering the plaintiff's itinerary "under the incorporation by reference doctrine"). Accordingly, the Court may not dismiss Tenn's claim on the basis of his PNR; instead, it will evaluate his claim with the claims of the other Non-Arbitration Plaintiffs.[3]

**2. Failure to State a Claim**

Under New York law, there are four elements of a cause of action for breach of contract: (1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the **[*13]** breach. *See, e.g., Cohen v. Avanade, Inc., 874 F. Supp. 2d 315, 320 (S.D.N.Y. 2012)*. Here, there is no dispute that the allegations in the Complaint satisfy the first two elements. But British Airways contends that the Non-Arbitration Plaintiffs fail to plausibly allege a breach and resulting damages. *See* Def.'s Br. 14-18 & n.4.

British Airways's latter argument — that the Non-Arbitration Plaintiffs fail to plausibly allege any damages arising from a breach — can be swiftly rejected. For starters, British Airways relegates the argument to a single footnote, *see id.* at 18 n.4, which is "inadequate" to raise the issue, *New York v. Wheeler, No. 19-CV-3287 (JMF), 2019 U.S. Dist. LEXIS 124339, 2019 WL 3337996, at *2 (S.D.N.Y. July 25, 2019)*;

---

[2] Plaintiffs do not address choice of law, except to argue that it is premature to decide the law that applies to the claims of the "putative class." Pls.' Opp'n 24. Given that silence and given that the question here is the sufficiency of the Non-Arbitration Plaintiffs' claims, not the sufficiency of other putative class members' claims, the Court applies New York law to the Non-Arbitration Plaintiffs' contract claims. *See Johnson v. Priceline.com, Inc., 711 F.3d 271, 276 n.2 (2d Cir. 2013)* ("[C]ourts sitting in diversity may properly rely on the forum state's law where neither party asserts that another jurisdiction's law meaningfully differs.").

[3] *Rule 12(d) of the Federal Rules of Civil Procedure* allows a court to treat a motion under *Rule 12(b)(6)* as a motion for summary judgment if matters outside the pleadings are presented and all parties are "given a reasonable opportunity to present all the material that is pertinent to the motion." But British Airways does not request that its motion with respect to Tenn be converted pursuant to *Rule 12(d)* and there is no basis to do so. Among other things, Tenn suggests that discovery will reveal that he contacted British Airways before his outbound flight departed. *See* Pls.' Opp'n 9; *see also Moore v. City of New York, No. 18-CV-496 (JPO), 2019 U.S. Dist. LEXIS 106977, 2019 WL 2616195, at *1 n.2 (S.D.N.Y. June 26, 2019)* ("[T]he Court declines to convert the instant motion into one for summary judgment since discovery has not yet commenced." (internal quotation marks omitted)).

2021 U.S. Dist. LEXIS 58192, *13

*see, e.g., Pirnik v. Fiat Chrysler Autos., N.V., 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018)* (stating that an argument "relegated to a footnote . . . does not suffice to raise [an] issue" and citing cases). But even if it were adequate, the argument plainly fails. As discussed in more detail below, the gravamen of the Non-Arbitration Plaintiffs' claim is that they were entitled to full refunds under the COC, but were offered only travel vouchers and that the vouchers came with various restrictions. It is well-recognized that "compensation in kind is worth less than cash of the same nominal value." *In re Mex. Money Transfer, 267 F.3d 743, 748 (7th Cir. 2001)*. It follows that the Non-Arbitration Plaintiffs plausibly allege damages resulting from British Airways's alleged breach of the **[*14]** COC and that their claims cannot be dismissed on that basis.

Whether the Non-Arbitration Plaintiffs plausibly allege a breach in the first instance is a closer question, but the Court concludes that they do. In fact, the Non-Arbitration Plaintiffs allege two plausible theories of how British Airways breached the COC.[4] First, they plausibly allege that the airline failed to fulfill its obligation to offer one of the three remedies listed in the COC. Pls.' Opp'n 10-12. Section 9(b)(3) of the COC unambiguously provides that if British Airways cancels a flight, as it allegedly did here, the customer "can choose" one of three remedies: immediate rescheduling, rescheduling at the customer's convenience, or a refund. COC § 9(b)(3). Travel vouchers are not among the options. British Airways argues that the travel vouchers given to the Non-Arbitration Plaintiffs are "essentially" equivalent to the second remedy offered in Section 9(b)(3) — namely, rescheduling at the

customer's convenience. Defs.' Br. 4, 15.[5] But the "essential" equivalence of the two remedies is disputed — and, more to the point for present purposes, plausibly disputable. Ide alleges, for example, that the voucher British Airways provided him stated that it could **[*15]** be used only as "*part payment towards a future booking*" and that the voucher had to "*be redeemed for travel on flights taken within 12 months from the date of the first flight in [Ide's] original booking.*" Compl. ¶ 15 (emphasis added) (internal quotation marks omitted). Along similar lines, an archived copy of British Airways's website from May 3, 2020 (submitted here by the airline itself), announced that customers "due to travel between now and 31 July 2020 . . . can claim a voucher to the value of [their] booking[s], valid for travel *until 30 April 2022*." ECF No. 33-4, at 4 (emphasis added).[6] Thus, the Non-Arbitration Plaintiffs plausibly allege that they received a "remedy" that was worth less than the options to which they were entitled under Section 9(b)(3) of the COC.[7] *Cf. Synfuel*

---

[4] In their Complaint, the Non-Arbitration Plaintiffs invoke an April 3, 2020 notice issued by the United States Department of Transportation ("DOT"), which stated that passengers on carriers such as British Airways "should be refunded promptly when their scheduled flights are cancelled or significantly delayed." Compl. ¶ 54 (internal quotation marks omitted). The Non-Arbitration Plaintiffs argue that their reading of the COC "conforms with" the DOT notice and other DOT guidance. Pls.' Opp'n 13; *see also id.* at 3 (describing the COC as "consistent with" DOT policy); Compl. ¶ 5 (describing the COC as "align[ing] with" DOT guidance). At bottom, however, the references to the DOT notice appear to be little more than atmospheric. That is, although British Airways argues that the DOT's guidance cannot "support" a breach-of-contract claim, Def.'s Br. 18-20, the Court does not read the Complaint to allege such a claim. To the extent that it does, the Non-Arbitration Plaintiffs abandoned it by failing to respond to British Airways's arguments for dismissal. *See, e.g., Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC, No. 08-CV-442 (TPG) (FM), 2014 U.S. Dist. LEXIS 133839, 2014 WL 4723299, at \*7 (S.D.N.Y. Sept. 23, 2014)* ("At the motion to dismiss stage . . ., a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

[5] British Airways does not argue that, by requesting the vouchers, the Non-Arbitration Plaintiffs relieved British Airways from offering the remedies under Section 9(b)(3). That is probably for good reason. Although "parties generally may modify a contract by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel," excusing performance on that basis is an affirmative defense. *Axginc Corp. v. Plaza Automall, Ltd., 759 F. App'x 26, 28-29 (2d Cir. 2018)* (summary order) (internal quotation marks omitted). Thus, the Court could dismiss on that basis only if the defense were clear on the face of the Complaint, *see Galin v. Hamada, No. 15-CV-6992 (JMF), 2016 U.S. Dist. LEXIS 62071, 2016 WL 2733132, at \*2 (S.D.N.Y. May 10, 2016)* (citing cases), which it is not, *see, e.g., Beacon Terminal Corp. v. Chemprene, Inc., 75 A.D.2d 350, 429 N.Y.S.2d 715, 718 (2d Dep't 1980)* (explaining that the defense requires "proof of each element requisite to the formulation of a contract"); *see also, e.g., Alentino, Ltd. v. Chenson Enters., Inc., 938 F.2d 26, 28 (2d Cir. 1991)* (per curiam) (noting that the defendant "has the burden of presenting [an] accord-and-satisfaction defense, including all essential elements" like "the existence of an agreement between the parties which settles a dispute between them and its performance of that agreement").

[6] The Court may and does take judicial notice of this document as "information publicly announced on a party's website" where "the website's authenticity is not in dispute and it is capable of accurate and ready determination." *Hesse v. Godiva Chocolatier, Inc., 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020)* (internal quotation marks omitted).

[7] Under Section 9(b)(3) of the COC, the date selected by a customer availing herself of the second option does have to be "within the validity period of [the] ticket," which is defined as "the period for which [the] ticket is valid for travel." COC §§ 1, 9(b)(3). The COC provides that the validity period may be defined by the ticket itself or by provisions laid out in Section 3(b) of the COC. COC § 3(b)(1). The parties do not address what the relevant validity period was for

*Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) ("[C]ompensation in kind is worth less than cash of the same nominal value." (internal quotation marks omitted)); *In re Mex. Money Transfer Litig.*, 267 F.3d at 748 (noting that the value of vouchers "can be offset (in whole or in part) by raising prices during the period before the [vouchers] expire").

Second, the Non-Arbitration Plaintiffs plausibly allege that British [*16] Airways breached the COC by preventing them from choosing their preferred remedy under Section 9(b)(3), namely, a refund of their ticket price. *See, e.g.*, Compl. ¶¶ 16, 23, 38, 90; Pls.' Opp'n 13-14. Among other things, the Non-Arbitration Plaintiffs allege that British Airways modified its website so that calling the airline became "[t]he only way to receive a refund." Compl. ¶¶ 58, 64-65. Moreover, "a large percentage of calls" were disconnected "due to heavy call volume or other reasons," and when calls did connect, customers were "often" made to "wait for hours on hold" before they were able to speak to a customer service representative to request a refund. *Id.* ¶ 65. For example, the Complaint alleges that Ide called British Airways five times and was disconnected four of those times; on a fifth try, he finally spoke to a customer service agent who ultimately denied his request for a refund because he had already been issued a voucher. *Id.* ¶¶ 14, 17. Meanwhile, Steele-Clarke attempted to seek a refund by email and Twitter direct messages, but British Airways refused her request. *Id.* ¶¶ 23-24. And Tenn attempted to contact British airways by phone and email "numerous times," but was also unsuccessful. [*17] *Id.* ¶¶ 35-36. Taken together, these allegations suffice to state a claim of breach on the theory that British Airways "unlawfully interfered" with the Non-Arbitration Plaintiffs' ability to select their preferred remedy and "prevented" them from exercising their options under Section 9(b)(3). Pls.' Opp'n 13-14.

In arguing otherwise, British Airways contends that it had no obligation to provide a refund to the Non-Arbitration Plaintiffs because they "chose not to call for a refund." Def.'s Br. 15-16; *see* Def.'s Reply 3. In essence, that is, British Airways contends that the Non-Arbitration Plaintiffs failed to satisfy a condition precedent to its obligation to provide a refund, let alone one of the other remedies set forth in Section 9(b)(3). *See, e.g.*, *Ballard v. Parkstone Energy, LLC*, 522 F. Supp. 2d 695, 710 (S.D.N.Y. 2007) ("A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." (internal quotation marks omitted)). Under well-established principles of contract law,

however, "a party may not avoid performance of a contractual duty by preventing the occurrence of a condition precedent (the so-called 'prevention doctrine')." *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 528 (2d Cir. 2005); *see MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, No. 09-CV-10093 (RJS), 2011 U.S. Dist. LEXIS 31307, 2011 WL 1197634, at *14 (S.D.N.Y. Mar. 25, 2011) (Sullivan, J.) ("It is well [*18] established that a party to a contract cannot rely on the failure of another to perform a condition precedent where the party itself has frustrated or prevented the occurrence of the condition." (cleaned up)); *see also Bus. Incentives Co. v. Sony Corp. of Am.*, 397 F. Supp. 63, 70 n.8 (S.D.N.Y. 1975) ("[F]rustration of the happening of a condition precedent may be a breach of contract in and of itself."); RESTATEMENT (FIRST) OF CONTRACTS § 315(1) (AM. LAW INST. 1932) ("Prevention or hindrance by a party to a contract of any occurrence or performance requisite under the contract for the creation of a right in favor of the other party . . . is a breach of contract . . . ."). The Non-Arbitration Plaintiffs plausibly allege exactly that here: that by removing refund claim forms from its website and channeling their refund requests through overburdened and inadequate call centers, British Airways frustrated their ability to secure refunds. Compl. ¶¶ 58, 64-68.[8]

In short, applying well-established principles of contract law, the Court concludes that the Non-Arbitration Plaintiffs bring a plausible breach-of-contract claim based on British Airways's failure to provide them with refunds. Notably, that conclusion is consistent with the conclusions of other courts over the last year in analogous [*19] cases — that is, cases brought against other airlines based on their cancellation of flights due to COVID-19. *See, e.g.*, *Herrera*, 2021 U.S. Dist. LEXIS 35061, 2021 WL 673448, at *13-15; *Bugarin v. All Nippon Airways Co.*, F. Supp. 3d , No. 20-CV-3341 (BLF), 2021 U.S. Dist. LEXIS 10647, 2021 WL 175940, at *11-12 (N.D. Cal. Jan. 19, 2021). In *Herrera*, for example, the plaintiffs alleged that the airline "rendered it functionally impossible to specifically request refunds [instead of] vouchers/coupons by inaccessibility of customer service, with wait times of more

---

the Non-Arbitration Plaintiffs' tickets, let alone how that period bears on the plausibility of their breach claims.

[8] British Airways argues that the prevention doctrine does not apply because the Non-Arbitration Plaintiffs' difficulties were not the result of its *intentional* actions, but a consequence of the COVID-19 public health emergency. Def.'s Reply 3-4 & n.2; *see also Blackrock Balanced Cap. Portfolio (FI) v. U.S. Bank Nat'l Ass'n*, 165 A.D.3d 526, 86 N.Y.S.3d 484, 486 (1st Dep't 2018) (explaining that the prevention doctrine requires "active conduct" (internal quotation marks omitted)). But putting aside that that is a factual question, the Non-Arbitration Plaintiffs allege that British Airways did act intentionally — for example, by modifying its website to remove online refund claims. Compl. ¶¶ 58, 65.

than two hours frequently reported; and/or obscuring passengers' right to a monetary refund." *2021 U.S. Dist. LEXIS 35061, 2021 WL 673448, at \*15* (cleaned up). The district court concluded that the parties' contract required the plaintiffs to take "some affirmative action to select a[ remedial] option," but — similar to this Court's conclusion above — held that, under California law, "where one contracting party prevents the other's performance of a condition precedent, the party burdened by the condition is excused from performing it, and the benefited party's duty of performance becomes unconditional." *Id.* (quoting *City of Hollister v. Monterey Ins. Co., 165 Cal. App. 4th 455, 490, 81 Cal. Rptr. 3d 72 (Ct. App. 2008))*. Ultimately, the court found that the plaintiffs had failed to sufficiently allege that *they* themselves had been prevented from requesting a remedy, and thus dismissed their claims, but it granted them leave to amend, suggesting that more particularized allegations — of the **[*20]** sort made by the Non-Arbitration Plaintiffs here — would be enough to state a breach-of-contract claim. *Id.* The decision in *Bugarin* is substantially similar. *See 2021 U.S. Dist. LEXIS 10647, 2021 WL 175940, at \*12*.

### 3. Preemption

The Court's conclusion that the Non-Arbitration Plaintiffs state a plausible contract claim all but disposes of British Airways's remaining argument for dismissal: that the claims are preempted by the ADA. The ADA's preemption provision bars states from enacting or enforcing laws or regulations "related to a price, route, or service of an air carrier," *49 U.S.C. § 41713(b)(1)*, so as to "ensure that the States [do not] undo federal deregulation with regulation of their own," *Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992)*. Significantly, however, the Supreme Court has held that the ADA does *not* preempt breach-of-contract claims "seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." *Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 228, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995)*. In such suits, courts are "confine[d] . . . to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *Id. at 233*. By contrast, the "*Wolens* exception" to preemption does not extend to statutory claims under state consumer protection laws. *See id. at 228*. Nor does it apply to implied-covenant claims "based on a state-imposed **[*21]** obligation." *Nw., Inc. v. Ginsberg, 572 U.S. 273, 284-85, 134 S. Ct. 1422, 188 L. Ed. 2d 538 (2014)*. But it does apply to an implied-covenant claim based on an obligation "that the parties voluntarily undertook." *Id. at 285*.

*Ginsberg* illuminates the distinction between implied-covenant claims that are preempted by the ADA and those that are not. In that case, the Supreme Court held that an implied covenant of good faith and fair dealing derived from Minnesota common law was "a state-imposed obligation" that "enlarge[d the parties'] contractual agreement" and was therefore preempted by the ADA. *Id. at 286, 289-90*. But the Court declined to issue a categorical rule that all claims based on implied covenants were necessarily preempted. *Id. at 285* ("[T]he reasoning of *Wolens* neither dooms nor spares all such claims."). Instead, the Court drew a distinction between state laws that use the implied-covenant "to effectuate the intentions of parties or to protect their reasonable expectations," which would fall within the scope of the *Wolens* exception to preemption, and state laws that "employ the doctrine to ensure that a party does not violate community standards of decency, fairness, or reasonableness," which would not. *Id. at 286* (internal quotation marks omitted). Noting that Minnesota prevented parties from contracting **[*22]** out of the covenant at issue and exempted certain types of contracts from the covenant for "policy reasons," the Court concluded that the covenant at issue could not "be viewed as simply an attempt to vindicate the parties' implicit understanding of the contract" and, thus, was preempted by the ADA. *Id. at 287-88* (internal quotation marks omitted).

In light of the discussion above, the Court concludes that the Non-Arbitration Plaintiffs' breach claims are not preempted by the ADA. To be sure, they are based in part on an "implied contractual obligation" — namely, the obligation of a party not to frustrate its counterparty's ability to perform a condition precedent. *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd., 157 F. Supp. 3d 352, 367 (S.D.N.Y. 2016)*, *aff'd*, *__ F. App'x __, Nos. 19-1031 (L), 19-1297 (xap), 2021 U.S. App. LEXIS 7534, 2021 WL 982208 (2d Cir. Mar. 16, 2021)* (summary order). Under New York law, however, the prevention doctrine "exists to serve the intent of the parties," *Consol. Edison, 426 F.3d at 529*, and any "implied obligation . . . must be consistent with the intent of the parties to the agreement," *HGCD Retail Servs., LLC v. 44-45 Broadway Realty Co., 37 A.D.3d 43, 826 N.Y.S.2d 190, 198 (1st Dep't 2006)*. In other words, the doctrine exists "to effectuate the intentions of parties or to protect their reasonable expectations," not to promote "community standards of decency, fairness, or reasonableness." *Ginsberg, 572 U.S. at 286* (internal quotation marks omitted); *see also* **[*23]** *Cox v. Spirit Airlines, Inc., 786 F. App'x 283, 286 (2d Cir. 2019)* (summary order) (noting that "routine contract claims" are not preempted, "which necessarily requires employing tools of contractual interpretation"). Thus, the Non-Arbitration Plaintiffs' claim seeks enforcement of a "self-imposed undertaking[]" to which ADA preemption does not apply. *See Wolens, 513 U.S. at 228*.

Once again, this conclusion is supported by the conclusions of other courts confronting similar claims over the last year. *See, e.g.*, *Herrera, 2021 U.S. Dist. LEXIS 35061, 2021 WL 673448, at \*9-12*; *Bugarin, 2021 U.S. Dist. LEXIS 10647, 2021 WL 175940, at \*9-10*; *Castanares v. Deutsche Lufthansa AG, No. 20-CV-4261 (MWF) (MRWx), 2021 U.S. Dist. LEXIS 42452, 2021 WL 811455, at \*6 (C.D. Cal. Jan. 26, 2021)*; *Ward, 2020 U.S. Dist. LEXIS 249511, 2020 WL 8415080, at \*12*; *Maree v. Deutsche Lufthansa AG, No. 20-CV-885 (MWF) (MRWx), 2020 U.S. Dist. LEXIS 190145, 2020 WL 6018806, at \*5 (C.D. Cal. Oct. 7, 2020)*. And once again, *Herrera* is instructive. The plaintiffs' claims in that case depended on the "general principle[] of contract law" that "where a contract calls for singular performance and no time is specified, a term calling for performance within a reasonable time is supplied." *2021 U.S. Dist. LEXIS 35061, 2021 WL 673448, at \*10* (internal quotation marks omitted). "Under the reasoning of *Ginsberg*," the court concluded that that "common law rule . . . is nothing more than a rule to effectuate the intent of the parties" and thus not preempted by the ADA. *2021 U.S. Dist. LEXIS 35061, [WL] at \*12*. So too the Non-Arbitration Plaintiffs' claims in this case.

### C. Damages and Injunctive Relief

Finally, British Airways argues that the Non-Arbitration Plaintiffs **[*24]** may not recover anything beyond compensatory damages and, thus, moves to strike their requests for statutory damages, punitive or exemplary damages, and injunctive relief. Def.'s Br. 24; Def.'s Reply 9-10. The Non-Arbitration Plaintiffs do not oppose the motion to strike their request for statutory damages, *see* Pls.' Opp'n 23, which is thus granted on that basis. With respect to the other forms of relief, British Airways plainly has the better of the argument as well.

*First*, courts have consistently held that punitive or exemplary damages fall outside the *Wolens* exception and are therefore preempted by the ADA. *See, e.g.*, *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1432 n.8 (7th Cir. 1996)*; *Starker v. Spirit Airlines, No. 17-CV-6812 (HBP), 2019 U.S. Dist. LEXIS 149702, 2019 WL 4194572, at \*8 (S.D.N.Y. Sept. 3, 2019)*; *Norman v. TWA, No. 98-CV-7419 (BSJ), 2000 U.S. Dist. LEXIS 14618, 2000 WL 1480367, at \*6 (S.D.N.Y. Oct. 6, 2000)*. The Court agrees. *Second*, there is no basis to depart from the general proposition that "the classic remedy for breach of contract is an action at law for damages." *Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp., 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994)* (internal quotation marks omitted). The injury alleged by the Non-Arbitration Plaintiffs "can be appropriately compensated by an award of monetary damages." *Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004)*. Indeed, "if liability is established, damages will not be difficult to calculate." *Alpha Cap. Anstalt v. Menaged, No. 15-CV-0987 (WHP), 2015 U.S. Dist. LEXIS 156070, 2015 WL 7271069, at \*3 (S.D.N.Y. Nov. 12, 2015)*. Thus, "an adequate remedy at law exists, and no irreparable harm may be found to justify specific relief." *Register.com, 356 F.3d at 404*; *accord Alpha Cap. Anstalt, 2015 U.S. Dist. LEXIS 156070, 2015 WL 7271069, at \*3*. Accordingly, Plaintiffs' request for **[*25]** statutory damages, punitive or exemplary damages, and injunctive relief are stricken.

### CONCLUSION

For the foregoing reasons, British Airways's motion to compel Dominique to arbitrate his claim is GRANTED and this case is STAYED as to him (and *only* him). Dominique and British Airways shall alert the Court **within thirty days of the resolution of the arbitration proceedings** and, if appropriate, propose next steps in connection with litigation of Dominique's claim.

Additionally, British Airways's motion to dismiss is GRANTED in part and DENIED in part. Specifically, it is denied with respect to the Non-Arbitration Plaintiffs' contract claims and granted with respect to their request for statutory damages, punitive or exemplary damages, and injunctive relief. The Court declines to grant leave to amend to reinstate these requests for relief, as the defects in the requests are substantive and cannot be cured. *See, e.g.*, *Grytsyk v. Morales, No. 19-CV-3470 (JMF), 2021 U.S. Dist. LEXIS 54642, 2021 WL 1105368, at \*12 (S.D.N.Y. Mar. 22, 2021)* ("A district court may deny leave to amend where amendment would be futile." (internal quotation marks omitted)).

Unless and until the Court orders otherwise, British Airways shall file its answer to the Non-Arbitration Plaintiffs' claims within **three weeks of the date of this [*26] Opinion and Order**. In addition, the initial pretrial conference is REINSTATED and scheduled for **April 28, 2021, at 4:15 p.m**. The conference will be governed by the Court's notice of initial conference, *see* ECF No. 7, and the parties should prepare accordingly, including by submitting a joint status letter and proposed case management plan no later than the Thursday prior to the conference.

The Clerk of Court is directed to terminate ECF No. 31.

SO ORDERED.

Dated: March 26, 2021

New York, New York

/s/ Jesse M. Furman

JESSE M. FURMAN

United States District Judge

---

**End of Document**

# **EXHIBIT B**

No *Shepard's* Signal™
As of: March 30, 2021 1:41 PM Z

# *Bombin v. Southwest Airlines Co.*

United States District Court for the Eastern District of Pennsylvania

March 29, 2021, Decided; March 29, 2021, Filed

Civil No. 5:20-cv-01883-JMG

**Reporter**
2021 U.S. Dist. LEXIS 58862 *

ADRIAN BOMBIN and SAMANTHA ROOD, on behalf of themselves and all others similarly situated, Plaintiffs, v. SOUTHWEST AIRLINES CO., Defendant.

**Counsel:  [*1]** For ADRIAN BOMBIN, on behalf of himself and all others similarly situated, Plaintiff: ANNICK PERSINGER, TYCKO & ZAVAREEI LLP, LOS ANGELES, CA; HASSAN A. ZAVAREEI, TYCKO & ZAVAREEI LLP, WASHINGTON, DC; MELISSA S. WEINER, HALUNEN LAW, MINNEAPOLIS, MN; MICHAEL P. OLS, JAMES C. SHAH, MILLER SHAH LLP, PHILADELPHIA, PA.

For SAMANTHA ROOD, Plaintiff: ANNICK PERSINGER, TYCKO & ZAVAREEI LLP, LOS ANGELES, CA; HASSAN A. ZAVAREEI, TYCKO & ZAVAREEI LLP, WASHINGTON, DC; JAMES C. SHAH, MILLER SHAH LLP, PHILADELPHIA, PA.

For SOUTHWEST AIRLINES CO., Defendant: JAMES T. MOUGHAN, BENNETT, BRICKLIN & SALTZBURG LLC, CENTRE SQUARE WEST TOWER, 32ND FLOOR, PHILADELPHIA, PA; M. ROY GOLDBERG, STINSON LLP, WASHINGTON, DC; TODD A. NOTEBOOM, STINSON LEONARD STREET LLP, MINNEAPOLIS, MN.

**Core Terms**

flight, Carriage, refund, allegations, canceled, airline, terms and conditions, preempted, tickets, Passenger, quotation, marks, Carrier, courts, travel, customer service, customers, motion to dismiss, forum-selection, transportation, destination, venue, class action allegations, provisions, clickwrap, scheduled, fare, breach of contract claim, class certification, district court

**Judges:** JOHN M. GALLAGHER, United States District Judge.

**Opinion by:** JOHN M. GALLAGHER

## Opinion

**MEMORANDUM OPINION**

**GALLAGHER, J.**

Plaintiffs Adrian Bombin and Samantha Rood purchased airline tickets from Defendant Southwest Airlines Co. ("Southwest"). At the outset of the COVID-19 crisis, Southwest canceled Bombin's flight, and rescheduled Rood's. Bombin and Rood now claim that they are entitled to relief (individually and on behalf of a putative class) for breach of **[*2]** contract because Southwest did not refund their fares. Before the Court is Southwest's motion to dismiss, strike class action allegations, or transfer venue. ECF No. 16. For the following reasons, Southwest's motion is denied.

**I. BACKGROUND**

In February 2020, Bombin booked a flight from Maryland to Cuba through Southwest's mobile application. Am. Compl. ¶ 26, ECF No. 14. That same month, Rood purchased two Southwest tickets for travel from California to Arizona. *Id.* ¶ 31.

By March, however, COVID-19 had been declared a global pandemic, and the United States started implementing travel

restrictions. *Id.* ¶¶ 7-8. Faced with the virus and declining consumer demand, Southwest changed its flight schedules. *Id.* ¶¶ 13-15. In particular, it canceled Bombin's flight to Cuba, and rescheduled Rood's flight to Arizona three separate times. *Id.* ¶¶ 28, 33-39.

Upon learning of the cancellation, Bombin called Southwest's customer service department to gain more information. *Id.* ¶ 28. He requested a refund, which Southwest denied. *Id.* ¶ 29. Instead, Southwest offered Bombin credit toward a future flight. *Id.* ¶¶ 29-30. Rood was similarly offered a travel credit in lieu of a refund. *Id.* ¶¶ 34, 37, 40.

Bombin **[*3]** and Rood allege that Southwest breached its Contract of Carriage by refusing to offer refunds for their flights. *Id.* ¶ 19. Section 9 of the Contract of Carriage provides in relevant part:

> a. Failure to Operate as Scheduled
>> (1) Canceled Flights or Irregular Operations. In the event Carrier cancels or fails to operate any flight according to Carrier's published schedule, or changes the schedule of any flight, Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions:
>>> (i) Transport the Passenger at no additional charge on Carrier's next flight(s) on which space is available to the Passenger's intended destination, in accordance with Carrier's established reaccommodation practices; or
>>> (ii) Refund the unused portion of the Passenger's fare in accordance with Section 4c.

Am. Compl. Ex. A, at 40, ECF No. 14. Southwest's Customer Service Commitment, a document which is incorporated by reference in the Contract of Carriage, further provides that, in the event Southwest changes a flight schedule more than seven days before departure, customers "will have the option to select the revised itinerary, choose an alternate flight/date within a 14-day parameter of **[*4]** [their] original travel, or cancel [their] trip without penalty and receive a refund issued to the original form of payment." Am. Compl. Ex. B, at 2, ECF No. 14. Bombin and Rood assert that these provisions, taken together, afford customers the discretion to select a refund due to a scheduling change. Am. Compl. ¶¶ 46-47, ECF No. 14. In other words, Southwest cannot unilaterally decide to offer travel credits in this situation—the choice (between travel credits, a refund, or a rebooking on a future flight) rests with the customer whose original flight was canceled or rescheduled.

Southwest now moves to dismiss for failure to state a claim. ECF No. 16. Southwest argues that Bombin's and Rood's claims are effectively foreclosed by Section 4(c)(4) of the Contract of Carriage:

> Delays or Involuntary Cancellation. If a Passenger's scheduled transportation is canceled, terminated, or delayed before the Passenger has reached his/her final destination as a result of a flight cancellation, Carrier-caused missed connection, flight delay, or omission of a scheduled stop, Carrier will either transport the Passenger at no additional charge on another of Carrier's flights, refund the fare for the unused transportation **[*5]** in accordance with the form of payment utilized for the Ticket, or provide a credit for such amount toward the purchase of future travel.

Def.'s Mot. 5-8, ECF No. 16-1; *see also* Am. Compl. Ex. A, at 14, ECF No. 14. There has not been a breach, Southwest contends, because this provision "expressly permitted Southwest to elect a fare credit as Plaintiffs' remedy." Def.'s Mot. 6, ECF No. 16-1. Southwest further asserts that Bombin's claims are preempted by the Montreal Convention (*id.* at 11-12), and that Plaintiffs' claims as a whole are preempted by the Airline Deregulation Act. *Id.* at 8-10.

Beyond *Federal Rule of Civil Procedure 12(b)(6)*, Southwest raises *Rule 12(b)(1)* and argues that the Court lacks subject-matter jurisdiction over Plaintiffs' claims. *Id.* at 15-17. In support, Southwest points to the terms and conditions on Southwest.com, which contain both a class action waiver and a forum-selection clause. *Id.* at 13. Because Bombin and Rood purportedly agreed to these terms before booking their flights, Southwest argues that they lack standing to bring the instant lawsuit. *Id.* at 16-17.

Southwest also moves to strike Plaintiffs' class allegations as failing to comply with the requirement of ascertainably. *Id.* at 14-15. Southwest takes issue with the following language in Plaintiffs' proposed class definition: **[*6]** "All persons in the United States . . . whose flight(s) were canceled or *changed* by Southwest . . . ." Compl. ¶ 76, ECF No. 14 (emphasis added). "[E]xcluded from the Class is any person who was reaccommodated and transported to their ticketed destination by Defendant or its agents on the next available flight and within a *reasonable time* of the original ticketed departure." *Id.* ¶ 77 (emphasis added). Southwest also contends that this exclusion renders the class unascertainable.

Finally, Southwest requests that we transfer this case to the Northern District of Texas. Def.'s Mot. 17-18, ECF No. 16-1.

## II. DISCUSSION

District courts have "'discretion to address convenience-based venue issues' in the first instance," so we begin by reviewing

Southwest's transfer request. *Reading Health Sys. v. Bear Stearns & Co., 900 F.3d 87, 95 (3d Cir. 2018)* (quoting *In re Howmedica Osteonics Corp., 867 F.3d 390, 404 n.8 (3d Cir. 2017)*). We then turn to Southwest's arguments for dismissal under Rules 12(b)(1) and 12(b)(6) before considering its motion to strike Plaintiffs' class allegations.

**A. Transfer of Venue**

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). **[*7]** A motion to transfer venue is appropriate where, as here, a party invokes a forum-selection clause. *Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49, 60-61 (2013)*.

"First, a district court must determine whether the forum-selection clause is valid and enforceable." *Silvis v. Ambit Energy, L.P., 90 F. Supp. 3d 393, 397 (E.D. Pa. 2015)*. "Second, a court must consider whether, pursuant to § 1404(a), 'extraordinary circumstances' militate against enforcing the forum-selection clause." *Id.* (citing *Atl. Marine, 571 U.S. at 62*). Federal law determines whether the clause is enforceable, while state law governs the interpretation of the clause's scope. *See Collins v. Mary Kay, Inc., 874 F.3d 176, 181 (3d Cir. 2017); Universal Atl. Sys., Inc. v. Honeywell Int'l, Inc., No. 17-4660, 2018 WL 1757727, at *3 (E.D. Pa. Apr. 12, 2018)*. In deciding this motion, "a court is not limited to the pleadings, and may consider affidavits and other evidence." *Roller v. Red Payments L.L.C., No. 18-1834, 2019 WL 3802031, at *4 (E.D. Pa. Aug. 12, 2019)* (citing *Fellner ex rel. Estate of Fellner v. Phila. Toboggan Coasters, Inc.*, No. 05-cv-1052, *2005 WL 2660351, at *4 (E.D. Pa. Oct. 18, 2005)*).

Southwest's transfer request hinges on the terms and conditions printed on its website, which include the following language: "You agree to the personal and exclusive jurisdiction of the courts located within Dallas, TX. You hereby consent to the exclusive jurisdiction and venue of the State and Federal courts in Dallas, Texas in all disputes." Def.'s Mot. 13, ECF No. 16-1. In its motion, Southwest alleges that users of its website and mobile application— including Bombin and Rood—must click to **[*8]** accept these terms and conditions upon purchasing tickets. *Id.* at 13, 16. The terms and conditions therefore amount to a "clickwrap agreement." *See Zabokritsky v. JetSmarter, Inc., No. 19-273, 2019 WL 2563738, at *3 (E.D. Pa. June 20, 2019)*. "A clickwrap agreement presents the user with a message on his or her computer screen, requiring the user to manifest his or her assent to the terms of the . . . agreement by clicking on an icon." *Id.* (internal quotation marks and citation omitted). This Court has enforced forum-selection clauses contained in clickwrap agreements. *See, e.g., Feldman v. Google, Inc., 513 F. Supp. 2d 229, 246-48 (E.D. Pa. 2007); see also ADP, LLC v. Lynch*, No. 2:16-01053, *2016 WL 3574328, at *4 (D.N.J. June 30, 2016)* ("Numerous courts, including courts in the Third Circuit, have enforced clickwrap agreements." (internal citation omitted)).

The problem with Southwest's motion, as Plaintiffs recognize (*see* Pls.' Opp'n 17-18, ECF No. 17), is that the record is insufficiently developed to rule on the enforceability of the forum-selection clause. While Southwest includes a hyperlink to its terms and conditions in its motion (Def.'s Mot. 13, ECF No. 16-1), there is no factual support for its assertion that Plaintiffs *actually* agreed to the terms and conditions when they purchased their tickets.

In short, there is no proof (beyond the unsworn allegations of defense counsel) that users **[*9]** of the Southwest website and mobile application must click on an icon to accept the terms and conditions before purchasing airline tickets. Southwest attached a declaration to its motion (*see* ECF No. 16-3), but the affiant, a Southwest employee, says nothing about the terms and conditions on Southwest's website or mobile application. Compare that declaration to the one in *Ward v. Am. Airlines, Inc.*, No. 4:20-cv-00371-*O, 2020 WL 8415080 (N.D. Tex. Nov. 2, 2020)*. There, plaintiffs sued an airline for its failure to "refund the costs of their nonrefundable tickets after it cancelled their flights." *Id.* at *4. The airline moved to compel arbitration based on an arbitration clause in an online clickwrap agreement. *Id.* at *4-5. To put the clickwrap agreement before the court, the airline submitted a declaration that not only authenticated the terms of the agreement, but also affirmed that "customers are not able to purchase tickets without agreeing to" its terms. *Id.* at *2 n.1. Such evidence is absent here.

And without consideration of the forum-selection clause, we find that Southwest has not carried its "burden of establishing the need for transfer." *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)*. "A district court should not transfer a case relying 'entirely on the facts and conclusions asserted in [the movant's] **[*10]** motion,'" yet that is exactly what Southwest asks us to do. *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, *2019 WL 5394109, at *3 (E.D. Pa. Oct. 22, 2019)* (quoting *Plum Tree, Inc. v. Stockment, 488 F.2d 754, 757 (3d Cir. 1973)); see also Theresa Ayling v. Travelers Prop. Cas. Corp., No. 99-3243, 1999 WL 994403, at *3 (E.D. Pa. Oct. 28, 1999)* ("[T]he Third Circuit has required that defendants submit affidavits, depositions or other evidence to support their motion for transfer." (internal

citation omitted)). "Although it would undoubtedly be inconvenient for defendants to have their business in [Texas] and travel to the Eastern District of Pennsylvania, there is nothing in the transfer motion to indicate that defendant would suffer a greater inconvenience than would plaintiff[s] if the case is transferred." *Plum Tree, 488 F.2d at 757 n.3*. Accordingly, we deny Southwest's motion to transfer venue.

### B. Standing

Southwest next asks that we dismiss the complaint for lack of subject-matter jurisdiction based on Article III standing. Def.'s Mot. 15-17, ECF No. 16-1. "A motion to dismiss for want of standing is . . . properly brought pursuant to *Rule 12(b)(1)*, because standing is a jurisdictional matter." *Const. Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014)* (internal quotation marks and citation omitted). A *Rule 12(b)(1)* motion can present either a facial or factual attack to the complaint. The former "requires the court to consider the allegations of the complaint as true." *Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016)* (internal quotation [*11] marks and citation omitted). The latter "attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or otherwise present[ing] competing facts." *Id.* (internal quotation marks and citation omitted). Because a factual attack permits the court to evaluate evidence outside the pleadings, it "strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd., 836 F.3d 261, 268 (3d Cir. 2016)* (citing *Davis, 824 F.3d at 348-50*). "When a factual challenge is made, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Davis, 824 F.3d at 346*.

Southwest presents a factual attack to Plaintiffs' claims. Def.'s Mot. 17, ECF No. 16-1. As a result, Southwest urges us to consider the terms and conditions on Southwest.com, which contain a class action waiver. *Id.* at 13. Southwest alleges that Plaintiffs lack "the requisite 'standing' to represent the putative class" because they agreed to the class action waiver. *Id.* at 16-17.

For the reasons discussed above, we will not consider the Southwest.com terms and conditions at this time. And in the absence of the terms and conditions, we are not yet convinced that Southwest raises a viable standing argument. "The fact '[t]hat a suit may [*12] be a class action . . . adds nothing to the question of standing.'" *Polanco v. Omnicell, Inc., 988 F. Supp. 2d 451, 464 (D.N.J. 2013)* (quoting *Lewis v. Casey, 518 U.S. 343, 356 (1996)*). Indeed, "[o]nce Article III standing is determined vis-à-vis the named parties . . . there remains no further separate class standing requirement in the constitutional sense." *In re Horizon Healthcare Servs. Inc. Data Breach Litig., 846 F.3d 625, 634 n.11 (3d Cir. 2017)* (internal quotation marks and citation omitted); *see also Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 361 n.3 (3d Cir. 2015)* ("The named plaintiff in a class action must meet all the jurisdictional requirements to bring an *individual suit asserting the same claims*, including standing." (emphasis added) (quoting 5 Jerold S. Solovy et al., *MOORE'S FEDERAL PRACTICE—CIVIL § 23.63* (3d ed. 1997))).

As it currently stands, Plaintiffs have met the jurisdictional requirements to bring their breach of contract claims. A litigant has standing if she "(1) suffered an injury-in-fact or an invasion of a legally protected interest, (2) that is fairly traceable to the defendant's conduct, and (3) is likely to be redressed by a favorable judicial decision." *Pozzuolo v. Portfolio Recovery Assocs., LLC, 371 F. Supp. 3d 217, 221 (E.D. Pa. 2019)* (internal quotation marks and citation omitted). Here, Plaintiffs have plausibly alleged that they (1) suffered an injury because of a breach of contract that (2) was caused by Southwest's conduct, and (3) their injury is redressable in the form of compensatory damages. *See* Am. Compl. ¶¶ 91-95, [*13] ECF No. 14; *see also* Pls.' Opp'n 15, ECF No. 17. We will deny Southwest's motion to dismiss for lack of standing.[1]

### C. Breach of Contract

Southwest also asks that we dismiss the complaint for failure to state a claim.[2] To survive dismissal under *Federal Rule of Civil Procedure 12(b)(6)*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007))*. A claim is facially plausible, and survives a

---

[1] "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." *FED. R. CIV. P. 12(h)(3)*. Accordingly, we will revisit this ruling if it becomes clear that Plaintiffs lack standing to pursue their claims.

[2] In the alternative, Southwest asks that we dismiss under *Rule 12(b)(6)* because of the forum-selection clause contained in the Southwest.com terms and conditions. As mentioned above, the terms and conditions were not properly presented to the court, and we will not consider them at this stage. *See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)* ("In deciding a *Rule 12(b)(6)* motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1996 (3d Cir. 1993)))*.

12(b)(6) motion, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly, 550 U.S. at 556*).

Our analysis proceeds in three parts. We first "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Connelly v. Lane Const. Corp., 809 F.3d 780, 787 (3d Cir. 2016)* (quoting *Iqbal, 556 U.S. at 675*). We then "identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal, 556 U.S. at 679*). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal, 556 U.S. at 679*).

Texas law governs this dispute, thanks to the Choice of Law provision in Southwest's Contract of Carriage. **[*14]** *See* Am. Compl. Ex. A, at 44, ECF No. 14. To state a breach of contract claim under Texas law, a plaintiff must show "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Hunn v. Dan Wilson Homes, Inc., 789 F.3d 573, 579 (5th Cir. 2015)* (internal quotation marks and citation omitted).

This case turns on the third element; that is, whether Southwest breached the Contract of Carriage when it failed to offer refunds to Plaintiffs. Southwest claims that there is no breach because the Contract of Carriage is unambiguous, and it vests Southwest with discretion to issue fare credits instead of refunds. *See* Def.'s Mot. 5, ECF No. 16-1. Plaintiffs counter that the Contract of Carriage can reasonably be interpreted to provide customers with the right to choose a refund. Pls.' Opp'n 3, ECF No. 17. We agree with Plaintiffs and find that they have stated a plausible breach of contract claim. Stated differently, the Contract of Carriage does not *unambiguously* vest Southwest with discretion to select between a credit and refund when a flight is canceled or otherwise rescheduled. *See Gray v. Chesapeake Expl., L.L.C.* **[*15]** , No. SA-14-CA-1020-*XR, 2015 WL 339744, at *5 (W.D. Tex. Jan. 26, 2015)* (rejecting argument that the contract at issue was unambiguous and denying motion to dismiss).

At the outset, we acknowledge the labyrinthine **nature of the Contract of Carriage**. It is, as Judge Hamilton of the Seventh Circuit recognized, "a puzzle." *Hughes v. Southwest Airlines Co., 961 F.3d 986, 991 (7th Cir. 2020)* (Hamilton, J., concurring). Section 4(c)(4) of the Contract of Carriage suggests that Southwest, and Southwest alone, can decide to offer credits when it cancels a flight. *See* Am. Compl. Ex. A, at 14, ECF No. 14 ("Carrier will either transport the Passenger at no additional charge . . . refund the fare . . . or provide a credit."). By contrast, Section 10 of the Customer Service Commitment (which is incorporated by reference in the Contract of Carriage), expresses in no uncertain terms that customers "*will have the option to* . . . receive a refund" when Southwest makes "any change" to a flight schedule more than seven days before departure. Am. Compl. Ex. B, at 2, ECF No. 14 (emphasis added).

"A contract is not necessarily ambiguous simply because some sections arguably conflict." *NuStar Energy, L.P. v. Diamond Offshore Co., 402 S.W.3d 461, 466 (Tex. Ct. App. 2013)*. When dealing with provisions that arguably conflict, "we should attempt to harmonize the two provisions." *Royal Maccabees Life Ins. Co. v. James, 146 S.W.3d 340, 345 (Tex. Ct. App. 2004)* (internal citation omitted); *see also NuStar, 402 S.W.3d at 467* ("[W]e must examine **[*16]** and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." (internal quotation marks and citation omitted)). We must construe the contract "from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 312 (Tex. 2005)* (internal quotation marks and citation omitted). If the contract is capable of "more than one reasonable interpretation after applying the pertinent rules of contract construction, then the contract is ambiguous and there is a fact issue regarding the parties' intent." *NuStar, 402 S.W.3d at 466* (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc., 389 S.W.3d 802, 806 (Tex. 2012))*; *see also id.* ("The contract is unambiguous if it can be given a certain or definite meaning as a matter of law." (internal citation omitted)).

With these principles in mind, we find that both parties have advanced credible interpretations of the Contract of Carriage. The Court cannot reconcile Section 4(c)(4) of the Contract of Carriage and Section 10 of the Customer Service Commitment at this time.

Southwest's point, that Section 4(c)(4) is the most specific provision about refunds and therefore controls, is well **[*17]** taken. Def.'s Mot. 8, ECF No. 16-1; *see Lederer v. Lederer, 561 S.W.3d 683, 693 (Tex. Ct. App. 2018)* ("To the extent of any conflict, specific provisions control over more general ones." (internal citation omitted)). But to credit Southwest's interpretation would afford the Contract of Carriage a lopsided construction and render Section 10 of the Customer Service Commitment meaningless. We find it unlikely that a customer would "give the airline an *utterly discretionary*

Case No. 1:20-cv-01153-PAB-KLM   Document 71-1   filed 04/01/21   USDC Colorado   pg 17 of 18

Page 6 of 7
2021 U.S. Dist. LEXIS 58862, *17

*choice*, regardless of reasons, among (a) flying her to her destination on time, (b) flying her to her destination eventually, (c) refunding her money, or (d) keeping her money and merely offering credit for future travel, perhaps to some other destination." *Hughes, 961 F.3d at 993* (Hamilton, J., concurring) (emphasis added).

Plaintiffs' argument, that Section 4(c)(4) is "silent as to who holds discretion to choose among various options," is similarly viable. Pls.' Opp'n 4, ECF No. 17; *see also Hughes, 961 F.3d at 991* (Hamilton, J., concurring) ("[T]o the extent there is a choice of remedy, does the choice belong to the passenger or the airline?"). Section 10 of the Customer Service Commitment expressly vests customers with that discretion, and we cannot read that provision out of the contract. *See NuStar, 402 S.W.3d at 466* (instructing that we must "give effect to all of the contract's **[*18]** provisions").

Accepting Plaintiffs' well-pleaded allegations as true, we find that they have stated a plausible claim for relief. Bombin's flight was canceled, and Rood's flight was rescheduled. Am. Compl. ¶¶ 28, 33-39, ECF No. 14. In violation of the Contract of Carriage and Customer Service Commitment, Southwest failed to give Plaintiffs the option of a refund. *Id.* ¶¶ 29, 34, 37, 40. The Court will deny Southwest's motion to dismiss.

**1. Airline Deregulation Act Preemption**

Southwest also contends that Plaintiffs' claims are preempted by the Airline Deregulation Act ("ADA"), but this argument fails. "While the ADA 'stops States from imposing their own substantive standards with respect to rates, routes, or services,' it serves as no bar to 'affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated.'" *Ward, 2020 WL 8415080, at *12* (quoting *Am. Airlines v. Wolens, 513 U.S. 219, 232-33 (1995)*). "'This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.'" *Id.* (quoting *Wolens, 513 U.S. at 233*).

Plaintiffs point directly to the terms of the Contract **[*19]** of Carriage (and the Customer Service Commitment, which is incorporated by reference) to support their allegations. As a result, Plaintiffs' claims are not preempted by the ADA. *See, e.g., Abdel-Karim v. EgyptAir Airlines, 116 F. Supp. 3d 389, 404 (S.D.N.Y. 2015)*, aff'd sub nom. *Abdel-Karim v. Egyptair Holding Co., 649 F. App'x 5 (2d Cir. 2016)* (holding that a breach of contract claim is not preempted where "plaintiff relies mainly upon the parties' agreed-upon terms in the Conditions of Carriage").

**2. Montreal Convention Preemption**

Southwest further argues that Bombin's claim is preempted by the Montreal Convention. The Montreal Convention establishes a "uniform system of liability for international air carriers." *In re Nigeria Charter Flights Contract Litig., 520 F. Supp. 2d 447, 452 (E.D.N.Y. 2007)* (citing *Ehrlich v. Am. Airlines, 360 F.3d 366, 371 n.4 (2d Cir. 2004))*.[3] Article 29 of the Montreal Convention "preempts state law claims falling within its scope." *Id. at 453*. As relevant here, a claim "for damage occasioned by delay in the carriage by air of passengers, baggage or cargo" falls within the scope of the Montreal Convention. Convention for International Carriage by Air art. 19, May 28, 1999, S. TREATY DOC. No. 106-45 (2000), 1999 WL 33292734; *see also Benjamin v. Am. Airlines, Inc., 32 F. Supp. 3d 1309, 1317 (S.D. Ga. 2014)* ("By its plain language, Article 19 governs only claims for delay, not non-performance of a contract." (internal citation omitted)).

What constitutes a "delay" under the Montreal Convention is not always clear.[4] Courts distinguish claims sounding in "delay" (which are **[*20]** preempted by the Montreal Convention) from claims sounding in "nonperformance" (which are *not* preempted by the Montreal Convention). *See, e.g., Atia v. Delta Airlines, Inc., 692 F. Supp. 2d 693, 699 (E.D. Ky. 2010)* ("[F]ederal courts have concluded that where the complaint alleges complete nonperformance of a contract, rather than delay in transportation, the Montreal Convention does not preempt a plaintiff's breach of contract claim.").

Simply put, this is not a case where Southwest "properly delivered" Bombin "to the appropriate destination but . . . did so in a[n] untimely manner." *Vumbaca v. Terminal One Grp. Ass'n L.P., 859 F. Supp. 2d 343, 366 (E.D.N.Y. 2012)*. Instead, this case is about Southwest's cancellation of flights and its subsequent failure to offer refunds per its Contract of Carriage. Bombin plausibly alleges nonperformance of contract, so his claim is not preempted by the Montreal Convention.

**D. Motion to Strike**

---

[3] It is undisputed that both the United States and Cuba are signatories to the Montreal Convention. Bombin booked an international flight from Maryland to Cuba. Am. Compl. ¶ 26, ECF No. 14.

[4] Indeed, flight cancellations are "not expressly addressed" by the Montreal Convention. Jae Woon Lee & Joseph Charles Wheeler, *Air Carrier Liability for Delay: A Plea to Return to International Uniformity*, *77 J. Air L. & Com. 43, 60 (2012)*.

Finally, Southwest moves to strike Plaintiffs' class allegations for lack of ascertainability. Under *Federal Rule of Civil Procedure 12(f)*, courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Federal Rule of Civil Procedure 23(d)(1)(D)* relatedly provides that a "court may issue orders that . . . require that the pleadings be amended to eliminate **[*21]** allegations about representation of absent persons and that the action proceed accordingly."

"Courts may, in rare instances, strike class allegations prior to a motion for class certification." *Bernstein v. Serv. Corp. Int'l, No. 17-4960, 2018 WL 6413316, at *3 (E.D. Pa. Dec. 6, 2018)*. "However, district courts within the Third Circuit typically conclude that motions to strike class action allegations filed before plaintiffs move for class certification are premature." *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., 284 F.R.D. 238, 244 (E.D. Pa. 2012)* (citing *P.V. ex rel. Valentin v. Sch. Dist. of Phila.*, No. 2:11-cv-04027, 2011 WL 5127850, at *3-4 (E.D. Pa. Oct. 31, 2011)). Granting such a motion before class certification is appropriate "only where '[n]o amount of additional class discovery will alter th[e] conclusion' that the class is not maintainable." *Id.* (quoting *Thompson v. Merck & Co.*, No. C.A. 01-1004, 2004 WL 62710, at *2 (E.D. Pa. Jan. 6, 2004)); *see also id. at 245* (noting that "[d]iscovery and full briefing on the merits of class certification are typically required" before considering whether the requirements of *Federal Rule of Civil Procedure 23* have been satisfied).

Southwest challenges the ascertainability of Plaintiffs' proposed class definition. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the **[*22]** class definition." *Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015)* (internal quotation marks and citations omitted). The parties primarily dispute whether the use of "reasonable" in the proposed class definition is sufficiently objective. But we need not resolve this issue now. On the face of the First Amended Complaint, we do not find that it would be impossible for Plaintiffs to prove the existence of an ascertainable class. So we will deny the request to strike the class allegations without prejudice to Southwest's ability to litigate this issue during the class certification stage.

### III. CONCLUSION

For the foregoing reasons, Southwest's motion to dismiss, strike class action allegations, or transfer venue is **DENIED**. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*

JOHN M. GALLAGHER

United States District Court Judge

### ORDER

**AND NOW**, this 29th day of March, 2021, upon consideration of Defendant's Motion to Dismiss, Strike Class Action Allegations or Transfer (ECF No. 16), Plaintiffs' Opposition (ECF No. 17), and Defendant's Reply Brief in Support of its Motion to Dismiss, Strike Class Action Allegations or Transfer (ECF No. 20), **IT IS ORDERED** that Defendant's Motion to Dismiss, Strike Class Action Allegations or Transfer **[*23]** (ECF No. 16) is **DENIED**.

**IT IS FURTHER ORDERED** that an initial pretrial conference will be scheduled in due course.

BY THE COURT:

*/s/ John M. Gallagher*

JOHN M. GALLAGHER

United States District Court Judge

**End of Document**

David Ross